UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| PLUMBERS AND STEAMFITTERS LOCAL NO. 7 PENSION FUND, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>WALGREEN CO., et al.,<br><br>Defendants. | No. 1:08-cv-02162<br><br>CLASS ACTION<br><br>Judge Gottschall<br>Magistrate Judge Brown |

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE
ACT OF 1934

## OVERVIEW AND BACKGROUND

1.      This is a securities class action on behalf of all those who purchased or otherwise acquired the publicly traded securities of Walgreen Co. ("Walgreens" or the "Company"), New York Stock Exchange Symbol "WAG," between June 25, 2007 and October 1, 2007 (the "Class Period") against Walgreens, Jeffrey A. Rein ("Rein") and Gregory D. Wasson ("Wasson") for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.      Walgreens is a retail drug store chain that sells prescription and non-prescription drugs and general merchandise.  Prescription sales are the most important part of Walgreens' business driven in large part by the sale of generic prescription drugs which yield a larger profit margin than the sale of branded drugs.  In early 2007, defendants Rein, the former Chairman of the Board and Chief Executive Officer ("CEO"), and Wasson the former Chief Operating Officer ("COO") and current CEO and Board member, knew and failed to disclose that generic reimbursements and introductions were declining and would negatively impact gross profits for the year.  Defendants also failed to disclose that sales, occupancy and administrative ("SO&A") expenses were increasing, despite Rein admitting that defendants saw these figures weekly. Defendants knew the substantially increasing SO&A expenses would also negatively impact gross profits for the year.

3.      Walgreens is no stranger to Medicaid fraud.  On June 4, 2008, the United States Attorney's office for the Northern District of Illinois announced that Walgreens had agreed to pay $35 million to settle a government investigation which discovered that Walgreens was switching Medicaid patients from a cheaper version of a drug to a more expensive version solely to increase the reimbursement coming to the Company.  Walgreens' history of fraud continues here.

4.      The reimbursement and expense issues and the government investigation were compounded by the competitive pressure Walgreens was facing throughout 2007.  Walgreens faced

business pressure from its competitors CVS, which merged with Caremark in March 2007, and Wal-Mart. CVS' merger with Caremark made it a much more imposing competitor and Wal-Mart was offering generic drugs for $4. In order to maintain its business posture, Walgreens acquired Option Care, Inc. ("Option Care") in September 2007. Throughout the Class Period, Walgreens gave the market the impression that its business was healthy, all the while knowing that was not so. Walgreens used equity analysts that covered its stock to get this misleading message into the market. Indeed, while Walgreens did not publicly provide guidance to the market, its management did discuss Company business and prospects with certain equity analysts knowing that false statements would be disseminated to the market.

5.     Despite telling the market otherwise, defendants knew that its business was worse than it appeared given the declining generic reimbursements and increasing SO&A expenses. Defendants were aware of issues which would adversely affect Walgreens' future results related to an important generic prescription drug (Simvastatin) and the SO&A expenses prior to the fourth quarter of 2007.[1] Those issues were not disclosed to the public by Walgreens until October 2007 when the defendants first disclosed the truth about earnings. The disclosure in October 2007 caused Walgreens' stock to collapse 15% in one day from $47.24 per share to $40.16 per share on extremely high trading volume.

## JURISDICTION AND VENUE

6.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. §240.10b-5. Jurisdiction is conferred by §27 of the 1934 Act and venue is proper pursuant to §27 of the 1934 Act.

---

[1]     Walgreens' fiscal year ends on August 31.

7.     Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District and Walgreens is headquartered in this District.  In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and facilities of the national securities markets.

## THE PARTIES

**Lead Plaintiff**

8.     Lead Plaintiff Teamsters Affiliates Pension Plan, International Brotherhood of Teamsters General Fund and Retirement and Protection Plan (the "Teamsters' Funds") is based in Washington D.C.  Lead Plaintiff Teamsters' Funds purchased or acquired Walgreens common stock during the Class Period while such stock was artificially inflated and has been damaged thereby.

**Defendants**

9.     Defendant Walgreens is principally a retail drugstore chain that sells prescription and non-prescription drugs and general merchandise.  In 2007 Walgreens was the nation's largest drugstore chain based on sales and profits.  Walgreens is an Illinois corporation with its principal executive offices located at 200 Wilmot Road, Deerfield, Illinois.  Throughout the Class Period, Walgreens traded in an efficient market on the New York Stock Exchange ("NYSE").

10.     Rein, during the Class Period, served as Walgreens' Chairman of the Board and CEO.  On October 10, 2008, Walgreens announced Rein's retirement "effective immediately."  As part of his duties, Rein was responsible for directing the Company's finances and business affairs.  During the Class Period, Rein participated in the issuance of false and misleading statements and failed to disclose material information about Walgreens' business and financial status and outlook.  Rein prepared and signed the Company's SEC filings, issued statements in press releases and led the

Company's conference calls.  Rein represented himself as one of the primary persons with knowledge about Walgreens' business, financial reports and outlook and business practices.

11.     During the Class Period, while in possession of material, undisclosed information about Walgreens' false statements and disclosures, Rein sold 12,274 shares of his Walgreens stock for proceeds of $562,855.

12.     Wasson was Walgreens' President and COO during the Class Period.  Wasson participated in the issuance of false and misleading statements and failed to disclose material information about Walgreens' business and financial status and outlook.  Wasson prepared and signed the Company's SEC filings, issued statements in press releases and led the Company's conference calls.  Wasson represented himself as one of the primary persons with knowledge about Walgreens' business, financial reports and outlook and business practices.

13.     During the Class Period, while in possession of material, undisclosed information about Walgreens' false statements and disclosures, Wasson sold 19,342 shares of his Walgreens stock for proceeds of $874,452.  Wasson's stock sales were not part of any pre-established trading plan and were out of line with his pre-Class Period trading practices.

14.     During the Class Period, defendants Rein and Wasson (combined, the "Individual Defendants"), as senior executive officers of Walgreens, were privy to confidential and proprietary information concerning Walgreens, including its operations, finances, financial condition and present and future business prospects.  Because of their positions with Walgreens, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and communications with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof.  In fact, Walgreens' management systems, including their Strategic Inventory Management System ("SIMS"), provided real-time information to

senior officers such that they could monitor revenues and expenses on a weekly basis, if not more frequently.[2]  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

15.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.   In addition, the Individual Defendants, by reason of their status as senior executive officers were "controlling persons" within the meaning of §20(a) of the 1934 Act.

16.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Walgreens' quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.   Each defendant was provided with drafts and copies of the Company's financial statements, reports and press releases, alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations which were being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

---

[2]     According to Walgreens, SIMS unites all elements of the purchasing-distribution-sales cycle, providing immediate inventory information which optimizes inventory management, and produces better in-stock conditions and faster reaction to sales trends.  In-store IBM AS/400 computers combine store scanning with SIMS, allowing buyers to track item movement from the time merchandise arrives at the distribution centers to the time the product is sold at the checkout.

17.     As senior executive officers and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the 1934 Act, and was traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information concerning Walgreens' financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Walgreens' common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations, including those disseminated through securities analysts covering Walgreens, and omissions during the Class Period violated these specific requirements and obligations.

18.     Defendants were motivated by their lucrative employment contracts which rewarded them for Walgreens' apparent success in the form of salary increases, stock awards, option awards and other compensation. Rein and Wasson received a total of $11.6 million in compensation for fiscal 2007, in addition to the proceeds they received from selling their shares of Walgreens' stock while such stock was artificially inflated.

19.     Defendants were also motivated to participate in the scheme alleged herein as they were determined to acquire Option Care. Moreover, the Individual Defendants' continued employment with the Company was at least in part dependent on the successful acquisition of complementary companies; when Walgreens recently failed to acquire Longs Drug Stores Corp., Rein was forced to announce his immediate retirement.

## BACKGROUND TO THE CLASS PERIOD
## AND OVERVIEW OF THE SCHEME TO DEFRAUD

20.     In 2007, Walgreens was the nation's largest drugstore chain based on sales and profits. The Company sells prescription and non-prescription drugs and general merchandise.

General merchandise includes, among other things, beauty care products, personal care products, household items, candy, photofinishing, greeting cards, seasonal items and convenience foods. However, prescription sales are the most important part of Walgreens' business. Customers can have prescriptions filled at the drugstore counter, through the mail, by telephone and via the internet. As of August 31, 2007, Walgreens operated 5,997 locations, including three mail service facilities, 101 home care facilities and eight specialty pharmacies, located in 48 states and Puerto Rico. In 2006, Walgreens pharmacies across the country dispensed approximately 529 million prescriptions, approximately 13% of all prescriptions filled nationwide.

