# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

PLUMBERS AND STEAMFITTERS
LOCAL NO. 7 PENSION FUND,

      Plaintiff,

      v.

WALGREEN CO., JEFFREY A. REIN and
GREGORY D. WASSON,

      Defendants.

Case No. 08 CV 2162

Judge Joan B. Gottschall

Magistrate Judge Brown

---

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

Alan N. Salpeter, Esq.
Vincent P. Schmeltz III, Esq.
Therese King Nohos, Esq.
DEWEY & LEBOEUF LLP
180 North Stetson, Suite 3700
Two Prudential Plaza
Chicago, Illinois  60601-6710
Telephone:  312-794-8000
Facsimile:  312-794-8100

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................... 1

STATEMENT OF ALLEGED FACTS ........................................................................... 4

    A.    Walgreens Is America's Largest Pharmacy. ................................... 4

    B.    Lifecycle Of Generic Drugs. .......................................................... 4

    C.    Walgreens' Sale of Prescription Drugs. ........................................ 5

    D.    Walgreens' 4Q07 Results. ............................................................... 6

    E.    Plaintiff Accuses Walgreens Of Making Fraudulent Statements. .................. 8

    F.    Plaintiff Accuses The Individual Defendants Of Insider Trading. .................. 9

ARGUMENT .................................................................................................................. 10

  I.    COUNT I FAILS TO STATE A CLAIM UNDER RULE 10b-5. ............................. 10

    A.    Plaintiff Fails To Allege That Walgreens Had A Duty To Disclose Any Allegedly Omitted Information. ................................. 11

        1.    Walgreens Had No Duty To Give An Earnings Forecast When Accurately Reporting Historical Results. ............................. 12

        2.    Walgreens Had No Duty To Disclose Publicly Available Information. ................................................................................. 14

            (a)    The Market Already Knew The Generic Drug Lifecycle. .............................................................. 14

            (b)    The Market Already Knew That Walgreens' Expenses Were Increasing. ................................... 16

    B.    Plaintiff Fails To Plead A Material Misstatement. ......................................... 17

        1.    The Lehman Report Cannot Be Attributed To Walgreens. .............. 17

        2.    The Lehman Report Does Not Contain Misrepresentations. .......... 18

    C.    Plaintiff Fails To Plead Scienter With Particularity. ..................................... 21

        1.    The SAC Lacks Particular Facts Suggesting Walgreens Knew It Would Materially Miss Wall Street's Projections. ........... 22

        2.    Ordinary Competitive Pressures Do Not Give Rise To A Strong Inference Of Scienter. ......................................................... 25

        3.    Plaintiff Fails To Plead With Particularity That Either Rein Or Wasson Acted With Scienter. .................................................... 25

        4.    It Is More Plausible To Infer That Walgreens Was Simply Too Optimistic For 4Q07. ............................................................. 27

  II.    COUNT II FAILS TO STATE A CLAIM UNDER SECTION 20(a). ...................... 29

  CONCLUSION ........................................................................................................ 30

i

# TABLE OF AUTHORITIES

## CASES

*Acito v. IMCERA Group, Inc.,*
  47 F.3d 47 (2d Cir. 1995) ............................................................................................ 23, 25, 26

*Arazie v. Mullane,*
  2 F.3d 1456 (7th Cir. 1993) ...................................................................................................... 13

*Basic Inc. v. Levinson,*
  485 U.S. 224 (1988) .................................................................................................................. 11

*Chiarella v. United States*
  445 U.S. 222 (1980) .................................................................................................................. 11

*Cheney v. Cyberguard Corp.,*
  No. 98-6879-CIV-GOLD, 2000 WL 1140306 (S.D. Fla. 2000) ............................................... 26

*Chiarella v. United States*
  445 U.S. 222 (1980) .................................................................................................................. 11

*Davis v. SSPS, Inc.,*
  385 F. Supp. 2d 697 (N.D. Ill. 2005).......................................................................................... 29

*DiLeo v. Ernst & Young,*
  901 F.2d 624 (7th Cir. 1990) .............................................................................................. 11, 22

*Druskin v. Answerthink, Inc.,*
  299 F. Supp. 2d 1307 (S.D. Fla. 2004)................................................................................. 27, 28

*Eldean v. Mitchell,*
  Case No. 07 C 6582, 2009 WL 674340 (N.D. Ill. Mar. 13, 2009) ........................................... 19

*Elkind v. Liggett & Myers, Inc.,*
  635 F.2d 156 (2d Cir. 1980) ...................................................................................................... 18

*Ernst & Ernst v. Hochfelder,*
  425 U.S. 185 (1976) .................................................................................................................. 21

*Fecht v. Northern Tel. Ltd. (In re Northern Tel. Ltd. Secs. Litig.),*
  116 F. Supp. 2d 446 (S.D.N.Y. 2000) ...................................................................................... 18

*Gallagher v. Abbott Laboratories, Inc.,*
  269 F.3d 806 (7th Cir. 2001) .................................................................................................... 11

*Harrison v. Dean Witter Reynolds, Inc.,*
  974 F.2d 873 (7th Cir. 1992) .................................................................................................... 29

*Higginbotham v. Baxter Int'l, Inc.,*
  495 F.3d 753 (7th Cir. 2003) .......................................................................................... 13, 14, 24

*In re Alamosa Holdings, Inc. Secs. Litig.,*
  382 F. Supp. 2d 832 (N.D. Tex. 2005) ...................................................................................... 18

*In re Bell Atlantic Corp. Secs. Litig.,*
  Nos. 91-0514 *et al.,* 1997 WL 205709 (E.D. Pa. 1997) ........................................................... 28

*In re Kulicke & Soffa Industs., Inc. Secs. Litig.,*
  747 F. Supp. 1136 (E.D. Pa. 1990) ............................................................................................ 22

*In re LeapFrog Enterprises, Inc. Sec. Litig.,*
  527 F. Supp.2d 1033 (N.D. Cal. 2007)...................................................................................... 17

*In re Navarre Corp. Secs. Litig.,*
  299 F.3d 735 (8th Cir. 2002) ............................................................................... 18

*In re Sofamor Danek Group, Inc.,*
  123 F.3d 394 (6th Cir. 1997) ............................................................................... 13

*In re Spyglass, Inc., Sec. Litig.,*
  No. 99 C 512, 1999 WL 543197 (N.D. Ill. July 21, 1999) .................................... 4

*In re Westell Technologies, Inc.,*
  No. 00 C 6735, 2001 WL 1313785 (N.D. Ill., Oct. 26, 2001) .............................. 27

*Makor Issues & Rights, Ltd. v. Tellabs Inc.,*
  513 F.3d 702 (7th Cir. 2008) ............................................................................... 27

*Mova Pharmaceutical Corp. v. Shalala,*
  140 F.3d 1060 (C.A. D.C. 1998) ............................................................................ 5

*New Jersey Carpenters Pension & Annuity Fund v. Biogen Idec. Inc.,*
  537 F.3d 35 (1st Cir. 2008) ................................................................................. 23

*Novak v. Kasaks,*
  216 F.2d 300 (2d Cir. 2000) ................................................................................ 25

*Panter v. Marshall Field & Co.,*
  646 F.2d 271 (7th Cir. 1981), cert. denied, 454 U.S. 1092 (1981) ...................... 13

*Premier Capital Mgmnt., LLC v. Cohen,*
  No. 02 C 5368, 2003 WL 21960357 (N.D. Ill. Aug. 15, 2003) ........................... 27

*Raab v. Gen. Physics Corp.,*
  4 F.3d 286 (4th Cir. 1993) ................................................................................... 17

*Roth v. OfficeMax, Inc.,* ('*OfficeMax II*')
  527 F. Supp. 2d 791 (N.D. Ill. 2007) ............................................................ 10, 29

*Santa Fe Indus., Inc. v. Green,*
  430 U.S. 462 (1977) ............................................................................................. 28

*Searls v. Glasser,*
  No. 91 C 6796, 1994 WL 523712 (N.D. Ill. 1994) ............................................. 12