21.     In 2007, prescription sales continued to become a larger portion of the Company's business. During the year, prescriptions accounted for 65% of sales. Importantly, third-party sales, where reimbursement is received from managed care organizations, government and private insurance, were 94.8% of prescription sales. One contributing factor to the Company's increase in prescription sales was the government's implementation of the Medicare Part D program which subsidized the cost of prescription drugs for Medicare beneficiaries in the United States. Medicare Part D went into effect on January 1, 2006, and brought increased business to the Company's pharmacy department as millions of senior citizens were provided prescription coverage under the program. The downside to Medicare Part D was that margins on prescriptions covered under the federal drug program are lower than other reimbursements.

22.     The main driver behind the Company's increase in prescription sales and the Company's business revenue, however, was the increased sales of generic prescription drugs which instantly yield a heftier profit margin than sales of branded drugs. In 2007, what defendants knew and failed to disclose was that generic drug introductions and reimbursements were declining and would negatively impact gross profits for the year. In addition, during the Class Period, defendants saw reports on a weekly basis showing that SO&A expenses (which included legal expenses) were

substantially increasing and would adversely impact gross profit in 4Q07, but failed to disclose this adverse trend to the public.

23.     In the pharmaceutical supply chain, generic drug reimbursement has an economic lifecycle which impacts the Company's business revenue.  Defendants were well aware of this factor and Rein subsequently commented on the generic reimbursement lifecycle in Walgreens' 2007 Annual Report:

> While a healthy pipeline of new brand name drugs brings hope for patients and increased business for pharmacies, generics are generally more profitable than their brand equivalents.   Generics also typically reduce patient co-pays and save significant dollars for third party payors.   That's why pharmacies see the highest gross profit dollars in the first months after a generic is introduced.   Payors, anxious to realize immediate savings, offer incentives to pharmacies to encourage patients and physicians to use the less expensive drugs.   They're willing to pay us more to compensate for extra administrative and inventory costs associated with generic introductions.  After a generic has been on the market for several months, the number of manufacturers usually increases, and both the cost and reimbursement come down.

24.     Most generic drugs move from their sweet spot (six months after generic introduction)[3] to maximum allowable cost ("MAC") pricing where the payor begins to set an upper limit on the reimbursement amount.  The chart below is a replica from a Bear Stearns analyst report dated October 1, 2007, illustrating the lifecycle of margin spread for branded to generic drugs.

---

[3]     Drug chains, like Walgreens, traditionally enjoy the greatest margin benefit roughly six months after initial generic introduction when drugs go multi-source.



25.     Going into 2007, defendants knew that the reimbursement lifecycle for some generic drugs introduced in the summer of 2006 would be substantially lower as they had reached the generic MAC.  One such drug was Simvastatin, the generic version of Zocor, which according to Rein, while speaking at the Morgan Stanley Global Consumer & Retail Conference on November 14, 2007, "was producing a tremendous amount of gross profit last year [2006]."  Beginning in January 2007, the Company knew that the gross profit on a script of Simvastatin would be cut by 50% from about $50 per script to roughly $25 per script.  Therefore, defendants knew that this reduction would have an impact on gross profits well before the end of 4Q07 when they blamed lower generic reimbursements (citing Simvastatin as an example) as one factor for the surprisingly significant miss in that quarter.  Following Walgreens' announcement of its 4Q07 earnings miss,

William Blair & Company issued a report on October 2, 2007, discussing this situation after discussions with Walgreens' management.  The report stated in part:

> ***In conversations with management***, the company cited tough year-ago gross profit dollar comparisons in the pharmacy – specifically related to last July's introduction of generic Zocor (i.e., simvastatin).  We understand that during the first six months of its availability, Walgreens was making a gross profit in the neighborhood of $50 per script (four to five times the estimated $10 to $12 for branded Zocor), largely due to a sharp drop in acquisition costs.  However, once simvastatin became a multi-source generic starting in January 2007, the implementation of maximum allowable cost (MAC) lowered the generic simvastatin gross profit contribution per script to roughly $25 per script – still healthy versus branded reimbursement but lower sequentially (as expected) relative to the first six months, where pharmacists are provided a strong incentive by payors to shift market share to the generic alternative.

Despite this knowledge in early 2007, defendants concealed the negative impact lower generic reimbursements would have until the Company's 4Q07 earnings fiasco.  Defendants sought to delay this information due to the adverse impact it would have on the planned acquisition of Option Care.

26.     The negative trends in the lifecycle for generic drug reimbursement could not have come at a worse time for Walgreens.  It coincided with the competitive pressure that Walgreens was feeling in 2007 and the federal government ending Walgreens' illegal Medicare practices in which it had previously engaged.  The drugstore industry is highly competitive, and Walgreens competes with various retailers, including chains and independent drugstores, mail order prescription providers, grocery stores, convenient stores, mass merchants and dollar stores.  During 2007, the Company's strongest competitors were CVS, Rite-Aid, Target, Wal-Mart and on the internet side Drugstore.com.  Compounding this competitive environment was CVS' merger with Caremark in March 2007.  The merger united the country's biggest pharmacy chain (CVS) and a leading pharmaceutical services company (Caremark).  Illustrating the pressure Walgreens was facing vis-a-vis CVS was the fact that as of November 1, 2007, CVS' share price rose 18% since the March 22 Caremark purchase while Walgreens' shares dropped 17% in the same period.

27.     To combat this and maintain its competitive presence, it was imperative Walgreens also grow by acquisition.  As a result, on July 2, 2007, Walgreens announced it was acquiring Option Care.  Walgreens announced that it would acquire Option Care in a cash transaction for $19.50 per share.  The transaction had a total value of approximately $850 million, including the assumption of some debt.  The press release stated in part:

> "This acquisition clearly establishes us as a national player in specialty pharmacy and home infusion services," said Jeffrey A. Rein, CEO of Walgreens. "Option Care offered the best opportunity for strengthening our position as a full-service specialty pharmacy provider, especially in areas such as hemophilia, immune deficiency and oncology.  By blending its capabilities with our current operations, we'll be able to provide patient care on a nationwide basis in the patient's home, at their physician's office or at one of our infusion suites."

> Walgreens President Greg Wasson said, "For health care payors, the acquisition will improve our ability to manage their significant spending on specialty pharmacy and related services.  Our combination of national and local capabilities provides a lower-cost alternative to providing these services in a hospital setting. Our broad distribution channel, as well as the compliance and outcomes information we can provide, will allow us to strengthen our relationships with manufacturers and will provide more access to limited distribution therapies."

28.     During a conference call on that same day Rein, Wasson and Chief Financial Officer Bill Rudolphsen touted the benefits of acquiring Option Care:

> [Rein:]  Today we announced the largest acquisition in our Company's history, with our agreement to buy Option Care Inc. for $19.50 a share and with the assumption of some debt a total enterprise value of approximately $850 million.  Option Care is a specialty pharmacy and home infusion service provider with operations in 34 states. Of its more than 100 pharmacies, 61 are company owned, while the remainder are franchisees.  This acquisition will instantly provide patients and payors with national access to our specialty pharmacy and home infusion services.  These two areas have seen a number of acquisitions by us in recent years, including our purchase of Medmark Specialty Pharmacy and Schraft's, a specialty pharmacy that focuses on fertility medication and services.

> This is an even bigger step because it dramatically expands our specialty and home infusion footprint that makes us a national player in both areas.  We'll now have the nation's fourth largest specialty pharmacy business and no one will match our specialty pharmacy size combined with our nationwide home infusion platform.

*       *       *

- 11 -

[Wasson:]  As we mentioned in our press release, the specialty pharmacy and home infusion markets are estimated at $60 billion a year with a projected annual growth rate of 20%.  The growth is being driven by three things; cost containment pressure, a strong pipeline of new therapies, and an emphasis on care management and compliance monitoring to improve outcomes.  On the infusion side of the business there's also cost containment pressure driving the industry, as well as a patient preference for at-home treatment and an increased utilization due to demographic trends.

Acquiring Option Care made a lot of sense to us for several reasons.  First, we established ourselves as a nationwide player in the specialty pharmacy and home care.  Second and very importantly, we'll offer a national provider platform, free of conflicts that payors may perceive as inherent with many of the specialty providers.  Third, it would give us more access to limited distribution therapies and strengthen our relationship with pharmaceutical manufacturers to help improve outcomes.  Fourth, we'll get existing contracts with more than 400 managed care organizations representing 75 million lives.  And finally, the two businesses have complementary footprints with overlap of only certain locations, which made Option Care a great fit for us.