*Shields v. Citytrust Bancorp, Inc.,*
  25 F.3d 1124 (2d Cir. 1994) ................................................................................ 28

*Silverman v. Motorola, Inc.,*
  Case No. 07 C 4507, 2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) ................ 19, 26

*Stavros v. Exelon Corp.,*
  266 F. Supp. 2d 833 (N.D. Ill. 2003) .................................................................... 3

*Stransky v. Cummins Eng. Co.,*
  51 F.3d 1329 (7th Cir. 1995) .................................................................... 10, 11, 13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
  551 U.S. 308 (2007) ...................................................................... 4, 10, 21, 28

*The Roots P'Ship v. Lands' End, Inc.,*
  965 F.2d 1411 (7th Cir. 1992) ........................................................................ 14, 22

*TSC Indus., Inc. v. Northway, Inc.,*
  426 U.S. 438 (1976) ............................................................................................. 14

*Wielgos v. Commonwealth Edison Co.*,
   892 F.2d 509 (7th Cir. 1989) ................................................................. 13, 14, 15

## STATUTES

15 U.S.C. § 78t(a) .................................................................................... 29

15 U.S.C. § 78u-4 ............................................................................... 10, 21

21 U.S.C. § 355(j)(5)(B)(iv) .................................................................... 5, 14

21 U.S.C. § 355t(1)(A)(i)-(ii) ................................................................. 5, 14

## REGULATIONS

17 C.F.R. § 229.10 .................................................................................... 12

17 C.F.R. § 229.303(a) .............................................................................. 13

17 C.F.R. § 230.175 .................................................................................. 13

17 C.F.R. § 240.10b-5 ......................................................................... passim

## RULES

Fed. R. Evid. 201(b) ................................................................................... 4

## INTRODUCTION

In its fourth attempt at pleading a valid claim, Plaintiff continues to allege that Walgreens had a duty to give earnings guidance to Wall Street.[1]  Plaintiff's Second Amended Complaint ("SAC") rests on 7 purportedly false statements.  The SAC alleges that, in 6 of these statements (reports of Walgreens' historical results), Walgreens failed to inform the market that its future earnings would not meet Wall Street's projections because of:  (i) reduced reimbursements for one of the generic drugs (simvastatin) that Walgreens sells; and (ii) increased expenses.  The Court already has held that Walgreens did not omit material information from these 6 statements, recognizing that Walgreens is entitled to report historical information and has no duty to predict earnings or release its financial results in the middle of a quarter.  (Sept. 24, 2009 Order ("Order") at 2-3.)  Because the SAC still fails to allege that Walgreens had a duty to provide the allegedly omitted information in these 6 statements, it also should be dismissed.

In a last-ditch effort to save its claim, Plaintiff has added a seventh statement to the SAC:  a June 2007 report of Walgreens' 3Q07 results from a Lehman Brothers analyst.  Tellingly, Plaintiff failed to cite this "new" statement in its prior complaints, despite admitting that it based its prior complaints on its counsel's review of "analysts' reports and advisories about the Company," among other materials.[2]  In this statement, the analyst purports to quote an unspecified Walgreens employee about generic drug sales and generic reimbursements from third-party payers. (Ex. 1, June 26, 2007 Lehman

---

[1] Unless otherwise noted, "Walgreens" shall refer collectively to Defendants Walgreen Co., Jeffrey A. Rein, and Gregory D. Wasson.  The "Company" shall refer to Walgreen Co. singularly, and the "Individual Defendants" shall refer to Rein and Wasson together.

[2] *See* Consolidated Amended Complaint ("CAC") at p. 1.

Bros. Equity Research Rpt. at 2 ("Lehman Report").) According to Plaintiff, Walgreens used the Lehman Report to tell the market that it was "happy with the gross profits for its prescription drugs"—somehow giving the impression that its gross profit dollars for generic drugs would not change in 4Q07. (SAC ¶ 70.) Plaintiff claims this excerpt was a fraudulent misstatement because Walgreens actually *knew* it was receiving fewer gross profit dollars for the generic version of Zocor (simvastatin). (*Id.*)

The Lehman Report is not an actionable misstatement. To begin with, Walgreens cannot be held responsible for Lehman Brothers' statements because neither the report nor the SAC contain specific facts connecting the Lehman Report to a particular Walgreens employee or employees. But, even if the statements in the report could be attributed to Walgreens, the report itself undermines Plaintiff's allegations. At best, it can be construed as Walgreens stating that—a mere 3 weeks into 4Q07—Walgreens was happy with the *current* level of reimbursements it had negotiated with third-party payers looked at as an average for *all* of the prescriptions it was filling for its various plans. The report says nothing whatsoever about the reimbursement rate for simvastatin specifically. Moreover, it says nothing whatsoever about what the profits from reimbursements on generics *would be* at the end of 4Q07, which was over 2 months away. For these reasons, among others, the Lehman Report undermines Plaintiff's allegation that Walgreens somehow used the Lehman analyst to convey the message that Walgreens either was happy with its gross profits or that future gross profits would be on par with its historical profits. Accordingly, the Lehman Report contains no misstatements and does not save Plaintiff's claim from dismissal.

Plaintiff also has failed to plead particularized facts sufficient to raise a strong inference that Walgreens acted with an intent to defraud the market for three reasons.

2

*First,* Plaintiff has failed to plead sufficient facts to demonstrate that Walgreens ***knew*** it was going to materially miss Wall Street's projections during 4Q07.  ***Second***, Plaintiff's allegations of competitive pressures, insider trading, and Walgreens' desire to close a merger do not raise a plausible inference that Walgreens had a motive to commit fraud. ***Third***, it is more plausible to believe that Walgreens had high expenses in 4Q07 because it was ebullient about a record year and continued to spend to support its record-high sales numbers—not that it attempted to fool the market so that a couple of its executives could net approximately $160,000 in profits on stock sales.

After four tries, enough is enough.  Plaintiff has not been able to plead a successful claim under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, promulgated thereunder, 17 C.F.R. § 240.10b-5 (together, "Rule 10b-5"), even though it has had over two years since the October earnings announcement to try to muster the facts to do so.  Its "Hail Mary" effort—the addition of the June 2007 Lehman Report—is equally unavailing.  Accordingly, the SAC should be dismissed ***with prejudice.***  *See, e.g., Stavros v. Exelon Corp.,* 266 F. Supp. 2d 833, 852 (N.D. Ill. 2003) (dismissing complaint with prejudice where amendment would be "futile").

## STATEMENT OF ALLEGED FACTS[3]

### A.    Walgreens Is America's Largest Pharmacy.

Walgreens is America's largest drugstore chain. (SAC ¶¶ 9, 20.) It sells prescription drugs and "front-end" merchandise such as beauty products, snacks, and greeting cards. (*Id.* ¶ 20.) Walgreens derives a greater proportion of its sales from prescription drugs, but front-end merchandise carries a higher profit margin. (Ex. 2, (Walgreens August 31, 2006 SEC Form 10-K at 4-5.))

During the putative class period, Walgreens operated nearly 6,000 stores, 101 home care facilities, eight specialty pharmacies, and three mail service facilities. (SAC ¶ 20.) In fiscal year 2007 ("FY07"), Walgreens added 536 new stores and completed an $850 million acquisition of Option Care. (Ex. 3, Oct. 1, 2007 Walgreens Earnings Release at 3-4; SAC ¶ 27.) During the alleged class period, Jeffrey A. Rein served as Walgreens' Chief Executive Officer and Chairman of its Board of Directors and Gregory D. Wasson served as its President and Chief Operating Officer.[4]

### B.    Lifecycle Of Generic Drugs.

The generic drug lifecycle and the availability of generics in the marketplace are well known. Congress requires the Food and Drug Administration ("FDA") to publish a

---

[3] Walgreens assumes, as it must, the truth of well-pleaded facts in the SAC. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Walgreens also cites documents Plaintiff quotes and others that the Court must consider under *Tellabs*. *Id.* ("courts **must consider** . . . **other sources** courts ordinarily examine when ruling on Fed. R. Civ. P. 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice") (emphasis added). For example, a district court may take judicial notice of facts that are not reasonably in dispute and that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," including publicly-filed SEC documents. *See* Fed. R. Evid. 201(b); *In re Spyglass, Inc., Sec. Litig.*, No. 99 C 512, 1999 WL 543197, *5 (N.D. Ill. July 21, 1999).