\*     \*     \*

[Rudolphsen:]  We believe the value of this acquisition of Walgreen's will be further leveraged through revenue, purchasing, expense, and people synergies.  The revenue synergies are a function of creating a strong, independent operator of specialty and infusion services.  Revenue synergies also can result from our ability to expand our business relationship with the clients of Option Care.  The purchasing synergies are a function of economics of scale, which provide us the opportunity to earn discounts we could not otherwise earn.  We expect to see expense synergies from consolidating certain facilities from both companies.  We estimate total pretax synergies to be about $15 million in the first year.  We expect the transaction to be slightly accretive to earnings in the first full year and that will increase in future years.  Another area from which we'll benefit is the considerable talent that comes with Option Care's employees.

29.     On September 12, 2007, Walgreens announced it had completed the acquisition of Option Care, just 19 days before the announcement of the significant 4Q07 earnings per share ("EPS") miss.

30.     Throughout 2007, CVS' stock price steadily increased.  During that same time period, however, Walgreens' stock price stayed relatively flat until the house of cards came tumbling down on October 1, 2007.  The chart below depicts a stock price comparison between Walgreens and its main competitor CVS from January 3, 2007 through December 31, 2007.



**Walgreen Co.**
Compared to CVS Caremark Corp. - January 3, 2007 to December 31, 2007

31.     With the combination of all these negative factors, defendants knew during the Class Period that Walgreens' revenue, gross profits, gross margins, and earnings would take a substantial hit in 4Q07. But before they would reveal this to the market on October 1, 2007, they acquired Option Care and Rein and Wasson sold a combined total of 31,616 shares for proceeds over $1.4 million.

## FRAUDULENT SCHEME AND CONDUCT

32.     Each defendant is liable for making false statements, or for failing to disclose adverse facts known to him about Walgreens. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on Walgreens' shareholders was a success, as it: (i) deceived the investing public regarding Walgreens' prospects and business; (ii) allowed the Option Care merger

- 13 -

to be completed; (iii) artificially inflated the price of Walgreens' publicly traded securities; (iv) caused Lead Plaintiff and other members of the class to purchase Walgreens' publicly traded securities at inflated prices; (v) allowed the Individual Defendants to sell 31,616 shares of their Walgreens stock for proceeds of over $1.4 million while the stock was still inflated; and (vi) permitted defendant Rein to continue to receive in fiscal 2007 $9.8 million total compensation, including a $1.1 million salary, a $6.6 million options award, and other compensation; and permitted defendant Wasson to continue to receive in fiscal 2007 $1.9 million total compensation, including a $595,000 salary, a $558,421 options awards, and other compensation.

33.     Walgreens had a history of not providing the market with guidance in its quarterly press releases and webcasts.  As such, Walgreens would provide historical financial data and explain the reasons for the quarterly results.  Walgreens, however, would not discuss future quarter expectations during its quarterly webcasts or in its press releases.  Instead, as part of its scheme to raise the market's expectations, Walgreens would take calls with equity analysts individually, knowing that the analysts would disseminate the information to the market.  Indeed, Walgreens would hide behind its no guidance policy as a shield while it used the equity analysts that covered its stock as a sword to raise the market's expectations.  Lehman Brothers equity research analyst Meredith Adler explained, referring to Walgreens' 3Q07 conference call:

> Walgreen will report 3Q07 earnings on Monday, June 25th before the market opens. ***The company does not hold a conference call when it announces earnings, but will take individual calls throughout the day***.

34.     For example, after Walgreens' June 25, 2007 3Q07 earnings announcement, on June 26, 2007, Lehman Brothers published its analyst report, disclosing presumably what it discussed with the Company on a call subsequent to Walgreens' announcement.  The Lehman Brothers' report paraphrased certain statements Walgreens made:

> ***The company continues to reiterate*** that generics are very positive for its business and that there are no meaningful changes in reimbursement from third-party payers

> . . . . ***WAG says*** that it negotiates with payers for what it considers an acceptable gross profit dollar per script, looked at as an average of all the scripts it fills for a particular plan.  ***The company says*** it remains happy with the outcome of those negotiations.

35.     Walgreens used the private conversations with securities analysts to artificially inflate its stock price in furtherance of the fraud.  Instead of denying the statements attributed to the Company by the securities analyst, Walgreens allowed the market to adopt the statements and artificially inflate the stock price.  Walgreens' objective was clearly to use the analysts to further the fraudulent scheme.

**DEFENDANTS' WRONGFUL CONDUCT
DURING THE CLASS PERIOD**

**Defendants' False and Misleading Statements During the Class Period**

36.     On June 25, 2007, the Company reported its financial results for 3Q07.  Net earnings for the quarter were up "19.6 percent to $561 million or 56 cents per share (diluted), from $469 million or 46 cents per share (diluted) in the same quarter a year ago."  The press release also included other positive information about the Company's business:

> Net earnings for the nine months climbed 22.9 percent to $1.64 billion or $1.63 per share (diluted), versus last year's $1.34 billion or $1.31 per share (diluted).  This year's nine-month earnings also benefited from the lower LIFO rate, while both this year's and last year's nine-month earnings include the previously mentioned tax benefits.

*       *       *

> Sales increased 12.5 percent to a record $13.7 billion for the third quarter and 14.5 percent to $40.3 billion for the first nine months.  Total sales in comparable drugstores (those open more than a year) were up 7.8 percent in the quarter, while front-end comparable drugstore sales rose 5.6 percent.

> Prescription sales, which accounted for 65.9 percent of total sales in the quarter, climbed 13.8 percent.  Prescription sales in comparable drugstores rose 9.0 percent in the quarter, while the number of prescriptions filled in comparable drugstores increased 5.4 percent.  Third party plans accounted for 94.8 percent of all prescription sales in the quarter.

For the most recently reported 52-week period, Walgreens increased its market share in 56 of its top 60 product categories compared to food, drug and mass merchandise competitors, as measured by A.C. Nielsen.

\*       \*       \*

Gross profit margins increased 84 basis points versus the year-ago quarter to 28.30 as a percent to sales, as both pharmacy and front-end margins showed improvement.  While pharmacy margins increased with the growth in generic drug sales, some of that benefit was offset by an overall sales shift toward the pharmacy business, which carries lower margins than front-end merchandise.  Margins on the front-end increased as a result of a shift in mix toward higher margin items.  The lower LIFO inflation index in the quarter also helped gross profit margins.

37.     Rein commented on the results, stating, in pertinent part, as follows:

"***The growth opportunity we have ahead of us is exciting***. . . .  With the first of 78 million baby boomers turning 65 in 2011, the demand for pharmacy services will get bigger and bigger. We intend to be the best-positioned pharmacy chain in the country to serve that need, and we're on track to exceed our goal of 7,000 stores in 2010."

38.     On that same day, the Company's pre-recorded webcast set forth much of the same

information regarding the successful 3Q07 earnings:

[Rick Hans:]  Today we announced third-quarter earnings were up 19.6% to $561 million, or $0.56 per share diluted.  That came on a sales increase of 12.5% to $13.7 billion.  This year's quarter includes a $13.5 million credit from the resolution of a multiyear state tax matter, compared to a $13.6 million tax credit in the year-ago quarter from the settlement of prior year's federal tax matters.

\*       \*       \*

This year's store growth continues on target.  We opened 129 new stores in the third quarter, including 35 acquisitions.  For the first nine months of the fiscal year, we opened 352 stores, including 43 acquired stores.  That puts us on schedule to open about 500 new stores in fiscal 2007, including more than 400 net new locations.  Our store count as of May 31 is 5751, a net increase of exactly 500 from a year ago.  We're on track to exceed 7000 stores in 2010.

Taking a closer look at sales, total comparable drugstore sales for stores open more than a year were up 7.8% in the quarter, while front-end comparable drugstore sales rose 5.6%.  Pharmacy sales climbed 13.8% overall and 9% on a comparable drugstore basis in the quarter.  The number of prescriptions filed in comparable drugstores rose 5.4%.

\*       \*       \*

- 16 -

During the past quarter, our main focus and biggest opportunity continued to be drugstore expansion. This will drive our company's growth well into the future, as we remain on track to operate more than 7000 stores in 2010. And as more industry consolidation takes place, we'll consider select acquisitions, such as the one that resulted in this quarter's opening of 30 former Familymeds Group pharmacies.