[4] (SAC ¶¶ 10, 12.) On October 10, 2008, Mr. Rein retired from the Company. In February 2009, Mr. Wasson became Walgreens' CEO.

complete list of all authorized generics (including when they became available) and to update the list quarterly.   21 U.S.C. § 355t(1)(A)(i)-(ii).   Congress also encourages manufacturers to incur the burden of being the first to apply for FDA approval of a generic by awarding so-called "first filers" with a 180-day exclusivity period.   During the exclusivity period, only the first filer can manufacture a new generic.   *See* 21 U.S.C. § 355(j)(5)(B)(iv); *see also Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 1064-65 (C.A. D.C. 1998) (describing regulatory scheme for generic drugs).   Other manufacturers may then produce the generic (this is known as "multi-sourcing").

Pharmacies such as Walgreens realize the highest gross profits dollars on generics during the 6-month exclusivity period when only one manufacturer has FDA approval to produce the new generic.  (SAC ¶ 9 (Chart – "Generic Exclusive").)  During that period, third-party payers (such as insurers and the government) pay pharmacies more to compensate them for the extra administrative and inventory costs associated with a new generic (the payers want to encourage generic use, too, because it reduces their costs). (*Id.* ¶¶ 23, 71.)  When multi-sourcing begins, competition drives down the cost of the generic and reduces third-party payer reimbursements.  (*Id.*)  At that stage, the generic reaches what is known as maximum allowable cost ("MAC") pricing.  (*Id.* ¶¶ 23-24.)[5]

### C.   Walgreens' Sale of Prescription Drugs.

Pharmacy sales of both branded and generic drugs accounted for 65% of Walgreens' sales in FY07.   (*Id.* ¶ 21.)   Generics yield a higher profit margin for Walgreens and lower price for its customers.   (*Id.* ¶ 22.)   Generics ***negatively*** impact

---

[5] Some analysts (such as Lehman Brothers) believed that there was a period of "incremental gross profit dollars to pharmacies" during a so-called "lag" between multi-sourcing and the beginning of MAC pricing.  (Ex. 1, Lehman Rpt. at 2) (selectively quoted in SAC ¶ 40); *see also* SAC ¶ 24 (copy of Bear Stearns chart showing 4 stages of pricing rather than 3).

sales, however, because generics sell for a lower price than branded drugs.[6]   (Ex. 2, Walgreens Aug. 31, 2006 Form 10-K at 4 (generics reduce sales dollars).)[7]   Because generics negatively impact revenues, they also impact expense ratios.[8]   (*See* Ex. 3, Oct. 1, 2007 Walgreens Earnings Release ("The impact of new, lower-cost generic drugs, which slowed pharmacy sales growth by 5.0 percentage points and total sales growth by 3.1 percentage points in the quarter, continued to affect expense ratios.") (selectively quoted in ¶ 48).)  Said another way, a generic drug generates *fewer* gross profit dollars, although a potentially higher gross margin percentage, as it moves through the cycle from exclusivity into MAC pricing, when both Walgreens' reimbursement rate and cost for the drug go down.  (*See, e.g.,* SAC ¶¶ 23 & 25.)

### D.   Walgreens' 4Q07 Results.

FY07 capped off Walgreens' 33rd consecutive year of record earnings and sales. (*Id.* ¶ 48.)  The October 1, 2007 press release announcing Walgreens' annual earnings reported a net earnings increase of 16.6% over the prior year.  (*Id.*)  Net earnings per

---

[6] Plaintiff continually blurs the distinction between sales, gross profit and gross margin. *See, e.g.,* SAC ¶ 2 ("Prescription *sales* . . . [are] driven in large part by the sale of generic prescription drugs which yield a *larger profit margin* than the sale of branded drugs." (emphasis added)); ¶ 44 (Walgreens "knew that *gross margins and gross profits* were important metrics and an increase in *sales* was misleading because it did not inform the market of the lower reimbursements Walgreens was receiving. . . ."). "Sales" reflects total sales revenue. "Gross profit" reflects the difference between sales revenue and cost of sales. "Gross margin" is also gross profit, although analysts frequently use this term as shorthand for gross margin percentage—expressed as a percentage of overall sales revenue.

[7] *See also* SAC ¶ 42 ("[June c]omparable pharmacy sales were negatively impacted by 5.9 percent due to generic introductions in the last 12 months."); ¶ 43 ("[July c]omparable pharmacy sales were negatively impacted by 4.5 percent due to generic drug introductions in the last 12 months.") ¶ 44 ("[August c]omparable pharmacy sales were negatively impacted by 4.2 percent due to generic drug introductions in the last 12 months.").)

[8] Expense ratios are calculated as expenses as a percentage of sales (*i.e.,* expenses divided by sales). Thus, if sales are lower, the expense ratio will increase even if expenses remain fixed.

share ("EPS") increased 18.0% over the prior year, from $1.72 per share (diluted) to $2.03 per share (diluted). (*Id.*)

Sales had been strong throughout the year. By the end of the third quarter ("3Q07"), Walgreens had reported $40.3 billion in sales for the first nine months of the fiscal year—an increase of 14% over the previous year. (*Id.* ¶ 38.) Walgreens' strong sales trend continued through 4Q07. The Company reported year-over-year sales increases of 9.5%, 11.0%, and 10.3%, respectively, for the three months of 4Q07. (*Id.* ¶¶ 42, 44, 46.) In fact, Walgreens *beat* analysts' sales projections for 4Q07. (*See, e.g.,* SAC ¶ 74 (Walgreens' actual sales exceeded Bear Stearns' forecast by $7.1 million).)

Walgreens' EPS for 4Q07 was only $0.40 though, $.06 to $.08 lower than analysts' predictions. (*Id.* ¶¶ 44, 47, 50.) Walgreens itself has a "no guidance" policy and does not offer projections regarding future earnings. (*See, e.g.,* SAC ¶ 33.) As a result, analysts, including the SunTrust analyst whom Plaintiff cites, acknowledge that, because "*the company provides no earnings guidance, there is always room for some bottom-line variability, relative to expectations* . . . ." (Ex. 4, Sept. 26, 2007 SunTrust Robinson Humphrey Analyst Rpt. at 1 (emphasis added).) Plaintiff alleges that the "miss" of analysts' 4Q07 projections caused Walgreens' stock to drop from $47.24 to $40.16 per share. (*Id.* ¶ 50.)

In its initial releases about the quarter, Walgreens reported that 4Q07 had been "negatively impacted by lower generic drug reimbursements, combined with higher salary and store expenses, and higher advertising costs." (*Id.* ¶ 48.) Walgreens initially cited the generic of Zocor—simvastatin—as *one* example of generics producing lower gross profit dollars than expected. (SAC ¶ 48 ("Generics *such as simvastatin* . . . saw a significant reduction in gross profit dollars during the fourth quarter.") (emphasis

added).)  Within a month, however, Walgreens clarified that "gross profit per prescription was in line with its plan [and that] the shortfall was from lower-than-anticipated [sales] volume growth in the pharmacy."  (Ex. 5, Nov. 2, 2007 Wm. Blair & Co. Equity Research Rpt. at 2.)

Walgreens cited a number of other reasons for its 4Q07 "miss," as well, which Plaintiff largely ignores.  Walgreens' other reasons included:  (i) an overall shift from front-end sales to pharmacy sales, which carry lower margins; (ii) an increase in a higher-than-expected LIFO inventory charge of $32 million as compared to $26.1 million in 4Q06; (iii) an increase in the sale of generic prescriptions, which depress revenues and adversely affect expense ratios; and (iv) a tough year-over-year sales volume comparison with 4Q06, which saw a surge in prescription sales due to the expansion of Medicare Part D.  (Ex. 3, Oct. 1, 2007 Walgreens Earnings Release (selectively quoted in ¶ 48); and Ex. 6, Oct. 1, 2007 Walgreens Earnings Webcast (selectively quoted in ¶ 49).)