We're also looking for other pharmacy-related healthcare opportunities, which is why we acquired convenient care clinic operator Take Care Health Systems in May. Our initial rollout of more than 400 clinics by the end of calendar 2008 won't have the same impact as opening 400 drugstores, but they will be central to our future expansion of other patient-focused healthcare services.

39.     The 3Q07 webcast adopted the risk disclosures in the Company's 2006 10-K. The risk disclosures stated, "[r]eductions in third-party reimbursement levels, from private or government plans, for prescription drugs **could** reduce our margin on pharmacy sales and **could** have a significant effect on our retail drug store profits." These disclosures were also false and misleading, as they discussed that the risk of reduced reimbursement rates **could** have a negative effect on the Company's financials when defendants knew that reduced reimbursement rates **would** indeed have a negative effect on the Company's financials.

40.     While knowing its generic drug Simvastatin was already in its weak spot of profitability, Walgreens told the market that there would be no meaningful changes in reimbursement from third-party payers. The market was concerned that Simvastatin specifically entered the weak spot too quickly. The Company, however, quashed those concerns by disseminating to the market through Lehman Brothers that it was happy with the gross profits for its prescription drugs. As the Lehman Brothers' June 26, 2007 analyst report indicates:

> **The company continues to reiterate** that generics are very positive for its business and that there are no meaningful changes in reimbursement from third-party payers – either in the timing of reimbursement changes or the level of those changes. . . . Some of the questions about generic reimbursement are coming because generic Zocor (simvastatin), the largest generic launched during the past few years, went to MAC pricing very quickly. **WAG says** that it negotiates with payers for what it considers an acceptable gross profit dollar per script, looked at as an average of all the scripts it fills for a particular plan. **The company says** it remains happy with the outcome of those negotiations.

- 17 -

41.     In fact, Walgreens' business was not doing anywhere near as well as suggested by defendants' statements.  Due to increasing expenses and the lifecycle of the generics, new store openings would not significantly improve the Company's income.

42.     On July 3, 2007, Walgreens reported sales of the first month of the Company's fiscal fourth quarter.  The Company reported June 2007 sales of $4,377,800,000, an increase of 9.5% from $3,999,255,000 for the same month in 2006.  Sales in comparable stores (those open at least a year) rose 5.1%.  The Company's press release stated, in pertinent part:

> June pharmacy sales increased 8.3 percent, while comparable pharmacy sales increased 4.2 percent. Comparable pharmacy sales were negatively impacted by 5.9 percent due to generic introductions in the last 12 months. Total prescriptions filled at comparable stores increased 2.2 percent. Pharmacy sales accounted for 65.5 percent of total sales for the month.

43.     On August 2, 2007, Walgreens reported July 2007 sales of $4,417,400,000, an increase of 11% from $3,979,512,000 for the same month in 2006.  Sales in comparable stores rose 7.2%.  The Company's press release stated, in pertinent part:

> July pharmacy sales increased 11.7 percent, while comparable pharmacy sales increased 8.2 percent. Comparable pharmacy sales were negatively impacted by 4.5 percent due to generic drug introductions in the last 12 months. Total prescriptions filled at comparable stores increased 5.6 percent. Pharmacy sales accounted for 66.1 percent of total sales for the month.

44.     On September 5, 2007, Walgreens reported August 2007 sales of $4,621,200,000, an increase of 10.3% from $4,191,489,000 for the same month in 2006.  Sales in comparable stores rose 6.5%.  The Company's press release stated, in pertinent part:

> August pharmacy sales increased 9.9 percent, while comparable pharmacy sales increased 6.5 percent. Comparable pharmacy sales were negatively impacted by 4.2 percentage points due to generic drug introductions in the last 12 months. Total prescriptions filled at comparable stores increased 3.4 percent. Pharmacy sales accounted for 66.4 percent of total sales for the month.

The June, July and August strong sales reports were misleading.  Defendants knew that gross margins and gross profits were important metrics and an increase in sales was misleading because it

did not inform the market of the lower reimbursements Walgreens was receiving on sales of Simvastatin or that the SO&A expenses were increasing.  Defendants knew that increasing expenses and the lifecycle of the generics were hurting gross profits for 4Q07.

45.    Given the strong sales reports during the quarter, analysts expected Walgreens to release solid 4Q07 financial results.  On September 26, 2007, SunTrust Robinson Humphrey issued a report anticipating that Walgreens would report strong fourth quarter earnings.  SunTrust estimated Walgreens' EPS at $0.48, and the consensus was EPS of $0.47.  The report entitled "WAG: Expect Good 4Q Report . . . Stock Well-Poised to Gain" stated, in pertinent part:

### Summary

- Walgreen's is expected to report 4Q results next Monday a.m.  We estimate EPS of $0.48, in line with the Street.

- Given strong monthly sales reports during the quarter and the sector trending favorably overall, we expect a good report, adding to what already makes this stock very attractive, in our opinion . . . a multiple that has been trading around its 10-year low P/E multiple for a blue-chip company in a sector whose defensiveness has been made more appealing by concerns about macro instability.

- In addition to having good 4Q sales volume, we believe that sales profitability trended up . . . given generics, strong comps in the relatively profitable front-end, and a relatively stable pharmacy/front-end sales mix, year-over-year.

- As is always the case with WAG, given that the company provides no earnings guidance, there is always room for some bottom-line variability, relative to expectations, but believe that most investors have grown accustomed to this.

- Net/net, we believe the story is very much intact here, and that the stock should benefit from strong company fundamentals and continued strength in the sector.

46.    On September 12, 2007, Walgreens announced that it had completed the acquisition of Option Care.  On that day, Walgreens stock closed at $45.03.

47.     On September 26, 2007, Bear Stearns also issued a report anticipating Walgreens'

financial reporting for 4Q07.  The Bear Stearns report called for EPS of $0.46 for Walgreens' 4Q07.

48.     On September 28, 2007, the last trading day of the month, Walgreens' stock price

closed at $47.24.  Then, on October 1, Walgreens issued a press release reporting fiscal 4Q07 and

FY07 financial results.  The 4Q07 results showed a substantial decline in earnings with Company

EPS substantially below the street estimates.  Defendants blamed lower generic reimbursements and

higher selling, general and administration expenses as the culprits.  The release stated in part:

> Walgreens . . . today announced its 33rd consecutive year of record earnings and sales.  The company also reported a decline in fourth quarter earnings due in part to lower reimbursements on some popular generic drugs and higher expenses.

> Fiscal year net earnings increased 16.6 percent to $2.04 billion versus last year's $1.75 billion.  Net earnings per share for fiscal 2007 increased 18.0 percent to $2.03 per share (diluted) versus $1.72 per share (diluted) the previous year.  Net earnings for the fourth quarter declined 3.8 percent to $397 million or 40 cents per share (diluted) versus last year's $412 million or 41 cents per share (diluted).

> *         *         *

> ***"This quarter was negatively impacted by lower generic drug reimbursements, combined with higher salary and store expenses, and higher advertising costs," said Chairman Jeffrey A. Rein.  "Our expenses weren't in line with the level of reimbursements we were receiving.  Managing both expenses and lower reimbursements on some generic drugs is my top priority.  We're going to fix this, and at the same time continue our aggressive growth plan***."

> Generics such as simvastatin (the generic version of Zocor) saw a significant reduction in gross profit dollars during the fourth quarter.  Retail pharmacies typically see the highest gross profit dollars in the first few months after a generic prescription drug becomes available, and simvastatin entered the market in late June 2006.

> "In the case of some blockbuster generic drugs, it's difficult to grow profit dollars after their first few months of availability," said President Greg Wasson.  "As this quarter shows, pharmacy gross profit margins on some drugs can increase on a percentage basis even while the gross profit dollars they produce fall."

> The company saw this play out to a significant factor in the fourth quarter.  For example, Walgreens filled nearly three times as many prescriptions for simvastatin in this year's fourth quarter compared to the year-ago quarter, yet the

company's gross profit dollars from the drug were virtually the same this year as they were a year ago.

*     *     *

Fourth quarter selling, occupancy and administration expenses increased 103 basis points from the previous year, from 22.45 to 23.48 as a percent to sales, primarily due to increases in salaries and store expenses, and advertising costs.  The impact of new, lower-cost generic drugs, which slowed pharmacy sales growth by 5.0 percentage points and total sales growth by 3.1 percentage points in the quarter, continued to affect expense ratios.