**E.    Plaintiff Accuses Walgreens Of Making Fraudulent Statements.**

In an attempt to plead fraud, Plaintiff quotes extensively from the same 6 Walgreens' 10-Q, press releases, and webcasts that it quoted in the previous version of the complaint—the Consolidated Amended Complaint ("CAC").  (*Id.* ¶¶ 36, 38, 42, 43, 44.)  These can be categorized generally as (i) post-3Q07 statements reporting historical results for 3Q07 and (ii) three statements that reported the historical sales results for each month of 4Q07 that had just ended.  (*Id.* ¶ 36 (quoting June 25, 2007 Press Release of 3Q07 results); ¶ 38 (June 25, 2007 Webcast of 3Q07 results); ¶ 61 (referring to 10-Q for 3Q07); ¶ 42 (July 3, 2007 Press Release regarding June results); ¶ 43 (Aug. 2, 2007 Press Release regarding July results); ¶ 44 (Sept. 5, 2007 Press Release regarding August results).)  In addition to these previously-quoted statements, Plaintiff now relies on the

Lehman Report.   Plaintiff alleges that the Lehman Report "paraphrase[es]" what a Lehman analyst "presumably" discussed with an unidentified Walgreens insider.   (SAC ¶ 34.)   Plaintiff claims each of these 7 statements was misleading because each either omitted (in the case of the original 6 statements) or improperly disclosed (in the case of the new statement) material information about future (i) gross profits and gross margins related to the sale of generics and (ii) expense increases.   (*Id.* ¶¶ 65, 69, 73.)

### F.   Plaintiff Accuses The Individual Defendants Of Insider Trading.

Plaintiff alleges that Rein sold a total of 12,274 shares for $562,855 during the putative class period on July 20, 2007, August 8, 2007 and August 9, 2007.   (*Id.* ¶ 82.) Plaintiff also alleges that Wasson sold a total of 19,342 shares of Walgreens stock during the alleged class period on August 14, 2007 for a total of $874,452.   (*Id.* ¶ 83.)   Plaintiff fails to disclose, however, that each time Rein and Wasson sold stock during the alleged class period, they did so by exercising stock options and, accordingly, simultaneously purchased the same number of shares.   (Ex. 7, Collection of Statements of Changes of Beneficial Ownership of Securities, filed on Form 4, for Messrs. Rein and Wasson ("Rein and Wasson Form 4s").)   Thus, Rein and Wasson earned a net amount of $312,878 and $244,388, respectively, from their sales as compared to their annual base salaries of $1,200,000 and $700,000, respectively.   (Ex. 8, 2007 Walgreens 2007 Proxy Stmnt. at 13.)   Plaintiff also fails to disclose that, at the end of the class period, Rein and Wasson each retained a significant amount of Walgreens' stock and, accordingly, lost share value of $459,435 and $80,478, respectively, from the drop in Walgreens' stock price.   (Ex. 9, Summary of Rein and Wasson Form 4s.)   Finally, Plaintiff fails to disclose that Rein traded pursuant to a 10b5-1 Plan.   (Ex. 7, Rein and Wasson Form 4s.)

## ARGUMENT

"Private securities fraud actions, . . . if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). Thus, Congress enacted the Private Securities Litigation Reform Act ("PSLRA") "[a]s a check against abusive litigation by private parties." *Id.* To effectuate that goal, the PSLRA imposes "[e]xacting pleading requirements" on private plaintiffs, among other safeguards. *Id.* The PSLRA "requires plaintiffs to state *with particularity* both the facts constituting the alleged violation, and the facts evidencing scienter. . . ." *Id.* (emphasis added). Indeed, the PSLRA "requires fact-pleading that *exceeds* even the particularity requirement of Rule 9(b) . . . ." *Roth v. OfficeMax, Inc.*, 527 F. Supp. 2d 791, 796 (N.D. Ill. 2007) (Gottschall, J.) (emphasis added) ("*OfficeMax II*"). The PSLRA requires that the Court "shall" dismiss any complaint, like the one here, that does not meet its exacting pleading requirements. 15 U.S.C. § 78u-4(3)(A). After two years of trying to meet these rigorous standards, Plaintiff has failed again. These repeated failures demonstrate the futility of its effort and, accordingly, the SAC should be dismissed *with prejudice*.

## I.    COUNT I FAILS TO STATE A CLAIM UNDER RULE 10b-5.

To state a claim for violation of Rule 10b-5, Plaintiff must plead *with particularity* that Walgreens "1) made a misstatement or omi[tted information it had a duty to disclose], 2) of material fact, 3) with scienter, 4) in connection with the purchase or sale of securities, 5) upon which the plaintiff relied, and 6) that reliance proximately caused the plaintiff's injury." *Stransky v. Cummins Eng. Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995). The SAC fails that test for at least three reasons.

*First,* Plaintiff has failed to plead with particularity that Walgreens had a duty to disclose any of the purportedly omitted information about simvastatin or expenses. *Second,* Plaintiff has failed to plead with particularity that Walgreens made any affirmative misstatements. *Third,* and finally, Plaintiff has failed to plead particular facts giving rise to a *strong inference* that Walgreens acted with the intent to deceive, manipulate, or defraud the market.

### A.    Plaintiff Fails To Allege That Walgreens Had A Duty To Disclose Any Allegedly Omitted Information.

As was the case in *Gallagher v. Abbott Laboratories, Inc.*, 269 F.3d 806, 808 (7th Cir. 2001), much of Plaintiff's complaint "reads as if firms have an absolute duty to disclose all information material to stock prices as soon as news comes into their possession." (*See* SAC ¶ 101 ("defendants had a duty to promptly disseminate truthful information that would be material to investors . . . so that the market price of the Company's securities would be based on truthful, complete and accurate information.").) Yet, as the Seventh Circuit has held, "that is not the way the securities laws work." *Id.* "We do not have a system of continuous disclosure." *Id.* "Instead firms are entitled to keep silent (about good news as well as bad news) unless positive law creates a duty to disclose." *Id.*[9] "Mere silence *about even material information* is not fraudulent absent a duty to speak." *Stransky*, 51 F.3d at 1331 (emphasis added).

---

[9] *See also Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."); *Chiarella v. United States*, 445 U.S. 222, 235 (1980) ("there can be no fraud absent a duty to speak.); *DiLeo v. Ernst & Young*, 901 F.2d 624, 628 (7th Cir. 1990) ("[t]he securities laws do not impose general duties to speak.").

1.    **Walgreens Had No Duty To Give An Earnings Forecast When Accurately Reporting Historical Results.**

Although the Court already has rejected this theory, Plaintiff continues to allege that Walgreens should have made projections about the future when accurately reporting its historical results.   Plaintiff continues to quote from the same 6 reports the Court already has examined, none of which contained any forward-looking statements. Plaintiff alleges (just as it did before):

- "The June, July and August [historical] sales reports were misleading. Defendants knew that gross margins and gross profits were important metrics [because they drive earnings per share] and [reporting] an increase in [historical] sales was misleading because it did not inform the market . . . [that] increasing expenses and the lifecycle of the generics were hurting gross profits *for 4Q07*." (SAC ¶ 44 (emphasis added).)

- "Despite . . . information [about higher expenses], defendants did nothing *to warn* the public of the impact on gross margins." (*Id.* ¶ 58 (emphasis added).)

- In a June 2007 press release and the 3Q07 10-Q, "Walgreens failed to tell investors . . . that its gross profit and gross margin were *likely to be significantly lower in fiscal 4Q07* . . . because existing generic drugs . . . were entering the weakest phase of their product profit lifecycle." (*Id.* ¶ 61 (emphasis added).)