49.     On that same day, the Company issued a pre-recorded audio webcast for 4Q07 earnings.  In the pre-recorded call, Walgreens reiterated the same factors for the earnings decline.  The Company stated:

As we mentioned in our press release, this quarter experienced several factors that drove down our profits.  They included lower reimbursements on some generic drugs introduced in the summer of 2006, including simvastatin, the generic version of Zocor, higher salary and store expenses to go along with increased advertising costs, and an increase in our LIFO inflation index that resulted in a $32 million charge this quarter versus a $26.1 million charge a year ago.

*     *     *

Fourth-quarter selling, occupancy and administration expenses increased 15.3%, or 103 basis points from the previous year, from 22.45 to 23.48 as a percent to sales.  SO&A margins were impacted by new, lower-cost generic drugs, which slowed pharmacy sales growth by 5 percentage points and total sales growth by 3.1 percentage points in the quarter.  The amount spent on SO&A grew because of higher salary and store expenses [and] increased advertising costs.  We have begun a rigorous review of all expense items and will quickly take the necessary steps to better control them.

50.     Walgreens' miss was dramatic as the street had been expecting EPS of $0.46-$0.47 while the Company reported EPS of $0.40.  The market reaction to this disclosure was swift and severe.  Following this disclosure, Walgreens' stock collapsed 15% from $47.24 per share to $40.16 per share on extremely high trading volume of 67.4 million shares.  The previous trading day's volume was 5.6 million shares, which was also the average volume for the August to September 2007 period.

51.     Analysts were confounded about the significant earnings miss and the stock suffered

several rating downgrades in the ensuing days.

52.     On October 1, 2007, Bear Stearns issued a report about the significant miss:

**Generic Cycle Playing Out – Material Downside in 4Q07**

- ***Significant Earnings Miss Indicative of Tough Road Ahead – Generics Coming Off the Boil.***   Walgreen reported a highly uncharacteristic significant earnings miss – missing our below consensus earnings est by $0.06 ($0.40 vs our $0.46).  The year over year earnings decline is the first that we are aware of – going back at least ten years.

53.     On October 1, 2007, SunTrust Robinson Humphrey also reported about the earnings

miss:

**Summary**

- WAG reported disappointing 4Q EPS this morning which came as quite a surprise.  We always note that there is room for variability in WAG's numbers relative to expectations; the $0.08 variance relative to our expectation was quite significant, however, and the stock, down some 15% today, clearly reacted.

54.     On October 2, 2007, William Blair & Company reported about the earnings miss and

commented on the rising expenses:

**INVESTMENT SUMMARY:**

- Walgreens' fiscal fourth-quarter (August) EPS of $0.40, unchanged versus a year ago, were significantly below our estimate of $0.48 and the $0.47 consensus.

                              *       *       *

- Why did management not tighten expenses more quickly considering the slower gross profit growth in the period?  Walgreens was undoubtedly trying to drive stronger gross profit growth with advertising, etc., although we wonder to what extent the company was making an "investment" in the final period of the fiscal year recognizing that strong growth in fiscal 2007 overall represented a significant hurdle for fiscal 2008.

55.     The statements by defendants, including those disseminated to the market through

securities analysts, in ¶¶34, 36-40 and 42-44, were materially false and misleading when made, or

omitted material facts necessary to make the statement not misleading.  Specifically, defendants initially cited two factors for the 4Q07 earnings miss: (1) lower generic drug reimbursements; and (2) higher salary and store expenses, and higher advertising costs.  Contrary to defendants' statements on October 1, 2007, defendants were well aware prior to the commencement of the Class Period that the Company's gross profits would be impacted by lower generic reimbursements and that expenses had been increasing throughout 2007 and were not in line with sales.

56.    First, defendants knew in January 2007 that Simvastatin was at the MAC level which cut the Company's gross profit per script by 50%, from around $50 to roughly $25 per script.  This fact did not take place in 4Q07 as defendants suggest, but was well known to them in January 2007. Thus, defendants new in early 2007 that the decline in Simvastatin margins would occur during the Company's fiscal 4Q07.

57.    On October 2, 2007, the William Blair & Company report also questioned management's lack of tightening expenses given that Walgreens knew in early 2007 that Simvastatin had reached the MAC and gross profits would be impacted.  The report stated in part:

> ***In conversations with management***, the company cited tough year-ago gross profit dollar comparisons in the pharmacy – specifically related to last July's introduction of generic Zocor (i.e., simvastatin).  We understand that during the first six months of its availability, Walgreens was making a gross profit in the neighborhood of $50 per script (four to five times the estimated $10 to $12 for branded Zocor), largely due to a sharp drop in acquisition costs.  However, once simvastatin became a multi-source generic starting in January 2007, the implementation of maximum allowable cost (MAC) lowered the generic simvastatin gross profit contribution per script to roughly $25 per script – still healthy versus branded reimbursement but lower sequentially (as expected) relative to the first six months, where pharmacists are provided a strong incentive by payors to shift market share to the generic alternative.

58.    Second, higher salary, store and advertising expenses were not confined to 4Q07, as defendants had access to weekly budget figures which showed that expenses were increasing and would impact gross profits in 4Q07.  Despite this information, defendants did nothing to warn the public of the impact on gross profits.

- 23 -

59.     On November 2, 2007, William Blair & Company issued a report based on meetings with Rein and other executives around that time.  The report confirmed that Walgreens had up-to-date information and gross profit and SO&A expenses (referred to below as SG&A) through each quarter.  The report stated in pertinent part:

> Walgreens acknowledges that SG&A [selling, general and administrative] spending was above its original target for the quarter, and management attributes this vexing dynamic to 50% poor planning and 50% poor execution.  The company was simply too optimistic overall for the quarter, and pharmacy trends slowed significantly versus plan during the second half of July and August.  ***Walgreens has up-to-date information on gross profit and SG&A spending through the quarter, but the company simply did not react to developments.  Management acknowledged that "flashing red lights are no good if you don't act on them."***  Many investors that we've spoken to find the explanation for the shortfall to be nearly as dismaying as the end result.  From our standpoint, the poor planning probably occurred earlier in the fiscal year when management did not adjust its spending appropriately ***in advance*** of the gross profit slowdown in the fourth quarter, which the company should have seen coming, and also failed to adjust its communication strategy with analyst and investors so that there would not be such a large surprise about the lumpiness of growth during the year.

60.     At the Morgan Stanley Global Consumer & Retail Conference on November 14, 2007, Rein confirmed that defendants saw the sales and expense numbers on a weekly basis:

> ***We obviously look at the numbers every single week***.  We look at the monthly figures in terms of gross profit.  We look at the income that is being produced, and we really took our eye off the ball there.  We just took our eye off the ball.  I don't know any other way to say it as honestly as possible.

**Walgreens Omitted Material Statements of Fact and Misled Investors About Walgreens' Gross Profit and Gross Margin**

61.     Walgreens failed to tell investors in the June 25, 2007 press release and in Management's Discussion and Analysis ("MD&A") section in the 10-Q for fiscal 3Q07 (March 1, 2007 through May 31, 2007) that its gross profit and gross margin[4] were likely to be significantly

---

[4]     "Gross profit" is the difference between "sales" and the "cost of sales." In retailing, the cost of sales is the purchase price paid by the retailer of the items sold. The cost of sales excludes store lease expenses, employee expenses, advertising, and other such costs that are classified as "selling, general, and

lower in fiscal 4Q07 (June 1, 2007 through August 31, 2007) because existing generic drugs at the time that were key to the Company's profitability and growth were entering the weakest phase of their product profit lifecycles and there were no generic drugs at the earlier, more profitable phase of their lifecycles that could materially offset said results in Walgreens' product pipeline.

62.     In the lifecycles of generic drugs, gross profits and gross margins of the products are much higher during the first several months they are on the market than the original branded products. This is true primarily because Walgreens receives substantial reimbursements from third-party payors even though the generic drugs cost Walgreens significantly less to purchase than their brand counterparts. For brand drugs with no generic equivalent, reimbursement varies, but is usually based on the average wholesale price ("AWP") minus 5% to 15%. This formula is used even though the AWP is usually higher than the actual cost that pharmacies pay to acquire the brand drug. When the generic version of the brand drug becomes available, however, pharmacies are often reimbursed at AWP minus 10% to 25% for the generic drug, making generics much more profitable than their brand equivalents.[5]

63.     Gross profits and gross margins of generic drugs become outsized within a period of about six month as more generic manufacturers saturate the market, pushing Walgreens' purchase prices lower, and consequently reducing their cost of sales relative to sales. The phase in which

administrative" ("SG&A") expenses or "selling, occupancy, and administration" ("SO&A") as used by Walgreens. "Gross margin" is the excess of sales over cost of sales when expressed as a percentage. In fiscal 3Q07, Walgreens' gross profit of $3,877,200,000 was calculated by subtracting cost of sales of $9,821,100,000 from sales of $13,698,300,000. The gross margin was 28.3% (i.e., gross profit ÷ sales).