(*See also id.* at ¶¶ 67, 68, 73.)  But, Rule 10b-5 does not impose a duty to make forecasts when accurately reporting historical results.

As this Court already held, "'[i]n general, courts reject the argument that accurate reporting of impressive results can mislead by implication to future periods.'"  (Order at 3 (quoting *Searls v. Glasser*, No. 91 C 6796, 1994 WL 523712, at *7 (N.D. Ill. 1994)).  Thus, Plaintiff's argument that Walgreens' historical statements impliedly predicted 4Q07 results fails again.  As such, Plaintiff's conclusory allegation that SEC Regulation S-K, 17 C.F.R. § 229.10, imposed a duty on Walgreens to make the disclosures at issue misses the mark.   (SAC ¶ 101.)   Regulation S-K governs *predictions*.   Because

12

Walgreens' accurate reports of historical results cannot be construed as predictions of future results, Regulation S-K is completely inapposite.

Furthermore, as this Court also recognized, "[t]he disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future.'" (Order at 3) (quoting *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 401 n.3 (6th Cir. 1997).) As the Seventh Circuit repeatedly has held, "predictions of future performance are [not required by law, as they are] inevitably inaccurate because things almost never go exactly as planned." *Arazie v. Mullane*, 2 F.3d 1456, 1468 (7th Cir. 1993) (citing *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 514 (7th Cir. 1989)). In fact, the securities laws used to ***prohibit*** issuers from making forecasts for that very reason. *Stransky*, 51 F.3d at 1333 ("Until the late 1970s, SEC policy forbade companies from making forward-looking statements in mandatory disclosure documents."). Now, SEC regulations permit—but do not require— projections. *Wielgos,* 892 F.2d at 516 ("firms may withhold even completed estimates"); *Panter v. Marshall Field & Co.*, 646 F.2d 271, 292-93 (7th Cir. 1981), cert. denied, 454 U.S. 1092 (1981) (no duty to reveal internal projections).[10]

In short, Walgreens lawfully waited to report its earnings, gross profits, and expenses until the end of the fourth quarter. No law required an earlier disclosure. *See Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 760 (7th Cir. 2003) ("what rule of law requires 10-Q reports to be updated on any cycle other than quarterly? That's what the 'Q' means."). Indeed, "[f]irms regularly learn financial information between quarterly reports, and they keep it under their hats until the time arrives for disclosure." *Id.* Thus,

---

[10] *See also* 17 C.F.R. § 229.303(a) (enumerating items regarding past performance to be included in 10K) *and* 17 C.F.R. § 230.175 (creating safe harbor for forward looking statements).

even if Walgreens had anticipated that its earnings would not meet Wall Street's expectations in 4Q07 (which Plaintiff has not pleaded with particularity, as discussed *infra* at 21-24), it had no duty to disclose such a belief.

### 2. Walgreens Had No Duty To Disclose Publicly Available Information.

The market already knew all of the information Plaintiff claims Walgreens failed to disclose. As such, it was immaterial and Walgreens had no duty to disclose it. *Id.* at 759 ("The securities laws do not require firms to 'disclose' information that is already in the public domain.") Plaintiff cannot ignore "truthful information already available to the market." *The Roots P'Ship v. Lands' End, Inc.*, 965 F.2d 1411, 1420 (7th Cir. 1992). Indeed, information is material and need be disclosed only if there is "a substantial likelihood that [its] disclosure . . . would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). Thus, to the extent the SAC is based on the omission of publicly available data, it fails.

### (a) The Market Already Knew The Generic Drug Lifecycle.

Pursuant to statute, the FDA publicly announces *which* new generics become available and *when* on at least a quarterly basis. *See* 21 U.S.C. § 355(t)(1)(A)(i)-(ii). Furthermore, the entire generic lifecycle—from the 180-day "exclusivity period" during which profit margins are at their highest to "multi-sourcing" when MAC pricing kicks in—is a product of federal statute. *See* 21 U.S.C. § 355(j)(5)(B)(iv). Thus, Walgreens had no duty to disclose the myriad generic drugs, or the lifecycle of those drugs, in Walgreens' "product pipeline." (SAC ¶ 61.) *See Wielgos*, 892 F.2d at 517. Just as the Seventh Circuit held in *Wielgos*, it would be "pointless and costly to compel" an issuer to reprint the Code of Federal Regulations, Walgreens need not reprint the FDA's schedule

14

of generic drug releases that discloses the existing generic drugs and defines when they move from exclusivity to MAC pricing. *Id.* Thus, this information is *per se* immaterial—and need not be disclosed—because it is not Walgreens-specific and the market already knows which generics are available. *See Wielgos*, 892 F.3d at 515 (issuer need only disclose "firm-specific" information).

Indeed, the analyst reports on which Plaintiff relies confirm that the generic drug pricing lifecycle is public and not unique to Walgreens. William Blair reported that, because simvastatin went to MAC pricing in January 2007, reimbursements from third–party payers fell from about $50 per prescription to $25 "as expected." (SAC ¶ 25.) Bear Stearns similarly reported: "This is not quarter specific and is ***not company specific***, in our opinion. This has been our general cautious thesis on the sector." (Ex. 10, Oct. 1, 2007 Bear Stearns Equity Research Rpt. at 1 (emphasis added).)

Finally, for all of Plaintiff's talk of non-disclosure, Walgreens actually provided multiple disclosures about generics and their reimbursement rates. For instance, Walgreens warned on June 25, 2007 that "[r]educed reimbursement rates could adversely affect our revenues and profits." (*See* SAC ¶ 69.) Walgreens also stated that, "[a]lthough pharmacy margins increased with the growth in generic drug sales, some of that benefit was offset by growth in Medicare Part D and third party pharmacy sales (which typically have lower margins than cash prescriptions)." (Ex. 11, May 31, 2007 Walgreens Quarterly Rpt. On Form 10-Q ("3Q07 10-Q") at 9.) Walgreens even disclosed that its third party sales, "where reimbursement is received from managed care organizations and government and private insurance," were increasing, further exacerbating the negative impact on its margins. (*Id.* at 9 (third party sales had increased from 93.5% to 94.8%

year-over-year).)   Thus, the market already knew everything about the generic drug lifecycle.

      **(b)**      **The Market Already Knew That Walgreens' Expenses Were Increasing.**

The market also knew, prior to the start of 4Q07, that Walgreens' expenses were increasing as a percentage of sales and that Walgreens' results could deviate from analysts' expectations because Walgreens did not make projections.   For instance, Walgreens' 3Q07 10-Q disclosed that Walgreens' SO&A expenses had increased from previous quarters, as a percentage of sales, "principally [due to] higher store level salaries and expenses"—one of the exact reasons for Walgreens' 4Q07 "miss" of analyst expectations.   (Compare Ex. 11, 3Q07 10-Q at 10 with SAC ¶ 48.)   That same SEC filing disclosed that "higher expense ratios during the quarter and nine month period [of FY07]" had partially offset improved sales and higher gross margins.   (Ex. 11 at 9.)   The market understood this trend.   In fact, William Blair released an earnings model on September 5, 2007 (about one month before Walgreens announced its 4Q07 results) that showed Walgreens' SO&A expenses increasing as a percentage of sales from 22.0% in the third quarter to 22.8% in the fourth quarter.   (Ex. 12, Sept. 5, 2007 Wm. Blair & Co. Equity Research Rpt at 5.)   Bear Stearns issued a similar prognostication.   (Ex. 13, Sept. 26, 2007 Bear Stearns Equity Research Rpt. at 1 (projecting expenses to increase due to "decelerating sales growth").)

In addition, the market knew that Walgreens' actual results could deviate from analyst expectations because Walgreens does not give earnings guidance.   Analysts have regularly acknowledged that, "[a]s is always the case with WAG, given that the company provides no earnings guidance, there is always room for some bottom-line variability,

relative to expectations, but [we] believe that most investors have grown accustomed to this." (Ex. 4, Sept. 26, 2007, SunTrust Analyst Rpt at 1.).