[5]     AWP refers to the average price at which wholesalers sell drugs to pharmacies, physicians, and other customers. According to the *RedBook*, published by Thomson Medical Economics, the pricing information is based on data obtained from manufacturers, distributors, and other suppliers. Despite its name, however, the AWP is not an accurate reflection of actual market prices for drugs. AWP has often been equated with a "sticker price" or "list price," as those terms are used in the automobile industry. Payments are usually based on AWP minus some percentage. AWP is not defined in law or regulation and there are no requirements that AWP reflect the price of any actual sale of drugs by a manufacturer.

reimbursements for a particular generic drug are at or near their highest level and Walgreens' actual cost to acquire the generic drug is at or near its lowest level may be termed the "sweet spot."

64.     After being on the market for about six months, however, Walgreens' gross profit and gross margin from the generic drug plateaus and subsequently descends as multiple generic equivalent drugs become available. During this stage, a MAC is set to place a cap on the amount of payment for the generic drug. As MAC pricing sets in, payors set an upper limit on reimbursements which essentially closes up the excess margin. This less profitable, tail-end phase of the product profit lifecycle may be termed the "weak spot."

65.     Walgreens' management knew no later than the start of the Class Period that gross profit and gross margin would be significantly lower in fiscal 4Q07, as they knew that the Company's profitability was primarily driven by the sale of pharmaceuticals; that generic drugs were the most profitable products in the pharmacy product class; that generic drugs were a substantial portion of its total pharmaceutical product mix; and, most importantly, that most of the Company's generic drugs for sale were entering or were already in the weak spot of the product profit lifecycle.[6] Defendants not only knew that these important factors would adversely affect the gross profit and gross margin in fiscal 4Q07, but were likely to continue unabated for several fiscal quarters going forward.

66.     The Company failed to inform investors in its June 25, 2007 press release and 10-Q MD&A for fiscal 3Q07 about these critical factors and their adverse impact on gross profits, gross margins, net profits, and EPS in fiscal 4Q07. Moreover, the Company told analysts that it remained

---

[6]     Walgreens disclosed the sales percentages derived from its three major product classes. Prescription drugs were 65%, 64%, and 64% of sales for fiscal 2007, 2006, and 2005 respectively. Non-prescription drugs were 10%, 11%, and 11% of sales for fiscal 2007, 2006, and 2005, respectively. General merchandise was 25%, 25%, and 25% of sales for fiscal 2007, 2006, and 2005, respectively. Walgreens did not disclose the portion of sales derived from branded and generic prescription drugs.

happy with the reimbursements it negotiated to receive for its generic drugs.  Walgreens was the nation's largest pharmacy chain in terms of retail sales and profits at the time and was and is extraordinarily successful in developing, operating, and growing the business. Consequently, management had to be extremely knowledgeable about such big picture factors affecting products, costs, pricing, and profits as well as technological, demographic, economic, and legal and regulatory developments in the pending and actual production and distribution of brand and generic pharmaceuticals; the product profit lifecycles of every drug entering or exiting the Company's product pipeline; the current and pending lifecycle phase and timing of the phase of every drug in the Company's product mix; and the current and projected impact on Walgreens' current and future income statements. Walgreens has been dealing with the product profit lifecycles of pharmaceuticals and the issues affecting the Company's profitability for many decades. The Company also has information systems, such as SIMS, enabling management to track progress in "real time" and to make timely, well supported projections of gross profits and gross margins.

67.     Walgreens' June 25, 2007 press release, however, was silent about the facts and circumstances that would put pressure on gross profits, gross margins, net earnings, and EPS going forward. Instead, the press release provided information indicating extraordinarily positive developments and glowing future prospects with the Company's report of an impressive 19.6% earnings increase and record sales in 3Q07. For example, CEO Rein said that: "The growth opportunity we have ahead of us is exciting . . . .  With the first of 78 million baby boomers turning 65 in 2011, the demand for pharmacy services will get bigger and bigger."  The Company also noted that in 3Q07, gross profit margins increased 84 basis points versus the year-ago quarter to 28.3 as a percent of sales, as both pharmacy and front-end margins showed improvement.

68.     Similarly, in the MD&A section of the 10-Q for 3Q07, the Company gave no inkling of the factors and trends they knew would adversely affect their financial results for 4Q07 and likely in subsequent quarters.

69.     Walgreens' June 25, 2007 webcast adopted the risk factors in the fiscal year ended August 31, 2006 10-K.  The 10-K generally identified the possibility that reduced reimbursement rates could adversely affect revenues and profits as one risk factor among several others:

> Reductions in third-party reimbursement levels, from private or government plans, for prescription drugs ***could*** reduce our margin on pharmacy sales and ***could*** have a significant effect on our retail drug store profits.
>
> The continued efforts of health maintenance organizations, managed care organizations, pharmacy benefit management companies, government entities, and other third-party payors to reduce prescription drug costs and pharmacy reimbursement rates may impact our profitability.  On February 8, 2006, the President signed into law the Deficit Reduction Act of 2005, which seeks to reduce federal spending by altering the Medicaid reimbursement formula for multi-source (i.e., generic) drugs. These changes are expected to result in reduced Medicaid reimbursement rates for retail pharmacies. . . .  Reduced reimbursement rates could adversely affect our revenues and profits.

But Walgreens' mere disclosure of the obvious risk factor that reduced reimbursements "could" adversely affect revenues and profits is false and misleading as it does nothing to inform investors of the known risks relating to the Company's pharmaceutical pipeline; the pharmaceutical product mix; the relative profitability of brand name drugs and their generic counterparts; the product profit lifecycles; and the impact of the lifecycle phases on the Company's profitability.  Indeed, the Company's generic warning regarding potential reduced reimbursement rates is false and misleading considering that the Company had knowledge that its Simvastatin reimbursements would be reduced.

70.     While knowing its generic drug Simvastatin was already in its weak spot of profitability, Walgreens told the market that there would be no meaningful changes in reimbursement from third-party payers.  The market was concerned that Simvastatin specifically entered the weak spot too quickly.  The Company, however, quashed those concerns by

disseminating to the market through Lehman Brothers analysts that it was happy with the gross

profits for its prescription drugs:

> ***The company continues to reiterate*** that generics are very positive for its business
> and that there are no meaningful changes in reimbursement from third-party payers –
> either in the timing of reimbursement changes or the level of those changes. . . .
> Some of the questions about generic reimbursement are coming because generic
> Zocor (simvastatin), the largest generic launched during the past few years, went to
> MAC pricing very quickly.  ***WAG says*** that it negotiates with payers for what it
> considers an acceptable gross profit dollar per script, looked at as an average of all
> the scripts it fills for a particular plan.  ***The company says*** it remains happy with the
> outcome of those negotiations.

71.     Walgreens' dose of very bad news about the gross profits and gross margins for fiscal

4Q07 shocked Walgreens' shareholders, causing the stock price to plunge, but was certainly not a

surprise for Walgreens' management, as they knew the die was cast before the quarter began. Only

after the damage to shareholders had been done did Walgreens give investors some genuine insight

about defendants' knowledge of the product profit lifecycle.  In Walgreens' 2007 Annual Report,

former Chairman and CEO Jeffrey A. Rein and President and COO Gregory D. Wasson provided

some "post-mortem" analysis relating to this issue in the section "Questions and Answers for

Shareholders," as follows in pertinent part:

> Why were generic drugs cited as a problem in the fourth quarter? Aren't
> generics more profitable than name brand drugs?