Thus, because the market was aware of the generic drug cycle and Walgreens' increasing expenses (and their impact on Walgreens' gross profits), Walgreens had no duty to disclose such information.

## B.    Plaintiff Fails To Plead A Material Misstatement.

The single new statement the SAC now pleads as a material misstatement is not even a Walgreens statement.  Rather, it is a report written by a Lehman analyst.  (*See, e.g.,* SAC ¶¶ 33-34 & 69.)  Nevertheless, Plaintiff attempts to hold Walgreens liable for the Lehman Report by alleging that Walgreens should have corrected the Lehman Report. (*See, e.g.,* SAC ¶ 35 ("Instead of denying the statements attributed to the Company by the securities analyst, Walgreens allowed the market to adopt the statements and artificially inflate the stock price.").)  Alternatively, Plaintiff claims that Walgreens provided false information to the analyst.  (*Id.* ¶ 70).  The Lehman Report cannot be attributed to Walgreens, however.  In any event, it contained no false information.[11]

### 1.    The Lehman Report Cannot Be Attributed To Walgreens.

As a general rule, third party statements cannot be attributed to a company.  *See Raab v. Gen. Physics Corp.,* 4 F.3d 286, 288 (4th Cir. 1993) (company had no duty to

---

[11] Paragraph 69 of the SAC arguably quotes another purported misstatement, which the Court already has examined and rejected.  Plaintiff again claims that Walgreens' risk disclosure that "[r]educed reimbursement rates *could* adversely affect our revenues and profits" was false and misleading given what Walgreens allegedly knew about simvastatin.  (SAC ¶ 69 (emphasis added).)  But an otherwise true risk disclosure statement is not misleading merely because Plaintiff would have liked it to be stated with greater certainty.  *See, e.g., In re LeapFrog Enterprises, Inc. Sec. Litig.,* 527 F. Supp.2d 1033, 1049 (N.D. Cal. 2007) (rejecting claim that defendant should have stated that adverse factors "are" affecting financial results rather than that they "may" affect financial results).

"police statements made by third parties for inaccuracies . . . ."); *see also Fecht v. Northern Tel. Ltd.* (*In re Northern Tel. Ltd. Secs. Litig.*), 116 F. Supp. 2d 446, 458-59 (S.D.N.Y. 2000) ("defendants had 'no duty to . . . warn the analysts (and the public) that their optimistic view was not shared by the company.'" (quoting *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 163 (2d Cir. 1980)). To fit within an exception to this rule, Plaintiff must plead *with particularity* facts such as "*who* supplied the information to the analyst, *how* the analyst received the information, and *how* [Walgreens] was entangled with or manipulated the information and the analyst." *In re Alamosa Holdings, Inc. Secs. Litig.*, 382 F. Supp. 2d 832, 855 (N.D. Tex. 2005) (emphasis added) ; *see also In re Navarre Corp. Secs. Litig.*, 299 F.3d 735, 743 (8th Cir. 2002). Here, Plaintiff merely alleges that the Lehman Report "disclos[ed] *presumably* what it discussed with the Company on a call subsequent to Walgreens' announcement." (SAC ¶ 34 (emphasis added).) Plaintiff does not allege *who* provided this information, *how* and *when* the information was communicated, or *how* Walgreens entangled itself with, or manipulated, Lehman. Lacking these details, Plaintiff cannot attribute this third-party statement to Walgreens.

## 2. The Lehman Report Does Not Contain Misrepresentations.

Even assuming the Court attributes the Lehman Report to Walgreens (which it should not), the Lehman Report contained no false information about either expenses or the generic lifecycle. To begin with, the Lehman Report said *nothing* about expenses. Next, what the Lehman Report said about generics is historical, well known, and accurate.

Indeed, the Lehman Report is sub-titled "A Solid Performance" and discusses Walgreens' 3Q07 historical actual results. (Ex. 1, Lehman Rpt. at 1.) The section of the

report from which Plaintiff selectively quotes begins with: "[3Q07] marks the third quarter in a row that WAG has experienced significant year-over-year gross margin improvement, which is being driven primarily by new generic drug launches . . . ." (*Id.* at 2.) Furthermore, the report was issued in the first month of the fourth quarter and made no pretense of projecting fourth quarter expectations. Read in context, the analyst was purporting to paraphrase an unidentified Walgreens insider's statements about Walgreens' 3Q07 historical performance. *See Silverman v. Motorola, Inc.*, Case No. 07 C 4507, 2008 WL 4360648, *8 (N.D. Ill. Sept. 23, 2008) (holding that court would read allegedly false statements in context of surrounding statements). As an historical, accurate, report, the Lehman Report does not give rise to liability. (Order at 3.)

Next, the Lehman Report itself belies Plaintiff's allegations. *See Eldean v. Mitchell*, Case No. 07 C 6582, 2009 WL 674340, *3 (N.D. Ill. Mar. 13, 2009) ("When exhibits and allegations in the complaint conflict, the exhibit controls."). Plaintiff claims that "Walgreens told the market that there **would be** no meaningful change in reimbursements from third-party payers" via the Lehman Report. (SAC ¶ 40 (emphasis added).) But the Lehman Report says no such thing. The Lehman Report states (when commenting on just-announced 3Q07 historical results) that "there **are no** meaningful changes in reimbursement from third-party payers." (*Id.* (emphasis added).) Plaintiff does not allege that statement is false with respect to 3Q07.[12]

Plaintiff also claims that Walgreens "quashed" concerns about simvastatin reaching MAC pricing too quickly by stating that it was "happy with the gross profits for

_____

[12] Moreover, simvastatin had gone to MAC pricing in January 2007—6 months before Lehman issued its report. Thus, even if the Lehman Report were forward-looking (and it is not), Plaintiff still has not alleged it was false because third-party payers had begun providing lower reimbursements for simvastatin well before the statement.

its prescription drugs." (SAC ¶¶ 40, 70.) But Plaintiff's excerpt ignores key parts of the

Lehman Report:

> The company continues to reiterate that generics are very positive for its business and that there are no meaningful changes in reimbursement from third-party payers—either in the timing of reimbursement changes or the level of those changes. Other retailers have commented specifically on pressures related to generic reimbursement, particularly in the timing that generics move to the fixed price list called MAC (maximum allowable cost) from a reimbursement methodology tied to average wholesale price. WAG continues to say that MAC begins when a generic starts to be supplied by multiple suppliers (known as multi-sourcing). In the past we believe that there was some lag between multi-sourcing and MAC, and this period provided incremental gross profit dollars to pharmacies. Some of the questions about generic reimbursement are coming because generic Zocor (simvastatin), the largest generic launched during the past few years, went to MAC pricing very quickly. WAG says that it negotiates with payers for what it considers an acceptable gross profit dollar per script, looked at as an average of all the scripts it fills for a particular plan. The company says it remains happy with the outcome of those negotiations.

(Ex. 1 at 2 (emphasis added to indicate Plaintiff's omissions).) When Plaintiff's selective

quotation is read in context with the information Plaintiff omits, it becomes clear that

Walgreens did not "quash[]" concerns that simvastatin reached MAC pricing too quickly.

Rather, Walgreens allegedly told the Lehman analyst ***not to count on*** an extended period

in which Walgreens would earn higher profit dollars.

Finally, the Lehman Report negates Plaintiff's allegation that Walgreens was

"happy with the gross profits for its prescription drugs"—or that it was implying to the

market that 4Q07 gross profits would be in-line with past profits. (SAC ¶¶ 40 & 70.)

The Lehman Report actually states that Walgreens "negotiates with [third-party] payers

for what it considers an acceptable gross profit dollar per script, looked at as an ***average***

***of all the scripts it fills*** for a particular plan." (SAC ¶ 70 & Ex. 1 at 3 (emphasis added).)

The next sentence states that "[t]he company says it remains happy with the outcome of *those negotiations*." (*Id.*) Thus, Walgreens may have been satisfied with the outcome of negotiations with third-party payers over "acceptable gross profit dollar[s] per script," but it was not making a projection about its future gross profit dollars or gross margin percentages (or its overall satisfaction with them) for the upcoming quarter.