> Jeff Rein: Yes. While a healthy pipeline of new brand name drugs brings
> hope for patients and increased business for pharmacies, generics are generally more
> profitable than their brand equivalents. Generics also typically reduce patient co-pays
> and save significant dollars for third party payors. That's why pharmacies see the
> highest gross profit dollars in the first months after a generic is introduced. Payors,
> anxious to realize immediate savings, offer incentives to pharmacies to encourage
> patients and physicians to use the less expensive drugs. They're willing to pay us
> more to compensate for extra administrative and inventory costs associated with
> generic introductions. After a generic has been on the market for several months, the
> number of manufacturers usually increases, and both the cost and reimbursement
> come down. This was a significant factor in the fourth quarter – we were up against a
> period with unusually high generic gross profits. Generics are still more profitable to
> pharmacies than name brand drugs, but the gross profit dollars realized are lower
> after the introductory period.

How do generics affect you going forward?

Greg Wasson: The tough year-over-year comparisons with regard to blockbuster generics can be expected to continue for several months. We're currently up against a "peak." By next summer, we'll be up against a "valley." There are no major generic drug introductions anticipated in 2008, but several name brand drugs are scheduled to come off patent between 2009 and 2011, once again creating a potentially high wave of new generics. While these cycles are challenging, they're an aspect of our business that affects our entire sector. We experience something similar, for example, when a mild flu season follows a strong one.

72.     Prior to the damaging news that Walgreens only earned $0.40 cents per share (diluted) in fiscal 4Q07, Walgreens' stock price was artificially inflated primarily by management's failure to disclose its knowledge that gross profit and gross margin were likely to be adversely affected in fiscal 4Q07 and that the Company's results of operations would be adversely affected. Management knew of these adverse factors prior to making false and misleading statements that omitted this material information.

**Walgreens Omitted Material Statements of Fact and Misled Investors About SO&A Expense**

73.     Another important reason why Walgreens' stock price was artificially inflated was that management also failed to disclose its knowledge no later than the start of the Class Period that SO&A expenses were going to be substantially higher in fiscal 4Q07, leading directly to lower reported net earnings and EPS.

74.     The financial impact of the two major factors that caused the chasm between investors' expectations and actual results in fiscal 4Q07 – the gross profit variance and the SO&A variance – can be clearly demonstrated by comparing analysts' projected income statements with the actual income statement for this period. For this purpose, the projections by Bear Stearns provide an effective example of analysts' expectations for fiscal 4Q07 because Bear Stearns estimated a more conservative $0.46 EPS (diluted) in its June 21, 2007 report when the consensus estimate was $0.47 EPS (diluted).   The following table is based upon Walgreens' actual results; Bear Stearns'

projections of $0.46 cents EPS (diluted) as provided in its October 1, 2007 analyst report; and the

calculated variances identifying the two factors causing the substantial earnings shortfall:

| Walgreens | F4Q 2007 - Actual | | F4Q 2007 - Bear Stearns Projected | | Variance: Actual Over or (Under) Projected Amounts |
|---|---|---|---|---|---|
| | | | | | |
| Sales | 13,421,500,000 | 100.00% | 13,414,400,000 | 100.00% | 7,100,000 |
| Cost of Sales | (9,666,200,000) | 72.02% | (9,591,300,000) | 71.50% | (74,900,000) |
| Gross Profit | 3,755,300,000 | 27.98% | 3,823,100,000 | 28.50% | (67,800,000) |
| SO&A | (3,151,800,000) | 23.48% | (3,092,000,000) | 23.05% | (59,800,000) |
| Operating income | 603,500,000 | 4.50% | 731,100,000 | 5.45% | (127,600,000) |
| | | | | | |
| Interest income | 6,400,000 | | 12,000,000 | | (5,600,000) |
| | | | | | |
| Earnings before income tax | 609,900,000 | 4.54% | 743,100,000 | 5.54% | (133,200,000) |
| | | | | | |
| Income tax | (213,400,000) | 34.99% | (278,700,000) | 37.51% | |
| | | | | | |
| Net earnings | 396,500,000 | 2.95% | 464,400,000 | 3.46% | (67,900,000) |
| Basic shares | 998,634,000 | | 998,634,000 | | |
| Diluted shares | 1,001,400,000 | | 1,001,400,000 | | |
| EPS – basic | 0.397 | | 0.465 | | (0.068) |
| EPS – diluted | 0.396 | | 0.464 | | (0.068) |

75.     The schedule for fiscal 4Q07 above shows that based on Bear Stearns' more

conservative projections relative to consensus estimates, Walgreens' cost of sales exceeded Bear

Stearns' estimate by a whopping $74,900,000. As a result, Walgreens' gross profit shortfall was

$67,800,000. Walgreens' gross margin was off the projected mark by 52 basis points (i.e., (27.98%

actual gross margin – 28.5% projected gross margin) x 100).  The Company's SO&A expenses exceeded Bear Stearns' estimate by a stunning $59,800,000. Walgreens' SO&A figure was off the projected mark by 43 basis points (i.e., (23.48% actual SO&A – 23.05% projected SO&A) x 100).

76.     Analysts and the investing public reasonably relied upon Walgreens' representations in fiscal 3Q07.  But those representations intentionally omitted material statements of fact and were misleading with respect to the actual facts and circumstances that management knew would make achieving gross profit and gross margin targets in fiscal 4Q07 very unlikely, if not impossible, for the reasons described above.

77.     The combination of the first and second factors for the chasm between investors' expectations and actual results produced an enormous variance shortfall of $127,600,000 in operating income that shocked investors.  Rein's initial explanation was: "This quarter was negatively impacted by lower generic reimbursements, combined with higher salary and store expenses, and higher advertising costs."

78.     Significantly, such expenses as salaries, store expenses, and other costs within SO&A did not just suddenly jump by $59,800,000 in fiscal 4Q07.  Management's excuse that they simply were not minding the store is not credible. Walgreens has developed a highly effective system for developing and operating its stores, and expenses are budgeted well in advance.  Walgreens' 2007 Annual Report states that Walgreens may open a new store every 16 hours on average, but "each one is the product of approximately two years of planning and construction."  Such matters as salary schedules are approved only at the top of the organization, and would have been known well in advance of the actual implementation of those plans. Store expenses at Walgreens are reviewed weekly at the district level and monthly at the corporate level. Management maintained a budget and monitored the actual expenses to ensure that targets would be met, so that expenses were in line with sales. Such SO&A items as advertising and promotion were not spent without approval at the top by

senior management. Walgreens maintained a budget for the items comprising SO&A and decisions to materially increase expenditures were made by top management and were made well in advance of the fiscal fourth quarter of 2007.

## INSIDER SELLING

79.    During the Class Period, the Individual Defendants occupied positions as top Walgreens officers and were privy to non-public information concerning the Company.  Rein and Wasson knew of the adverse facts specified herein and omitted to disclose those facts. Notwithstanding their duty to refrain from causing Walgreens to sell (issue) stock while in possession of material, adverse, non-public information concerning the Company, the Individual Defendants caused Walgreens to sell (issue) millions of shares of Walgreens stock at grossly inflated prices, thus, allowing Walgreens to benefit from the Individual Defendants' wrongful course of conduct and omissions.

80.    While defendants were issuing the fraudulent statements identified herein about Walgreens' financial results and business, they sold at least 31,616 shares of Walgreens stock – typically only days after issuing favorable, albeit false, statements about the Company – for insider trading proceeds of $1.4 million.  Notwithstanding the Individual Defendants' knowledge about the ongoing fraud and their duty as officers and directors of the Company to disclose adverse material facts before trading in Walgreens stock, the Individual Defendants personally profited from the artificial inflation in Walgreens' stock price which their fraudulent scheme created.

81.    The Individual Defendants were remarkably successful in timing their trades, capturing peak prices when selling.  The Individual Defendants sold their stock during July and August 2007.  Each of the Individual Defendants' sales came on the heels of a number of optimistic public statements, which Walgreens voluntarily made to the public, and shortly prior to the October 1, 2007 disclosure that the Company missed analyst forecasts for the first time in ten years.

82.     Rein personally sold 12,274 shares of Walgreens stock for insider trading proceeds of $562,855, thereby profiting from the artificial inflation in Walgreens' stock price which defendants' fraudulent scheme had created.  Rein's reported insider trading during the Class Period is detailed below:

| INSIDER | Date | Shares | Price | Proceeds |
|---------|------|--------|-------|----------|
| REIN | 7/20/2007 | 6,000 | $45.14 | $270,840 |
| | 8/08/2007 | 4,000 | $46.00 | $184,000 |
| | 8/09/2007 | 1,366 | $47.50 | $64,885 |
| | 8/09/2007 | 908 | $47.50 | $43,130 |
| **Total** | | **12,274** | | **$562,855** |

83.     Wasson personally sold 19,342 shares of Walgreens stock for insider trading proceeds of $874,452, also capitalizing on the artificial inflation in Walgreens' stock price created by defendants' fraud.  Wasson's insider trading is detailed below:

| INSIDER | Date | Shares | Price | Proceeds |
|---------|------|--------|-------|----------|
| WASSON | 8/14/2007 | 19,342 | $45.21 | $874,452 |
| **Total** | | **19,342** | | **$874,452** |

### LOSS CAUSATION/ECONOMIC LOSS

84.     By misrepresenting Walgreens' business, the defendants presented a misleading picture of the Company's financial and business health.  Thus, instead of truthfully disclosing during the Class Period that Walgreens' business was not as healthy as represented, Walgreens falsely reported its 3Q07 results, including concealing its gross profit and SO&A expense problems.