Thus, nothing in the Lehman Report supports an actionable misstatement by Walgreens. The report cannot be attributed to Walgreens. But even if the Court attributes it to Walgreens, Walgreens is not liable for securities fraud because the Lehman Report contains no material misrepresentations. Plaintiff's attempt to cast out-of-context-phrases as fraudulent misstatements fails.

### C.    Plaintiff Fails To Plead Scienter With Particularity.

To survive a motion to dismiss, Plaintiff must plead "that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs, Inc.*, 551 U.S. at 319 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 (1976). The PSLRA requires Plaintiff to "'state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.'" *Id.* at 321 (quoting 15 U.S.C. § 78u-4(b)(2) (emphasis added)). To plead a "strong inference," "[i]t does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind." *Tellabs,* 551 U.S. at 314.

Rather, the Court "must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Id.* Thus, "an inference of scienter must be *more than merely plausible or reasonable*—it must be *cogent* and at least as *compelling* as any opposing inference of nonfraudulent intent." *Id.* (emphasis added); *see also id.* at 324. Plaintiff

has failed to plead sufficient facts to demonstrate that Walgreens knew it was not going to meet Wall Street's expectations, must less a strong inference that its executives fraudulently hid that fact.

### 1. The SAC Lacks Particular Facts Suggesting Walgreens Knew It Would Materially Miss Wall Street's Projections.

The crux of Plaintiff's complaint is that Walgreens knew—or was reckless in not knowing—that decreasing reimbursements on a single generic (simvastatin) and increasing expenses would materially impact Walgreens' 4Q07 earnings. Standing alone, this pleading tactic would fail even if Walgreens had made projections itself—which it did not. *See DiLeo*, 901 F.2d at 627 ("Because only a fraction of financial deteriorations reflects fraud, plaintiffs may not proffer the different financial statements and rest. Investors must point to some facts suggesting that the difference is attributable *to fraud*." (emphasis added)). In order to meet the PSLRA's requirements for pleading scienter with sufficient particularity, Plaintiff *first* must plead the specific information Walgreens withheld. *See, e.g., The Roots P'ship,* 965 F.2d at 1419 (affirming dismissal where plaintiff failed to allege particulars about inadequate reserves, such as *what* reserves were or *what* they should have been). *Next,* Plaintiff must plead facts demonstrating that key officers at Walgreens—particularly the Individual Defendants—"assimilated and comprehended the significance" of the withheld information. *In re Kulicke & Soffa Industs., Inc. Secs. Litig.,* 747 F. Supp. 1136, 1139-1140 (E.D. Pa. 1990); *DiLeo,* 901 F.2d at 625 (affirming dismissal where complaint failed to provide *specific examples* of

problem loans that the auditors should have caught and *specific facts* demonstrating how auditors should have seen problems).  Plaintiff has done neither.[13]

For instance, Plaintiff alleges no particular facts to support its conclusions that (i) "*most* of the Company's generic drugs for sale were entering or were already in the weak spot of the product profit lifecycle" and (ii) "its gross profit and gross margin *were likely* to be significantly lower in fiscal 4Q07" as a result.  (SAC ¶¶ 61, 65 (emphasis added).) The SAC is devoid of any factual detail about which generic drugs were in their "weak spot," or how such weaknesses would impact gross profits, for example.

Similarly, with regard to expenses, Plaintiff alleges that Walgreens failed to disclose that "SO&A expenses were going to be *substantially higher* in fiscal 4Q07, leading directly to lower reported net earnings and EPS."  (SAC ¶ 73 (emphasis added).) But Plaintiff omits the fundamental facts of (i) *what* Walgreens' internal expense projections were and (ii) by *how much* Walgreens would miss those projections.[14]

Furthermore, even if Plaintiff had pleaded these facts (and it has not), Plaintiff's complaint still fails to plead particular facts giving rise to a strong inference that Walgreens perceived (or was reckless in not perceiving) a problem.  Such allegations should have included, at a minimum, what reports the Individual Defendants had, and

---

[13]  Pleading that a defendant merely withheld material information is insufficient to establish scienter. *See New Jersey Carpenters Pension & Annuity Fund v. Biogen Idec. Inc.*, 537 F.3d 35, 47 (1st Cir. 2008) (knowingly omitting material information is not, alone, determinative of scienter); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (plaintiff failed to adequately allege scienter despite allegations that defendant knew, but failed to disclose, deficiencies in manufacturing plant).

[14]  Plaintiff omits other details such as (i) *who* within management knew about or approved increased salaries, store expenses and advertising costs; (ii) *what* increased salaries, store expenses and advertising costs were approved or occurred; (iii) *when* those increased salaries, store expenses and advertising costs were approved or occurred; and (iv) *how* those allegedly known increased expenses caused Walgreens to miss its own projections.

23

when, showing that generic drug reimbursements and expenses would cause Walgreens to miss Wall Street's projections. In place of such details, Plaintiff points to third-party analyst forecasts and **assumes** that Walgreens knew (or was reckless in not knowing) that it would miss those forecasts. But this "hindsight analysis" does not show a material problem that Walgreens must have seen.

This is particularly problematic for Plaintiff since Walgreens only missed Wall Street's forecasts of gross profits as a percentage of sales by approximately **one-half of a percentage point**. (SAC ¶ 75.) Similarly, Walgreens SO&A expenses as a percentage of sales missed Wall Street's mark by **less than one-half of a percentage point**. (SAC ¶¶ 74-75.) Even analysts opined that Walgreens' expenses were not materially different than prior quarters. (Ex. 10, Oct. 1, 2007 Bear Stearns Equity Research Rpt. at 1 ("S[O]&A per unit rose only 5.5% [year-over-year] and consistent with prior quarters . . . "); Ex. 14, Oct. 2, 2007 Wm. Blair & Co. Equity Research Rpt. at 4 ("this quarter's SO&A growth was not materially different from recent trends . . . ").) "Reasonable executives need not see a 1.5% change as substantial; indeed, securities lawyers often use a **5% change** as a rule-of-thumb approach to what is 'material.'" *Higginbotham*, 495 F.3d at 759 (emphasis added).

Accordingly, the SAC does not plead (nor can it), with sufficient particularity, that Walgreens **knew** it would miss Wall Street's forecasts.[15]

---

[15] In any event, several components of Walgreens' expenses are estimated—and Plaintiff makes no allegation as to when Walgreens' executives might have known the actual numbers for those components. For example, Walgreens 3Q07 10-Q explained that Walgreens *estimates* the amount of vendor allowances to which it is entitled based on things such as the amount of product sold. (*See, e.g.,* Ex.11, 3QFY2007 10-Q at 10.)

2.   **Ordinary Competitive Pressures Do Not Give Rise To A Strong Inference Of Scienter.**

Plaintiff alleges that competitive pressures motivated Walgreens to commit fraud. Among the so-called pressures, Walgreens' primary competitor, CVS, allegedly became a bigger threat due to its March 2007 merger with Caremark.  (SAC ¶ 26.)  Another competitor, Wal-Mart, had started offering $4 generic prescriptions a year earlier, in September 2006.  (*Id.* ¶ 4.)  Finally, Walgreens had stopped engaging in allegedly illegal Medicare practices, which the Department of Justice alleged occurred between 2001 and 2005 and which settled without Walgreens admitting any liability.  (*Id.* ¶ 3.)  Even taking all of these allegations together, Plaintiff has not pleaded a strong inference of scienter. A mere desire to sustain corporate profitability or a high stock price in the face of competition is not indicative of a fraudulent intent.  *Novak v. Kasaks*, 216 F.2d 300, 309 (2d Cir. 2000).