85.     These omissions caused and maintained the artificial inflation in Walgreens' stock price throughout the Class Period and until the truth about its declining gross profits and increased SO&A expenses were revealed to the market.

86.     Defendants' false and misleading statements had the intended effect and caused Walgreens' stock to trade at artificially inflated levels throughout the Class Period, reaching as high

- 34 -

as $48.09 per share on September 27, 2007, the penultimate trading day before the release of the

Company's 4Q07 earnings results.

87.   On October 1, 2007, defendants announced disappointing 4Q07 financial results

based on what they claimed were: (1) lower generic drug reimbursements; and (2) higher salary and

store expenses and higher advertising costs.  As a result of this partial disclosure, Walgreens' stock

declined $7.08 per share to close at $40.16 per share, a one-day decline of 15% on extremely high

volume of 67.4 million shares.

88.   The decline in Walgreens' stock price was a direct result of the nature and extent of

defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of

Walgreens' stock price declines negate any inference that the loss suffered by Lead Plaintiff and

other class members was caused by changed market conditions, macroeconomic or industry factors

or Company-specific facts unrelated to the defendants' fraudulent conduct.  The economic loss, i.e.,

damages, suffered by Lead Plaintiff and other members of the class was a direct result of defendants'

fraudulent scheme to artificially inflate Walgreens' securities prices and the subsequent significant

decline in the value of Walgreens' securities when the truth was revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

89.   At all relevant times, the market for Walgreens securities was an efficient market for

the following reasons, among others:

(a)   Walgreens' stock met the requirements for listing, and was listed and actively

traded on the NYSE, an efficient and automated market;

(b)   As a regulated issuer, Walgreens filed periodic public reports with the SEC

and NYSE;

(c)   Walgreens regularly communicated with public investors via established

market communication mechanisms, including through regular disseminations of press releases on

the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Walgreens was followed by numerous securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of those reports was publicly available and entered the public marketplace.

90.     As a result of the foregoing, the market for Walgreens securities promptly digested current information regarding Walgreens from all publicly available sources and reflected such information in Walgreens' stock price.  Under these circumstances, all purchasers of Walgreens securities during the Class Period suffered similar injury through their purchase of Walgreens securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR EXISTS FOR DEFENDANTS' STATEMENTS

91.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The specific statements pleaded herein either were not identified as "forward-looking statements" when made or were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Walgreens who knew that those statements were false when made.

## LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

92.     Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of purchasers of Walgreens' publicly traded securities during the Class Period who were damaged by defendants' fraud.  Excluded from the class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

93.     The members of the class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Walgreens' common stock was actively traded on the NYSE.  While the exact numbers of class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed class.  Record owners and other members of the class may be identified from records maintained by Walgreens or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

94.     Lead Plaintiff's claims are typical of the claims of members of the class as all members of the class were similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

95.     Lead Plaintiff will fairly and adequately protect the interests of the members of the class and has retained counsel competent and experienced in class and securities litigation.

96.     Common questions of law and fact exist as to all members of the class and predominate over any questions solely affecting individual members of the class.  Among the questions of law and fact common to the class are:

(a)     Whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     Whether statements made by defendants to the investing public during the Class Period misrepresented and omitted material facts about the business, operations and financial results of Walgreens; and

(c)     To what extent the members of the class have sustained damages and the proper measure of damages.

97.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## FIRST CLAIM

### Violation of Section 10(b) of the 1934 Act and Rule 10b-5
### Promulgated Thereunder Against Walgreens and the Individual Defendants

98.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

99.     During the Class Period, defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Lead Plaintiff and other class members, as alleged herein; (b) artificially inflate and maintain the market price of Walgreens securities; and (c) cause Lead Plaintiff and other members of the class to purchase Walgreens securities at artificially inflated prices and, as a result, suffer economic losses when the truth about defendants' fraud was revealed.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

- 38 -

100.     Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Walgreens securities in violation of §10(b) of the 1934 Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

101.     In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-K, 17 C.F.R. §§229.10, *et seq.* and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition, revenue and earnings so that the market price of the Company's securities would be based on truthful, complete and accurate information.

102.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Walgreens as specified herein.

103.     These defendants employed devices, schemes and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices and a course of conduct as alleged herein in an effort to assure investors of Walgreens' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the

statements made about Walgreens and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Walgreens' securities during the Class Period.

104.     The Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high-level executives and directors at the Company during the Class Period; (b) the Individual Defendants were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; and (c) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

105.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such defendants' material misrepresentations and omissions were done knowingly or recklessly and for the purpose and effect of concealing Walgreens' financial results, operating condition and business prospects from the investing public and supporting the artificially inflated price of its securities.   As demonstrated by defendants' misstatements and omissions regarding the Company's financial results and operations throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

106.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Walgreens' securities

was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Walgreens' publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Lead Plaintiff and the other members of the class acquired Walgreens securities during the Class Period at artificially inflated prices and were damaged thereby.

107.    At the time of said misrepresentations and omissions, Lead Plaintiff and the other members of the class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and the other members of the class and the marketplace known of the true financial condition and business prospects of Walgreens, which were not disclosed by defendants, Lead Plaintiff and the other members of the class would not have purchased or otherwise acquired their Walgreens securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

108.    By virtue of the foregoing, defendants have violated §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

109.    As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and the other members of the class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SECOND CLAIM

### Violation of Section 20(a) of the 1934 Act
### Against Walgreens and the Individual Defendants

110.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

- 41 -

111.    The Individual Defendants acted as controlling persons of Walgreens within the meaning of §20(a) of the 1934 Act as alleged herein.  Walgreens controlled all of its employees and each of the Individual Defendants.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and awareness of the Company's operations and intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

112.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

113.    As set forth above, Walgreens and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the defendants are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and the other members of the class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, and designating Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as class counsel;

B.      Awarding compensatory damages in favor of Lead Plaintiff and the other class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiff and the class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiff demands a trial by jury.

DATED:  November 25, 2009                COUGHLIN STOIA GELLER
                                          RUDMAN & ROBBINS LLP
                                         X. JAY ALVAREZ
                                         RYAN A. LLORENS


                                                  s/ X. JAY ALVAREZ
                                         _____
                                         By:  X. JAY ALVAREZ

                                         655 West Broadway, Suite 1900
                                         San Diego, CA  92101
                                         Telephone:  619/231-1058
                                         619/231-7423 (fax)

                                         Lead Counsel for Plaintiff

                                         MILLER LAW LLC
                                         MARVIN A. MILLER
                                         LORI A. FANNING
                                         115 S. LaSalle Street, Suite 2910
                                         Chicago, IL  60603
                                         Telephone:  312/332-3400
                                         312/676-2676 (fax)

                                         Liaison Counsel

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 25, 2009, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail

addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on November 25, 2009.

s/ X. JAY ALVAREZ
X. JAY ALVAREZ
COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail: jaya@csgrr.com

# Mailing Information for a Case 1:08-cv-02162

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **X. Jay Alvarez**
  jaya@csgrr.com,e_file_sd@csgrr.com

- **Lori Ann Fanning**
  LFanning@MillerLawLLC.com,MMiller@MillerLawLLC.com,JRamirez@millerlawllc.com

- **Ryan A Llorens**
  ryanl@csgrr.com

- **Marvin Alan Miller**
  Mmiller@millerlawllc.com,LFanning@millerlawllc.com,KPulido@millerlawllc.com,JRamirez@millerlawllc.com

- **Therese King Nohos**
  tnohos@dl.com,jefriedman@dl.com,mhanson@dl.com

- **Alan Norris Salpeter**
  asalpeter@dl.com,jefriedman@dl.com,courtalert@dl.com

- **Vincent P. Schmeltz , III**
  vschmeltz@dl.com,llucas@dl.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)