In any event, Plaintiff has alleged facts that indicate that Walgreens was *succeeding* in the face of competitive pressures—not that it was engaging in fraud to avoid them.  FY07 capped off Walgreens' 33rd consecutive year of record earnings and sales.  (SAC ¶ 48.)  Walgreens' net EPS increased 18.0% over the prior year, from $1.72 per share (diluted) to $2.03 per share (diluted).  (*Id.*)  In short, Walgreens faced all of the same competitive pressures Plaintiff cites well before 4Q07 started and succeeded.

3.   **Plaintiff Fails To Plead With Particularity That Either Rein Or Wasson Acted With Scienter.**

To support an inference of scienter against Rein and Wasson, Plaintiff alleges that they each engaged in "insider trading" and had a strong desire to maintain their jobs. This common allegation does not sustain Plaintiff.  "If scienter could be pleaded on that

basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *See Acito*, 47 F.3d at 54.

Plaintiff claims that Rein sold a total of 12,274 shares of Walgreens stock during 4Q07 for proceeds of $562,855 and that Wasson sold a total of 19,342 shares of Walgreens stock for proceeds of $874,452. (SAC ¶¶ 10, 12.)  Plaintiff does not even attempt to allege that Rein's sales were unusual (apparently recognizing that they were part of a pre-approved 10b5-1 Plan).  And, while Plaintiff alleges that "Wasson's stock sales were not part of any pre-established trading plan and were out of line with his pre-Class Period trading practices," (*id.* ¶ 12), the Court need not give the allegation any weight because Plaintiff fails to support it with specific facts regarding Wasson's trades pre-4Q07. *See, e.g., Cheney v. Cyberguard Corp.*, No. 98-6879-CIV-GOLD, 2000 WL 1140306, at *8 (S.D. Fla. 2000) (plaintiffs "bear the burden of showing that sales by insiders were in fact unusual or suspicious in amount and in timing" such as by alleging "the amount of trading that the insider conducted before or after the class period").

Moreover, taking into account the cost of the shares they **_purchased_** as part of their option exercises, Rein's and Wasson's net proceeds were a fraction of their overall annual salaries (net proceeds of $312,878 and $244,388, respectively)—not the combined $1.4 million Plaintiff alleges.  In addition, each of them lost money on their remaining shares as a result of the resulting stock drop ($459,435 and $80,478, respectively).  In short, Plaintiff has failed to allege a personal and concrete material gain for these two men.  After their losses, Rein lost more than he gained and Wasson netted $163,910. Plaintiff's suggestion that Rein and Wasson concocted a fraud in order to **_temporarily_** mask an earnings shortfall for this amount is implausible. *See Silverman v. Motorola, Inc.*, No. 07 C 4507, 2008 WL 4360648, at *13 ("Insider trading alone does not raise an

inference of scienter."); *In re Westell Technologies, Inc.*, No. 00 C 6735, 2001 WL 1313785, at *10 (N.D. Ill., Oct. 26, 2001) (in order to raise a "strong inference of scienter," a complaint would have to show that "the defendants benefited in a **concrete and personal way**").

Plaintiff's allegation that the Option Care merger spurred Rein and Wasson to commit fraud is similarly implausible for two reasons. ***First,*** Walgreens **acquired** Option Care and, because the merger consideration was cash and the assumption of debt (SAC ¶ 28), Plaintiff alleges no reason why Walgreens would need to artificially inflate its earnings in order to close the Option Care deal. ***Second,*** the allegation that executives committed fraud in order to keep their jobs does not give rise to a strong inference of scienter. *Premier Capital Mgmnt., LLC v. Cohen,* No. 02 C 5368, 2003 WL 21960357 at *6 (N.D. Ill. Aug. 15, 2003.) The "'motive and opportunity to do wrong are certainly not the same as having the *intent* to do it . . . .'" *Id.* at * 7; *see also Druskin v. Answerthink, Inc.,* 299 F. Supp. 2d 1307, 1335 (S.D. Fla. 2004) ("motives such as greed can be ascribed to any company insider and are thus fundamentally inconsistent with the provisions of the Reform Act that require allegations of *specific facts* that establish scienter." (emphasis added)).  In short, these allegations of scienter lack the plausibility required by the PSLRA.

### 4.  It Is More Plausible To Infer That Walgreens Was Simply Too Optimistic For 4Q07.

"The plausibility of an explanation [of scienter] depends on the plausibility of the alternative explanations." *Makor Issues & Rights, Ltd. v. Tellabs Inc.,* 513 F.3d 702, 711 (7th Cir. 2008).  Thus, the Court must consider competing inferences.  And, here, it is significantly more plausible to conclude that Walgreens did not perceive the alleged problems with generics and expenses because it was simply too optimistic going into the

fourth quarter of a record-breaking year. While Plaintiff pleads the pat phrase that Walgreens' financial condition was a "house of cards," its own allegations belie that notion. (*Id.* ¶ 28.)

Optimism is the *much more likely inference* when one considers that 4Q07 capped off Walgreens' best year in seven years, that Walgreens "filled nearly three times as many prescriptions for simvastatin" in 4Q07 as in 4Q06, and that Walgreens beat at least one analyst's overall projected sales by $7.1 million. (*Id.* ¶¶ 50, 62, 93.) Thus, Plaintiff cannot establish scienter. *See, e.g., Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) ("misguided optimism is not a cause of action, and does not support an inference of fraud.").

Given the record year Walgreens was having, even analysts anticipated that Walgreens' higher-than-expected expenses resulted from its efforts to "drive stronger gross profit growth with advertising, etc. . . . ." (SAC ¶ 54.) A strategic decision in the midst of a record year to increase some expenses in order to achieve a higher profit— albeit one that may have backfired—is at least as plausible, if not more so, than an inference of fraudulent intent. *Druskin*, 299 F. Supp. 2d at 1324 ("poor business judgment or even mismanagement" does not suggest fraud); *In re Bell Atlantic Corp. Secs. Litig.*, Nos. 91-0514 *et al.*, 1997 WL 205709, at 27 (E.D. Pa. 1997) ("poor business judgment . . . does not create liability under Rule 10b-5"); *see also Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977) ("mismanagement" is not a "manipulative scheme").

Thus, Plaintiff's theory (that competitive pressures drove Walgreens to commit fraud) falls far short of being "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.*, 551 U.S. at 314. Every company faces competitive pressures of some sort or another. The facts alleged demonstrate that

Walgreens, America's largest pharmacy, faced its competitive pressures head-on and had a record year in spite of them.

## II.    COUNT II FAILS TO STATE A CLAIM UNDER SECTION 20(a).

By Count II, Plaintiff seeks to impose liability under Section 20(a) of the Securities and Exchange Act, 15 U.S.C. § 78t(a), against the Individual Defendants as persons who control Walgreens.   In order to state a Section 20(a) claim, however, Plaintiff must allege successfully, among other things, a primary securities fraud violation.  *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992); *see also Davis v. SSPS, Inc.*, 385 F. Supp. 2d 697, 777 (N.D. Ill. 2005).   As demonstrated above, Plaintiff failed to plead a claim for securities fraud under Rule 10b-5.   Thus, Plaintiff's Section 20(a) claim must fail as well.  *OfficeMax II*, (dismissing Section 20(a) claim where plaintiff failed to state a 10b-5 claim).

## CONCLUSION

Over two years have passed since the alleged October 1, 2007 "stock drop," and Plaintiff has submitted four versions of its complaint. Yet Plaintiff has failed to plead any facts suggesting either that Walgreens made a fraudulent omission or misrepresentation, or acted with scienter. Thus, for all of the foregoing reasons, each of Plaintiff's claims should be dismissed with prejudice because further amendments would be futile.

Dated: February 1, 2010

Respectfully Submitted,

WALGREEN CO., JEFFREY A. REIN, AND GREGORY D. WASSON

By____/s/ Vincent P. Schmeltz III____
One of Their Attorneys

Alan N. Salpeter, Esq.
Vincent P. Schmeltz III, Esq.
Therese King Nohos, Esq.
DEWEY & LEBOEUF LLP
180 North Stetson, Suite 3700
Two Prudential Plaza
Chicago, Illinois 60601-6710
Telephone: 312-794-8000
Facsimile: 312-794-8100