UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| PLUMBERS AND STEAMFITTERS LOCAL NO. 7 PENSION FUND, Individually and On Behalf of All Others Similarly Situated,<br><br>　　　　　　　　　　　　Plaintiff,<br><br>　vs.<br><br>WALGREEN CO., et al.,<br><br>　　　　　　　　　　　　Defendants. | No. 1:08-cv-02162<br><br><u>CLASS ACTION</u><br><br>Judge Gottschall<br>Magistrate Judge Brown |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...................................................................................................1

II. FACTS ...................................................................................................................3

III. ARGUMENT .........................................................................................................6

    A. Motion to Dismiss Standards ......................................................................6

    B. The Complaint States a Claim Under §10(b) of the Securities Exchange
        Act, and Rule 10b-5 Promulgated Thereunder .........................................7

        1. Section 10(b) Legal Standards ........................................................7

        2. Defendants Knowingly Made False and Misleading Statements
           During the Class Period ..................................................................7

        3. Defendants Are Liable for False and Misleading Statements Made
           Through Analysts .........................................................................10

        4. The Information in the Lehman Brothers Report Was Not Limited
           to 3Q07 Financial Results .............................................................14

        5. Defendants Explanation that the Market Already Knew the False
           and Misleading Information Disclosed in the Lehman Report Is
           Inaccurate ....................................................................................16

        6. The Market Was Not Already Aware of the Significance in the
           Increase of SO&A Expenses..........................................................17

        7. Plaintiffs Have Alleged a Strong Inference of Defendants' Scienter ........18

           a. Defendants Knew or Recklessly Disregarded the Adverse
               Impact of Lower Generic Drug Reimbursements and
               Higher SO&A Expenses ...................................................20

           b. The Court's Prior Order Supports a Finding of Scienter ..............22

           c. Defendants' Scienter Arguments Miss the Mark ..........................23

        8. Rein's and Wasson's Insider Trading and Incentive Packages
           Support a Strong Inference of Scienter ..........................................25

    C. The Complaint Properly Pleads Loss Causation...........................................28

    D. The Section 20(a) Claim Is Properly Pled ..................................................29

**Page**

IV.  CONCLUSION.................................................................................................................29

507719_1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..............................................................................6

*Caremark, Inc. v. Coram Healthcare Corp.*,
  113 F.3d 645 (7th Cir. 1997) .............................................................28

*Centers v. Centennial Mortgage, Inc.*,
  398 F.3d 930 (7th Cir. 2005) ...............................................................6

*Cooper v. Pickett*,
  137 F.3d 616 (9th Cir. 1997) ...............................................................11

*Dardick v. Zimmerman*,
  149 F. Supp. 2d 986 (N.D. Ill. 2001) ..................................................19

*Doherty v. City of Chicago*,
  75 F.3d 318 (7th Cir. 1996) ..................................................................6

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)............................................................................28

*Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.*,
  805 F.2d 732 (7th Cir. 1986) ................................................................6

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976)............................................................................18

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
  270 F.3d 645 (8th Cir. 2001) ..............................................................27

*Greater Pa. Carpenters Pension Fund v. Whitehall Jewellers, Inc.*,
  No. 04 C 1107, 2005 U.S. Dist. LEXIS 12971
  (N.D. Ill. June 30, 2005) ................................................................6, 27

*Harrison v. Dean Witter Reynolds, Inc.*,
  974 F.2d 873 (7th Cir. 1992) ..............................................................29

*Higginbotham v. Baxter Int'l, Inc.*,
  495 F.3d 753 (7th Cir. 2007) ........................................................17, 22

*In re Alamosa Holdings, Inc. Sec. Litig.*,
  382 F. Supp. 2d 832 (N.D. Tex. 2005) ................................................13

**Page**

*In re Guidant Corp. Sec. Litig.*,
  No. 1:03-CV-0892-SEB-WTL, 2004 U.S. Dist. LEXIS 22809
  (S.D. Ind. Nov. 8, 2004)...............................................................................................6

*In re Motorola Sec. Litig.*,
  No. 03 C 287, 2004 U.S. Dist. LEXIS 18250
  (N.D. Ill. Sept. 9, 2004) ............................................................................................20

*In re Navarre Corp. Sec. Litig.*,
  299 F.3d 735 (8th Cir. 2002) ...............................................................................11, 13

*In re NeoPharm, Inc. Sec. Litig.*,
  No. 02 C 2976, 2003 U.S. Dist. LEXIS 1862
  (N.D. Ill. Feb. 7, 2003)...................................................................................9, 12, 23

*In re Newell Rubbermaid Inc. Sec. Litig.*,
  No. 99 C 6853, 2000 WL 1705279
  (N.D. Ill. Nov. 14, 2000)..........................................................................................13

*In re Northern Telecom Ltd. Sec. Litig.*,
  116 F. Supp. 2d 446 (S.D.N.Y. 2000)......................................................................11

*In re Sears, Roebuck & Co. Sec. Litig.*,
  291 F. Supp. 2d 722 (N.D. Ill. 2003) .......................................................................19

*In re Syntex Corp. Sec. Litig.*,
  95 F.3d 922 (9th Cir. 1996) ......................................................................................12

*In re Sys. Software Assocs. Sec. Litig.*,
  No. 97 C 177, 2000 U.S. Dist. LEXIS 3071
  (N.D. Ill. Mar. 8, 2000).............................................................................................26

*In re Wellcare Mgmt. Group Sec. Litig.*,
  964 F. Supp. 632 (N.D.N.Y. 1997)...........................................................................27

*In re Westell Techs., Inc. Sec. Litig.*,
  No. 00 C 6735, 2001 U.S. Dist. LEXIS 17867
  (N.D. Ill. Oct. 26, 2001) ................................................................................. *passim*

*Johnson v. Tellabs, Inc.*,
  262 F. Supp. 2d 937 (N.D. Ill. 2003) .........................................................................6

*Lieblang v. Crown Media Holdings, Inc.*,
  No. 07 C 4250, 2008 U.S. Dist. LEXIS 7918
  (N.D. Ill. Jan. 31, 2008) ......................................................................................20, 28

507719_1

**Page**

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) .....................................................................19

*Norfolk County Ret. Sys. v. Ustian*,
    No. 07 C 7014, 2009 U.S. Dist. LEXIS 65731
    (N.D. Ill. July 28, 2009)...............................................................25, 27, 28

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).......................................................................20

*Ong v. Sears, Roebuck & Co.*,
    459 F. Supp. 2d 729 (N.D. Ill. 2006) .........................................................28

*Raab v. Gen. Physics Corp.*,
    4 F.3d 286 (4th Cir. 1993) .........................................................................11

*Rehm v. Eagle Fin. Corp.*,
    954 F. Supp. 1246 (N.D. Ill. 1997) .......................................................18, 20

*Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*,
    365 F.3d 353 (5th Cir. 2004) .....................................................................11

*Stransky v. Cummins Engine Co.*,
    51 F.3d 1329 (7th Cir. 1995) .....................................................................16

*Takara Trust v. Molex Inc.*,
    429 F. Supp. 2d 960 (N.D. Ill. 2006) ....................................................25, 26

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).......................................................................... *passim*

*Triad Assocs. v. Chicago Hous. Auth.*,
    892 F.2d 583 (7th Cir. 1989) .......................................................................6

*Warshaw v. Xoma*,
    74 F.3d 955 (9th Cir. 1996) .............................................................10, 11, 13

Page

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
  §78j(b)................................................................................3, 7, 18
  §78t(a)........................................................................................29
  §78u-4(b)(2)...............................................................................18

Federal Rules of Civil Procedure
  Rule 8.........................................................................................29
  Rule 8(a)(2).................................................................................28
  Rule 9(b).....................................................................................13
  Rule 12(b)(6)......................................................................... *passim*

17 C.F.R.
  §240.10b-5...........................................................................3, 4, 5, 7

Lead Plaintiffs, Teamsters Affiliates Pension Plan and International Brotherhood of Teamsters General Fund and Retirement and Protection Plan (the "Plaintiffs"), respectfully submit this opposition to the motion to dismiss filed by Defendants Walgreen Co. ("Walgreens" or the "Company"), Jeffrey A. Rein ("Rein") and Gregory D. Wasson ("Wasson") (collectively, the "Defendants").

## I.    INTRODUCTION

The Court's September 24, 2009 Order ("Order") made it clear that Plaintiffs' Consolidated Amended Complaint satisfied many of the pleading requirements to prevail in a Rule 12(b)(6) motion to dismiss.  The Court suggested scienter was properly pled when it stated that: "Plaintiffs have made a strong showing that Defendants were aware of the issues related to simvastatin and the SO&A expenses prior to the fourth quarter of 2007."  Order at 2.  Moreover, the Court stated "thus, even under the heightened scienter requirements imposed by the Private Securities Litigation Reform Act, Plaintiffs have likely shown that Defendants were aware that the stock price would drop when these disclosures were later made."  *Id*.  The Court also implied that the alleged misstatements were material enough to cause Plaintiffs' loss at the end of the Class Period.  *Id*.  ("There is also no dispute these issues were not disclosed to the public by Walgreens, and there is reason to believe, at least at this stage, that these were the dominant factors giving rise to the stock drop at the end of September, 2007.")

The Court's opinion concerning scienter, materiality and loss causation should not change. The allegations added to the Second Amended Complaint ("Complaint") will only reinforce those opinions.  Plaintiffs have added allegations that Defendants did not only know generic drug reimbursements would decrease in 4Q07, they knew by exactly how much.  Indeed, Walgreens admitted to negotiating those amounts with third-party payers in advance.

- 1 -

The Court, however, found that Plaintiffs did not plead a basis by which Defendants had a legal duty to disclose Walgreens' decline in generic drug reimbursement and increase in SO&A expenses.  Order at 3-4.

Plaintiffs' Complaint cures the lone deficiency the Court found in the prior complaint. Plaintiffs' Complaint alleges that Walgreens spoke to a Lehman Brothers analyst at the beginning of the Class Period and made false statements concerning generic drug reimbursements.  The analyst report indicates that other retail drug stores were concerned about a decline in reimbursements from third-party payers for generics that were reaching a certain point in their life-cycle, including simvastatin – the largest generic launched during the past few years.  Alleviating that concern, Walgreens told the analyst that:

- generics were positive for its business;

- there were no meaningful changes in reimbursement;

- it negotiates with third-party payers for what it considers acceptable gross profit dollar per script; and

- it was happy with its negotiations.

Given the disclosures at the end of the Class Period, these statements were clearly false and misleading.  Thus, adding these false and misleading statements to the Complaint, Plaintiffs complete the puzzle of pleading a viable securities fraud claims.

Defendants, of course, continue to hide behind Walgreens' so-called policy not to provide guidance to the public and only discuss historical financials.  It is clear, however, that Walgreens' defense is a sham and merely an attempt to subvert the securities laws.  As alleged in the Complaint, a number of analysts have confirmed having discussions with Walgreens.  Lehman Brothers analyst

Meredith Adler explained that "[t]he company does not hold a conference call when it announces earnings, but will take individual calls throughout the day." ¶33.[1]

Walgreens uses its "policy" as a shield by claiming that it did not make any false and misleading statements.  Because Walgreens did not issue any press releases or speak on any conference calls concerning these allegations, Defendants feel that they can pretend they did nothing wrong and use their "no guidance" policy to protect them.  Defendants, however, also use securities analysts as a sword to get the information they want the public to know about into the market.  In this case, Walgreens used Lehman Brothers to improperly mislead the public into thinking that Walgreens' generic drugs reimbursement was not a concern.  Walgreens cannot have it both ways.  This Court should not permit Walgreens to violate the Securities Laws by issuing its false and misleading statements through securities analysts.

Plaintiffs' Complaint properly pleads a claim under §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, promulgated thereunder. 17 C.F.R. §240.10b-5.  The prior Complaint sufficiently alleged all elements of Rule 10b-5 other than misstatements.  Plaintiffs' current Complaint alleges misstatements and further supports the allegations that the Court found were likely sufficient to satisfy materiality, scienter and loss causation.

## II.    FACTS

Walgreens is a retail drug store chain that sells prescription and non-prescription drugs and general merchandise.  ¶2.  Prescription sales are the most important part of Walgreens' business.  ¶20.  In 2007, prescriptions accounted for 65% of sales, with generic drug reimbursement sales making up 94.8% of total prescription sales. ¶21.  Generic prescription drugs are the main driver in

---

[1]       All ¶__ or ¶¶__-__ references are to the Complaint unless otherwise noted.

Walgreens' business revenue because such drugs instantly yield a heftier profit margin than sales of branded drugs. ¶22. Most generic drugs move from their sweet spot (generally six months after generic introduction) to maximum allowable cost ("MAC") pricing where there is an upper limit set on the reimbursement amount. ¶24.

Going into 2007, Defendants knew that the reimbursement levels for certain generic drugs, including the Company's blockbuster drug simvastatin, would be lower because those drugs had reached the generic MAC. ¶¶25, 55-56, 65. In the case of simvastatin, Defendants knew in January 2007 that the gross profit on a script would be cut by 50%, from about $50 to $25 per script. *Id*. Despite this knowledge, in early 2007, Defendants concealed the negative impact lower generic reimbursements would have until the Company announced its 4Q07 earnings – Walgreens' first earnings miss, the first in more than 10 years. ¶¶25, 48-49, 52.

Throughout the Class Period, Defendants also concealed that the Company's gross profits would be lower, because Walgreens was systematically increasing SO&A expenses. Defendants knew that such expenses were increasing because they had access to the information contained in the Company's Strategic Inventory Management System ("SIMS"). The SIMS provided real-time information such that Defendants could monitor revenue and expenses on a weekly basis, if not more frequently. ¶14. Significantly, Rein admitted that he "obviously look[ed] at the numbers every single week." ¶60. Analysts covering Walgreens also confirmed that Defendants had information showing increased spending but did nothing about it – "Walgreens has up-to-date information on gross profit and SG&A spending through the quarter, but the company simply did not react to developments. Management acknowledged that 'flashing red lights are not good if you don't act on them.'" ¶59.

Armed with the knowledge that: (1) lower reimbursement rates would impact gross profit during the Class Period (¶¶23-25, 48-49, 56-57, 65-66, 70-71), and (2) SO&A expenses were ever

- 4 -

increasing during that same time period (¶¶14, 48-49, 54, 58-60, 73-78), Defendants did nothing to

inform the public of these two negative factors which would hurt the Company's bottom line.

Walgreens' press release announcing the Company's 3Q07 earning results, the pre-recorded webcam

recording of 3Q07 results, and the monthly sales reports for June, July and August 2007 (¶¶36, 38,

42-44) omitted any mention of the two adverse trends Defendants knew would affect the Company's

net income.

Significantly, after Walgreens' June 25, 2007 3Q07 earnings announcement, on June 26,

2007, Lehman Brothers published a report disclosing what was discussed in a private conversation

with the Company regarding its earnings announcement.  The report, in pertinent part, attributed the

following to the Company:

> The company continues to reiterate that generics are very positive for its business
> and that there are no meaningful changes in reimbursement from third-party
> payers . . . .  WAG says that it negotiates with payers for what it considers an
> acceptable gross profit dollar per script, looked at as an average of all the scripts it
> fills for a particular plan.  The company says it remains happy with the outcome of
> those negotiations.

¶¶34, 40.

Based on the information that Defendants did disclose, the market could only conclude that

Walgreens was going to have another solid quarter.  Anticipating strong 4Q earnings, analysts

reported an EPS consensus of $0.47.  ¶45.  Walgreens' October 1, 2007 press release reporting fiscal

4Q07 and FY07 financial results took the market by surprise.  The 4Q07 results showed a substantial

decline in earnings, as the Company's EPS of $0.40 was dramatically below the street consensus.

¶48.  On that day, Defendants finally disclosed what they knew all along – blaming lower generic

reimbursements and SO&A expenses as the reasons for the miss.  *Id*.  Rein specifically stated: "This

quarter was negatively impacted by lower generic drug reimbursements, combined with higher

salary and store expenses, and higher advertising costs."  *Id*.  By then it was much too late for

stockholders, as Walgreens' stock collapsed 15% on one day from $47.24 per share to $40.16 per share, on extremely high trading volume of 67.4 million shares.  ¶50.

## III.   ARGUMENT

### A.   Motion to Dismiss Standards

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), the court "must assume the truth of the facts alleged in the pleadings, construe the allegations liberally, and view them in the light most favorable to the plaintiff." *Greater Pa. Carpenters Pension Fund v. Whitehall Jewellers, Inc.*, No. 04 C 1107, 2005 U.S. Dist. LEXIS 12971, at *7 (N.D. Ill. June 30, 2005); *see Centers v. Centennial Mortgage, Inc.*, 398 F.3d 930, 933 (7th Cir. 2005); *see also Doherty v. City of Chicago*, 75 F.3d 318, 322 (7th Cir. 1996).  The purpose of a motion to dismiss is "to test the legal sufficiency of a complaint, not the merits of the case." *Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937, 944 (N.D. Ill. 2003) (citing *Triad Assocs. v. Chicago Hous. Auth.*, 892 F.2d 583, 586 (7th Cir. 1989)).  As the United States Supreme Court has cautioned, "when a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007).  In fact, Defendants must exceed a high threshold to succeed in obtaining dismissal of Plaintiffs' claims: "A party moving to dismiss bears a weighty burden: it must show that the pleadings themselves fail to provide a basis for any claim for relief under any set of facts." *In re Guidant Corp. Sec. Litig.*, No. 1:03-CV-0892-SEB-WTL, 2004 U.S. Dist. LEXIS 22809, at *20 (S.D. Ind. Nov. 8, 2004) (citing *Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.*, 805 F.2d 732, 733 (7th Cir. 1986)).

**B.     The Complaint States a Claim Under §10(b) of the Securities Exchange Act, and Rule 10b-5 Promulgated Thereunder**

**1.     Section 10(b) Legal Standards**

The United States Supreme Court "has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions . . . ." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, , 551 U.S. 308, 313 (2007).   Under §10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, it is unlawful for any person, directly or indirectly, to commit fraud in connection with the purchase or sale of securities.  15 U.S.C. §78j(b); 17 C.F.R. §240.10b–5.  To allege securities fraud under Rule 10b-5, a plaintiff must show: (1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) on which plaintiff relied; and (5) that proximately caused his injury.  *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006) ("*Makor I*"), vacated on other grounds, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ("*Tellabs*").  As set forth below, Plaintiffs have adequately pled a securities fraud violation.

**2.     Defendants Knowingly Made False and Misleading Statements During the Class Period**

The Court's Order pointed out that the one real deficiency in Plaintiffs' Complaint was that it "failed to allege a basis by which Defendants could have any legal duty to disclose the drop in revenue from simvastatin and the increase in SO&A expenses prior to the time it did." Order at 3-4. Plaintiffs' Complaint cures that deficiency.  Plaintiffs allege that during the Class Period Defendants made false and misleading statements and omitted material information concerning the reimbursements Walgreens was receiving from third-party payers and the gross profits Walgreens would make from sales of certain generic drugs.  ¶¶25, 36-40, 42-44, 55, 70-71.  The Complaint also sufficiently alleges that Defendants failed to inform the public that Walgreens' SO&A expenses

were increasing and would impact their business, as Defendants ultimately revealed at the close of the Class Period.  ¶¶36-40, 42-44, 66, 73-78.

Despite having a policy of not providing guidance to investors, there is no doubt Walgreens did provide information to the market in the form of private conversations with analysts who disseminated the information Walgreens provided to the public through analyst reports.  Indeed, Walgreens disseminated misleading statements through analysts during the Class Period.  ¶¶34, 40. In doing so, Defendants were obligated to speak the entire truth and insure that investors were not misled.  *See In re Westell Techs., Inc. Sec. Litig.*, No. 00 C 6735, 2001 U.S. Dist. LEXIS 17867, at *23 (N.D. Ill. Oct. 26, 2001) ("'The disclosure required by the Securities Laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers.'") (citation omitted).

On June 26, 2007, through a Lehman Brothers analyst report, Walgreens made the following false and misleading statements concerning generic drugs:

- The Company continues to reiterate that generics are very positive for its business and that there are no meaningful changes in reimbursement from third-party payers – either in the timing of reimbursement changes or the level of those changes. ¶¶ 34, 40.

- WAG says that it negotiates with payers for what it considers an acceptable gross profit dollar per script, looked at as an average of all the scripts it fills for a particular plan.  The company says it remains happy with the outcome of those negotiations.

*Id*.

The Company made these false and misleading statements in response to market concern that certain generic drugs, such as simvastatin, had already went to MAC pricing.  The June 26, 2007 Lehman Brothers analyst report noted that there were questions about generic reimbursement because generic Zocor (simvastatin), the largest generic launched during the past few years, went to MAC pricing very quickly.  ¶40.  Despite knowing that simvastatin went to MAC in January 2007,

- 8 -

and that the gross profit on a script was cut by 50%, Walgreens told the market through the Lehman analyst that it had negotiated the gross profit for each prescription drug with third party payers and was "happy" with its gross profits from generic drugs.  ¶¶40, 70.  Because the gross profit for simvastatin had already been negotiated, Defendants knew, or were reckless in not knowing, that the gross profits the Company would receive from sales of simvastatin was going to decline significantly.  As the Company acknowledged in its October 1, 2007 release, Walgreens would have to sell three times the amount of simvastatin to equal the same amount of gross profit it received from the drug in 4Q06.  ¶48.  Therefore, Walgreens' June 26, 2007 statements concerning generic drug reimbursements were false and misleading.

Significantly, when Walgreens elected to speak to analysts about reimbursements from third–party payers for generic prescription drugs, it was obligated to speak the full truth, including informing the market that the gross profit on a script of the drug was cut in half and would impact its business.  *See In re NeoPharm, Inc. Sec. Litig.*, No. 02 C 2976, 2003 U.S. Dist. LEXIS 1862, at *41 (N.D. Ill. Feb. 7, 2003) ("[I]f defendants were aware of the problems with LEP and failed to disclose them when discussing LEP, a reasonable trier of fact may find that the statements were misleading.").  By Defendants' own admission, they knew exactly how much Walgreens would receive in gross profit per script of simvastatin.  ¶¶25, 40, 55-56, 70.  Thus, because simvastatin was such a significant piece of its generic drug business, Defendants had a duty to disclose the negative impact simvastatin reimbursements was having on Walgreens business during their private discussions with the Lehman analyst, and not at the end of the Class Period when the Company's stock crashed partly because of Defendants' disclosure of the issues related to simvastatin.  *See Westell,* No. 00 C 6735, 2001 U.S. Dist. LEXIS 17867, at *26 ("[I]f SBC was the centerpiece of Westell's prosperity and Westell's top managers knew that sales to SBC would certainly drop

- 9 -

precipitously, then the court finds it reasonable to infer that the optimism Defendants focused on SBC before August 2 was misleading.").

Defendants' Class Period statements were false and misleading also because they failed to tell the entire story surrounding Walgreens' increased SO&A expenses. ¶¶25, 36-40, 42-44, 73. The financial statements Walgreens released throughout the Class Period (¶¶36, 42-44) were misleading because they did not indicate the decrease in gross margins Walgreens was experiencing. ¶¶44, 61, 66, 68-69. Moreover, as Defendants acknowledged at the end of the Class Period, the SO&A expenses were directly linked to generic drug reimbursements and gross profits. ¶¶48, 77. As such, Defendants lofty statements concerning generic drug reimbursements also misled the public on the SO&A expenses related to generic drugs. ¶¶34, 40, 48, 77.

### 3. Defendants Are Liable for False and Misleading Statements Made Through Analysts

Defendants argue they cannot be held liable for the false statements the Company communicated to a Lehman Brothers analyst on a private conference call, which were reiterated in a June 26, 2006 Lehman Brothers analyst report, because the statements were not disseminated to the public directly from the Company.  The fact that the false statements were communicated to the market via an analyst report, however, does not render these statements inactionable.  To the contrary, it is well-established that Defendants cannot escape liability by filtering their false statements through the eyes and ears of analysts.  *See Warshaw v. Xoma*, 74 F.3d 955 (9th Cir. 1996).  In *Xoma*, plaintiffs alleged – as Plaintiffs here allege – that the defendant "intentionally used [] third part[y] [analysts] to disseminate false information to the investing public."  *Id.* at 959. Accepting Plaintiffs' allegations as true for purposes of a Rule 12(b)(6) motion to dismiss, the court held the company "cannot escape liability simply because it carried out its alleged fraud through the

- 10 -

public statements of third parties." *Id.* The third party statements, therefore, were actionable against the company. *Id.*[2]

Here, Walgreens' pattern and practice of holding only pre-recorded earnings conference calls and not issuing guidance in company press releases and, instead, hosting private conference calls with analysts with the expectation that the analysts would reiterate the Company's false statements to the market (¶33) is analogous to the defendants' conduct in *Xoma. Id.* Like defendants in *Xoma*, Walgreens "cannot escape liability simply because it carried out its alleged fraud through the public statements of [Lehman]." *Id.* Walgreens is liable for deliberately hosting private calls with analysts and communicating false statements to those analysts to be repeated to the investing public.[3]

---

[2]    Indeed, several other Circuits hold that where a defendant uses analysts and other third parties as a conduit for their false statements, such statements are actionable against the defendant. *See, e.g., Cooper v. Pickett*, 137 F.3d 616, 624, 629 (9th Cir. 1997) ("corporate defendants may be directly liable under 10b-5 for providing false or misleading information to third-party securities analysts . . . with the intent that the analysts communicate those statements to the market"); *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 743 (8th Cir. 2002) ("The investors could also allege that the defendants used the analysts as a conduit, making false and misleading statements to securities analysts with the intent that the analysts communicate those statements to the market."); *Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 373 (5th Cir. 2004) (same).

[3]    Walgreens cites two cases to escape liability but neither of them deal with the situation here and in *Xoma*, where the Company deliberately issued false statements to an analyst on a private conference call with the intent that they be later reiterated to the market. For example, *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 288 (4th Cir. 1993), a case relied upon by Walgreens, stands for the unremarkable proposition that a company has no duty to "police statements made by third parties for inaccuracies." In that case, the analyst report in question stated only that the defendant company "has indicated" that revenue would increase going forward, not that the analyst had spoken to anyone at the company about increased revenue. *Id.* Here, however, the complaint specifically alleges Walgreens' practice of hosting private investor calls with analysts, which were then followed by published analyst reports – including the Lehman analyst report – specifically quoting statements from the Company. ¶¶33-34, 70 (Lehman report stating that "[t]he company [Walgreens] says" that they are pleased with their generic drug performance). Similarly, in *In re Northern Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446 (S.D.N.Y. 2000), another case relied upon by Walgreens, the defendant, who followed a no-guidance policy, was not liable for projections in an analyst report where there was "**no allegation** . . . that [defendant] participated in or endorsed analysts' positive projections." *Id.* at 458 (emphasis added). Here, the opposite is true. The Complaint alleges that Walgreens actively used the Lehman analyst report as a conduit through which to communicate their false statements regarding Simvastatin to the market. ¶¶33-34, 70.

- 11 -

Similarly, the court in *Neopharm* stated that where analyst reports cite false statements and "defendants provided the basis for the information," the defendant company may be liable for the statements contained in those analyst reports. 2003 U.S. Dist. LEXIS 1862, at *37 (citing *Westell*, 2001 U.S. Dist. LEXIS 17867, at *7 (noting that stock analyst's report expressly cited conversations with "the Company's Management"). The court in *Neopharm* found defendants liable for an analyst report that "specifically mentions discussions with senior management." *Id.* at *41 n.4. Similarly, here, the Lehman report *on its face* reflects conversations with Walgreens. *See* ¶70 (the Lehman report states: "***WAG says . . . .***" "***[t]he company says . . . .***" and "***[t]he company continues to reiterate*** . . . !" positive information concerning its generic drug reimbursements, which included the reimbursements for Simvastatin). These statements are actionable against Walgreens for the same reason the *Neopharm* court stated that where analyst reports cite discussions with "the Company's management," the defendant company may be liable for the statements contained in those analyst reports. 2003 U.S. Dist. LEXIS 1862, at *36-37. The Complaint alleges that Lehman issued an analyst report after speaking to Walgreens on a private conference call to discuss quarterly earnings – as was the usual practice – attributing Walgreens' false statements concerning Simvastatin to the Company. *See* ¶70 (noting that "***WAG says . . . .***" "***[t]he company says . . . .***" and "***[t]he company continues to reiterate*** . . . ." positive information concerning Simvastatin). Walgreens is, therefore, liable for the false statements communicated via the Lehman report.

Moreover, as *Westell* instructs, a defendant can be held liable for a false statement issued by an analyst if the defendant "put their imprimatur, express or implied," on the false statement and "'sufficiently entangled himself with the analysts' forecasts'" 2001 U.S. Dist. LEXIS 17867, at *30 (citing *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 934 (9th Cir. 1996). In *Westell*, plaintiffs alleged that an unidentified company representative spoke to an analyst and confirmed that projected earnings were still in line with what had previously been reported. *Id.* at *22 (attributing false

- 12 -

statement to "the Company").  Though the individual was not specifically identified, the court found

that plaintiffs "sufficiently pled who made the alleged misrepresentations," particularly because "an

analyst's source is not someone that a plaintiff could typically identify with particularity."  *Id.* at *32

(citing *In re Newell Rubbermaid Inc. Sec. Litig.*, No. 99 C 6853, 2000 WL 1705279, at *14 (N.D. Ill.

Nov. 14, 2000) ("[I]t is well established in this Circuit that a party may be excused from Rule 9(b)'s

requirement of pleading with particularity if the information that he is required to plead rests

exclusively within the defendants' control or is otherwise unavailable to him.")).  The court

explained, "it is plain enough here that the statements to analysts that were not publicly attributed are

not likely to be available to plaintiff without discovery."  *Id.* at 33.[4]  Though, at present, the false

statements in the Lehman report are attributed to Walgreens generally, absent discovery the

Complaint "sufficiently [pleads] who made the alleged misrepresentations," particularly because "an

analyst's source is not someone that a plaintiff could typically identify with particularity."  *Westell*,

2001 U.S. Dist. LEXIS 17867, at *30.

Finally, Walgreens undoubtedly "put their imprimatur, express or implied," on the false

statements contained in the Lehman report.  *Id*.  The Complaint specifically alleges Walgreens'

"history of not providing the market with guidance" and "not discuss[ing] future quarter

expectations" in favor of "tak[ing] calls with equity analysts individually, knowing that the analysts

---

[4]      Ignoring this on point precedent, Defendants instead cite to out-of-Circuit case law on the
entanglement theory.  *See* Memorandum in Support of Defendants' Motion to Dismiss Second Amended
Complaint ("Defs.' Mot.") at 18-19 (citing *In re Alamosa Holdings, Inc. Sec. Litig.*, 382 F. Supp. 2d 832
(N.D. Tex. 2005) and *Navarre*, 299 F.3d at 743.  In *Alamosa*, plaintiffs wholly failed to identify any particular
statement by any analyst that any defendant made, let alone show why such a statement was false.  *Id.* at 855.
In *Navarre*, plaintiffs cited to a CNN news program transcript that contained a bare statement that "the
company has publicly admitted" that it would complete a lucrative initial public offering ("IPO") by the end
of the year.  299 F.3d at 739.  Notably, the analyst report at issue in that case did not indicate any analyst
spoke to a company representative about the alleged fraudulent IPO timeline.  Here, as in *Xoma*, Plaintiffs
have alleged Walgreens' specific plan to host private analyst conference calls in order to filter false
information to the market via those analysts.  ¶¶33-35, 70.

- 13 -

would disseminate the information to the market." ¶33.  To that end, on June 26, 2006 – one day

after 3Q07 earnings were announced – Lehman issued an analyst report after speaking to Walgreens

containing false statements from a Company representative.  ¶¶34, 70.  Walgreens exploited this

private conversation with Lehman in order to circulate false, positive information to the market.

¶35.

### 4. The Information in the Lehman Brothers Report Was Not Limited to 3Q07 Financial Results

According to Defendants, the information disclosed in the Lehman Brothers report about

generics was "historical, well known, and accurate."  Defs.' Mot. at 18.  As such, Defendants

attempt to convince the Court that the analyst report only "discusses Walgreens' 3Q07 historical

actual results."  *Id.*  Defendants are wrong.  While the report indeed discussed Walgreens' 3Q07

results, the alleged false and misleading statements attributed to Walgreens concerned the status of

Walgreens' reimbursements for generic drugs at that time and going forward.  Defendants cannot

argue otherwise.  Once Walgreens negotiated the reimbursement amount for its generic drugs and

the Company was satisfied with those rates as of the first part of 4Q07, there is no reason to believe

that those rates would change throughout the remainder of 4Q07.  Additionally, although the report

addresses 3Q07 results, the fact of the matter is that the report was published during Walgreens'

4Q07 and the false statements attributable to Walgreens are in the present tense.  At that time, the

first month in Walgreens' fiscal 4Q07, the Company stated that generics were very positive for its

business and that there were no meaningful changes in reimbursement from third party payers.  ¶¶34,

40, 70.

The section of the analyst report where various statements are attributed to Walgreens, if

taken in context, does not address 3Q07 results.  Instead, that section containing the alleged

misleading statements addresses concerns at that time, the first month of 4Q07, that other retailers

- 14 -

were having with generic reimbursements. Defs.' Mot. Ex 1 at 2. ("Other retailers have commented specifically on pressures related to generic reimbursement, particularly in the timing that generics move to the fixed price list called MAC (maximal allowable cost) from a reimbursement methodology tied to average wholesale price."). Significantly, the Company's response was directly related to the fact that there were questions that "(simvastatin), the largest generic launched during the past few years, went to MAC pricing very quickly." *Id*. In response to this market concern, Walgreens downplayed any impact that simvastatin went to MAC pricing very quickly by informing the public that "it negotiates with payers for what it considers an acceptable gross profit dollar per script," (*id*.) and the "company . . . remain[ed] happy with the outcome of those negotiations." *Id*. at 3.

Also, a plain reading of the June 26, 2007 report clearly shows the report was not limited to an analysis of Walgreens' 3Q07 financial results, as Defendants want the Court to believe. Throughout the report the analyst discusses Walgreens' future expectations, even providing 4Q07 financial expectations. *Id*. at 1. The report also attributes other statements to Walgreens that are not related to 3Q07 financial events. *Id*. at 3. ("The company indicated that it continues to experience inflation in branded pharmaceuticals, while the rapid increase in penetration and attractive costs in some drugs led to higher-than-expected deflation." "WAG reiterated its stance that it will not borrow to buy back stock and that its priority for free cash is to invest in its business either directly or through acquisitions, including the purchase of some real estate for its stores."). In short, a plain review of the analyst report contradicts Defendants' argument that the statements in the report were all in the context of 3Q07 financials.

- 15 -

**5.    Defendants Explanation that the Market Already Knew the False and Misleading Information Disclosed in the Lehman Report Is Inaccurate**

Defendants argue that information concerning generic drug lifecycles was publicly available and they had no duty to disclose that information. Defs.' Mot. at 14-16.  According to Defendants, the FDA announces the availability of generic drugs on a quarterly basis and the generic lifestyle is the product of federal statute.  *Id*. at 14.  Thus, Defendants argue that they had no duty to disclose information regarding the generic drug lifecycle and reimbursement rates because the investing public was already well aware of this information.  *Id*. at 14-15.  Defendants' argument is meritless.  If the information was so well known to the investing public, then there would not have been such market concern regarding MAC pricing of simvastatin, as discussed in the June 26, 2007 Lehman report.  ¶¶34, 40.  Indeed, the analyst report indicated that the cycle of generics and reimbursement rates is not as predictable as Defendants make it appear in their motion.  Moreover, even if the market generally knew about generic drug lifecycles, the dramatic decrease that Walgreens received from third-party payer reimbursements for simvastatin was not known.  In fact the 50% decrease in reimbursements from third-party payers was not revealed until the end of the Class Period, when it was far too late.  ¶¶25, 48, 50-51, 56-57.

Defendants may not have had a duty to speak about the reimbursement rate of Walgreens' generic drugs, but once they spoke through the June 26, 2007 Lehman report, they certainly had a duty to speak the entire truth.  *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995) ("If one speaks, he must speak the whole truth.")  Instead, Walgreens told investors that it was "happy" with the reimbursement rates it negotiated, without explaining that its business was being significantly impacted by the lower reimbursement rates it was receiving for its largest generic drug.  ¶¶34, 40, 61, 66, 70.

- 16 -

Defendants also disingenuously claim that the analyst reports Plaintiffs relied upon confirm that simvastatin went to MAC pricing in January 2007 and its reimbursement fell from $50 per script to $25. Defs.' Mot. at 15. What Defendants simply ignore, however, is that the William Blair analyst report which contained this information, was issued after the end of the Class Period. ¶25. Walgreens management told William Blair that the reason 4Q07 results missed expectations was because gross profits for simvastatin fell in half. This, however, was over three months after Walgreens misled the public by stating it was "happy" with its generic reimbursement rate negotiations. ¶¶34, 40, 70.

### 6.   The Market Was Not Already Aware of the Significance in the Increase of SO&A Expenses

Similarly, Defendants argue that they had no duty to disclose the extraordinary rise in SO&A expenses because the market already knew they were increasing prior to 4Q07. While the market may have understood SO&A expenses were rising at a gradual rate, it certainly did not expect the rise in expenses that were disclosed at the end of the Class Period.[5] Indeed, if the rise in expenses was expected, then the Company likely would not have announced that the rise in expenses negatively impacted the quarter. ¶48. In fact, Walgreens' 4Q07 press release and pre-recorded audio webcast announced that the rise in SO&A expenses was 15.3%, which is certainly a material increase. *See Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 759 (7th Cir. 2007) ("securities lawyers often use a 5% change as a rule-of-thumb approach to what is 'material'"). Walgreens' admission that they ignored red lights concerning the rising SO&A expenses (¶59) is also an indication that the expenses were not ordinary, as ordinary expenses do not trigger red lights.

---

[5]    If the market expected such a significant rise, then analysts earnings expectations would have been more in line with Walgreens 4Q07 results and Walgreens would not have missed those expectations by $0.06-$0.08 per share, which was its first miss in over ten years. ¶52.

Importantly, the Court's Order supports Plaintiffs' allegations that the market was taken back by the 15.3% increase in SO&A expenses.  Order at 2 (discussing the drop in simvastatin reimbursements and rise in SO&A expenses, the Court opined that "these issues were not disclosed to the public by Walgreens, and there is reason to believe, at least at this stage, that these were the dominant factors giving rise to the stock drop at the end of September, 2007.").

### 7.   Plaintiffs Have Alleged a Strong Inference of Defendants' Scienter

In addition to pleading falsity in a §10(b) case, the PSLRA requires a plaintiff to plead a "strong inference that the defendant acted with the required state of mind."  15 U.S.C. §78u-4(b)(2). Scienter is a "mental state embracing intent to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  "Scienter 'may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Westell*, 2001 U.S. Dist. LEXIS 17867, at *34 (citations omitted).  "'Reckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"  *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1255 (N.D. Ill. 1997) (citation omitted).

In *Tellabs*, 551 U.S. 308, the U.S. Supreme Court determined the standard courts should apply in interpreting the PSLRA's "strong inference" requirement:

> First, faced with a Rule 12(b)(6) motion to dismiss a §10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true. . . .

> Second, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss . . . .

- 18 -

> Third, in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences.

*Id*. at 322-23.  Considering each of these factors, the Court determined, "[a] complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and ***at least as compelling*** as any opposing inference one could draw from the facts alleged."  *Id*. at 324 (emphasis added).

Defendants' motion is not faithful to the U.S. Supreme Court's directive.  Instead of considering Plaintiffs' allegations "holistically," as required by Tellabs, Defendants' arguments depend upon isolated examination of varying categories of allegations contained in the Complaint.  This type of piecemeal analysis was expressly rejected in Tellabs.  *Id*. at 326 ("[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically.").

It is well established that senior executives, such as Rein and Wasson, are presumed to know of factors that effect a company's core operations.  *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 711 (7th Cir. 2008) ("*Makor II*") ("And at the top of its corporate pyramid sat . . . the CEO.  The 5500 and the 6500 were his company's key products.  Almost all the false statements that we quoted emanated directly from him.  Is it conceivable that he was unaware of the problems of his company's two major products and merely repeating lies fed to him by other executives of the company?  It is conceivable, yes, but it is exceedingly unlikely."); *Dardick v. Zimmerman*, 149 F. Supp. 2d 986, 988-89 (N.D. Ill. 2001) ("[I]t is highly significant that what [plaintiff] relies on is the failure of all defendants to have disclosed a deep and pervasive corporate illness . . . .  To the outsider looking in, it is surely strongly inferential that every officer or director of [the company] either had the knowledge of such deep financial difficulties or, if not, that his failure to have such knowledge equated to reckless disregard."); *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) ("Officers of a company can be assumed to know of facts 'critical to a

business's core operations or to an important transaction that would affect a company's performance.'"); *Rehm*, 954 F. Supp. at 1256 (finding a strong inference of scienter where alleged misstatements addressed an important aspect of the business).

Moreover, the scienter requirement is satisfied where, as here, the alleged facts support a strong inference that the Defendants knew or had access to information that undermined or contradicted their statements to the market. *See, e.g.*, *Lieblang v. Crown Media Holdings, Inc.*, No. 07 C 4250, 2008 U.S. Dist. LEXIS 7918, at *14 (N.D. Ill. Jan. 31, 2008) (inference of scienter supported by fact that CFO made statements that were contemporaneously contradicted by other sources); *In re Motorola Sec. Litig.*, No. 03 C 287, 2004 U.S. Dist. LEXIS 18250, at *92 (N.D. Ill. Sept. 9, 2004) (holding that defendants' "'access to information contradicting their public statements'" supports a finding that they "'knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation'") (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)).

As shown below and alleged throughout the Complaint, Plaintiffs' allegations are not only sufficiently detailed, they are supported by evidence indisputably linking Defendants to the nefarious actions Plaintiffs allege harmed Walgreens' stockholders. Tested against the Tellabs standard, Plaintiffs' allegations plead a strong inference of scienter that is cogent and at least as compelling as any competing inference Defendants have offered.

**a.** **Defendants Knew or Recklessly Disregarded the Adverse Impact of Lower Generic Drug Reimbursements and Higher SO&A Expenses**

In Walgreens' 4Q07 press release, Wasson referred to simvastatin as a blockbuster generic drug and described how it becomes more difficult to grow profit dollars once the generic drug reaches MAC:

"In the case of some blockbuster generic drugs, it's difficult to grow profit dollars after their first few months of availability," said President Greg Wasson. "As this quarter shows, pharmacy gross profit margins on some drugs can increase on a percentage basis even while the gross profit dollars they produce fall."

The company saw this play out to a significant factor in the fourth quarter. For example, Walgreens filled nearly three times as many prescriptions for simvastatin in this year's fourth quarter compared to the year-ago quarter, yet the company's gross profit dollars from the drug were virtually the same this year as they were a year ago.

¶48.

Significantly, what Defendants knew in January 2007, but did not disclose to the market until October 1, 2007, was that simvastatin and other generic drugs were at the MAC level which Defendants knew would impact gross profit during the Class Period.  ¶¶56, 65.  Moreover, as revealed in the June 26, 2007 Lehman report, Defendants knew the exact amount of reimbursement Walgreens would receive per script of simvastatin, as Walgreens acknowledged those reimbursements were already negotiated.  ¶¶34, 40.  Later, on October 2, 2007, Walgreens would reveal to William Blair what it already knew in January 2007, which was that it received only $25 per script of simvastatin instead of the $50 it was receiving:

> In conversations with management, the company cited tough year-ago gross profit dollar comparisons in the pharmacy – specifically related to last July's introduction of generic Zocor (i.e., simvastatin).  We understand that during the first six months of its availability, Walgreens was making a gross profit in the neighborhood of $50 per script (four to five times the estimated $10 to $12 for branded Zocor), largely due to a sharp drop in acquisition costs.  However, once simvastatin became a multi-source generic starting in January 2007, the implementation of maximum allowable cost (MAC) lowered the generic simvastatin gross profit contribution per script to roughly $25 per script – still healthy versus branded reimbursement but lower sequentially (as expected) relative to the first six months, where pharmacists are provided a strong incentive by payors to shift market share to the generic alternative.

¶57.

Moreover, Defendants' admissions subsequent to the Class Period support an inference of scienter for both the generic drug reimbursement and SO&A expenses allegations.  ¶¶48-49, 52-60.

- 21 -

Throughout the Class Period, Defendants had access to information illustrating gross profit and SO&A expenses.  ¶¶14, 58-60.  A November 2, 2007 William Blair analyst report indicated that management admitted having up-to-date information on both gross profits and expense.  ¶¶58-59.  The report quotes Walgreens admonishing itself and admitting that "flashing red lights are no good if you don't act on them."  ¶59.  Significantly, at a Morgan Stanley conference in November 2007, Rein acknowledged, "[w]e obviously look at the numbers every single week." ¶60.

### b.  The Court's Prior Order Supports a Finding of Scienter

Throughout the Order dismissing Plaintiffs' prior complaint, the Court notes that Plaintiffs pled enough facts showing that Defendants had knowledge of the lower reimbursement rates and higher SO&A expenses.  According to the Court, "[p]laintiffs have made a strong showing that Defendants were aware of the issues related to simvastatin and the SO&A expenses prior to the fourth quarter of 2007."  Order at 2.  "The Court goes on to acknowledge that "even under the heightened scienter requirements imposed by the Private Securities Litigation Reform Act, Plaintiffs have likely shown that Defendants were aware that the stock price would drop when these disclosures were later made." *Id*. (citing *Higginbotham*, 495 F.3d at 756 (discussing scienter and the holding of *Tellabs*, 551 U.S. 308).

Plaintiffs' scienter allegations have actually been strengthened in the Complaint, thus the Court should not alter its opinion that Plaintiffs have made a "strong showing" of Defendants' scienter.  Plaintiffs amended the Complaint with statements from Walgreens that it actually negotiated its generic reimbursement rates; thus it knew what those rates were when the false and misleading statements were made.  As alleged in the Complaint, the June 26, 2007 Lehman analyst report stated that "WAG says that it negotiates with payers for what it considers an acceptable gross profit dollar per script . . . ." ¶40.  Given that Walgreens, through its own admission, negotiated the gross profit per script, it must have had knowledge of what those gross profits would be in the 4Q07

- 22 -

when it stated that there were no meaningful changes in reimbursement from third-party payers and it remained happy with its negotiations. ¶¶25, 40, 55-56.

Defendants argue that in order to properly plead scienter Plaintiffs must allege the information that was withheld and the facts demonstrating Defendants comprehended the significance of the withheld information. Defs.' Mot. at 22. Plaintiffs' Complaint certainly does that. As pled in the Complaint, the information withheld was the fact that the gross profits for simvastatin would be significantly decreased in the 4Q07 and have an effect on Walgreens' 4Q07 financial results. ¶¶25, 31, 44, 55-56, 61, 65-70. This information was withheld despite the fact that those numbers were already negotiated with third party payers and Walgreens said it was happy about the negotiations. The Court has already stated that Defendants must have comprehended the significance of the withheld information. Order at 2 ("Plaintiffs have likely shown that Defendants were aware that the stock price would drop when these disclosures were later made.").

### c.    Defendants' Scienter Arguments Miss the Mark

Defendants argument linking the generic reimbursement and SO&A expenses misstatements to missing Wallstreet's 4Q07 projections is misplaced. The June 26, 2007 false and misleading statements concerning generic reimbursements is not linked to Wallstreet projections. Thus, Plaintiffs do not have to show that Defendants knew that decreasing reimbursements would impact 4Q07 earnings – which Defendants likely knew, anyway. Instead, Plaintiffs must simply show that when Walgreens stated that "generics were positive for its business and that there were no meaningful changes in reimbursement from third-party payers" and it was "happy" with the outcome of its negotiations for generic reimbursements, Defendants knew or were reckless in not knowing that Walgreens would receive considerably less reimbursement for each script of simvastatin. Indeed, when Walgreens spoke positively about generic drug reimbursements on June 26, 2007 it had a duty to provide the negative information it knew at the time. *See In re Neopharm*, 2003 U.S.

- 23 -

Dist. LEXIS 1862 at *43-*44 (where plaintiff sufficiently pled scienter by alleging "strong circumstantial evidence that defendants knew the results of the Phase II testing at the beginning of the Class Period," which were negative, when it made misleading statements concerning its experimental drug).

Nonetheless, the information Defendants knew at the time did indicate that Walgreens would miss earnings forecasts. Plaintiffs allege that generic drug revenue was a significant portion of Walgreens business. ¶¶2, 22. Plaintiffs also allege that, because the reimbursement rates were already negotiated, Defendants knew the gross profit per script it would receive for any given quarter. ¶40. As such, as it was revealed at the close of the Class Period, that Defendants knew that it would have to sell nearly three times the amount of simvastatin to receive the same amount in gross profit that it received the same quarter the year prior. ¶¶48, 56. Given how highly unlikely it is to sell three times the amount of a product in the same period a year later, Defendants either knew or were reckless in not knowing that the reimbursement rates for simvastatin would have a detrimental effect on its 4Q07 results.

Any argument from Defendants suggesting the generic drug reimbursement rates and SO&A expenses were not the reasons Walgreens missed 4Q07 expectations belie Defendants own statements at the end of the 4Q07. The fact that Defendants specifically and unconditionally told the public that the 4Q07 earnings miss was attributable to lower generic reimbursements (i.e., simvastatin) and higher SO&A expenses cannot be so easily dismissed by Defendants. On three occasions, immediately following the 4Q07 earnings report, Defendants gave those same two reasons for the significant miss:

- October 1, 2007 – "This quarter was negatively impacted by lower generic drug reimbursements, combined with higher salary and store expenses, and higher advertising costs," said Chairman Jeffrey A. Rein. "Our expenses weren't in line with the level of reimbursements we were receiving. Managing both expenses and lower reimbursements on some generic drugs is my top priority. We're going to fix

- 24 -

this, and at the same time continue our aggressive growth plan. Generics such as simvastatin (the generic version of Zocor) saw a significant reduction in gross profit dollars during the fourth quarter. Retail pharmacies typically see the highest gross profit dollars in the first few months after a generic prescription drug becomes available, and simvastatin entered the market in late June 2006." ¶48.

- October 1, 2007 – "As we mentioned in our press release, this quarter experienced several factors that drove down our profits. They included lower reimbursements on some generic drugs introduced in the summer of 2006, including simvastatin, the generic version of Zocor." ¶49.

- October 2, 2007 – "In conversations with management, the company cited tough year-ago gross profit dollar comparisons in the pharmacy – specifically related to last July's introduction of generic Zocor (i.e., simvastatin)." ¶57.

It was this unequivocal disclosure on October 1, 2007, which caused Walgreens' stock to crash. Thus, Defendants cannot now attempt to convince the Court that the generic drug reimbursements and expenses had no bearing on the 4Q07 financials.

### 8. Rein's and Wasson's Insider Trading and Incentive Packages Support a Strong Inference of Scienter

"Simple greed is a powerful motivator, as proven by recent events in the marketplace." *Norfolk County Ret. Sys. v. Ustian*, No. 07 C 7014, 2009 U.S. Dist. LEXIS 65731, at *32 (N.D. Ill. July 28, 2009). This case contains forceful evidence of Defendants' motive and opportunity in the form of insider trading. Allegations of insider trading support a strong inference of scienter where, as here, Defendants Rein and Wasson sold substantial amounts of the Company's stock after the stock price had been artificially inflated by their misrepresentations to the market, but prior to the stock's decline. *Westell*, 2001 U.S. Dist. LEXIS 17867, at *34 (noting that "[a]llegations that a corporate insider delayed disclosing materially adverse information in order to sell personally-held stock at a huge profit can supply the requisite motive for a scienter allegation").

The Seventh Circuit has not expressly adopted any hard and fast rule as to what circumstances will render such trading unusual. *Id*. ("The precise form of insider trading is not statutorily defined, nor has the Seventh Circuit ruled on the issue."); *Takara Trust v. Molex Inc.*, 429

- 25 -

F. Supp. 2d 960, 978 n.10 (N.D. Ill. 2006) (noting that "with regard to stock sales as evidence of scienter, the Seventh Circuit refused to hold that one percent of a defendant's stock was per se too little"). Thus, although an insider's prior trading history is instructive in this context, it is neither indispensable nor solely determinative of the issue. Rather, a plaintiff may show that insider trading is unusual or suspicious by alleging that the trades were timed to take advantage of the company's stock price as a result of undisclosed inside information, or which suggest that the trades were coordinated among insiders in a discernable pattern. *See, e.g.*, *In re Sys. Software Assocs. Sec. Litig.*, No. 97 C 177, 2000 U.S. Dist. LEXIS 3071, at *43 (N.D. Ill. Mar. 8, 2000); *Takara*, 429 F. Supp. 2d at 981 (holding that allegations of insider trading supported an inference of scienter where the sales were timed to take place before the release of negative news, even though sales amounted to only 1.9% of the individual defendants' holdings).

Here, both Rein and Wasson collectively unloaded 31,616 shares of their personal holdings in the Company over a limited, less than a one month period of time during the Class Period (i.e., between July 20, 2007 and August 14, 2007). ¶¶11, 13, 82-83. These insider sales generated $1.4 million in proceeds in that brief timeframe. ¶80. Moreover, the dates on which those sales took place followed closely in time to Defendants' positive public statements regarding Walgreens' financial outlook – statements that caused corresponding increases in the stock price, of which the Defendants took advantage. In fact, these sales were coordinated to take place within a three and a half week period between July 20, 2007 and August 14, 2007, when the share price hovered between $45.14 and $47.50, which were among the highest share prices for Walgreens stock during for the entire year of 2007. As such, the sales were not only suspicious because they were precisely timed to capitalize on the inflated stock price resulting from Defendants' fraudulent statements to the market, but they were also unusual in light of the coordinated and surgical manner in which the sales occurred.

- 26 -

Defendants' argument that Defendants actually lost money on its trading in Walgreens stock, as implausible as it sounds, is improper.  In a Rule 12(b)(6) motion to dismiss, the Court "must assume the truth of the facts alleged in the pleadings, construe the allegations liberally, and view them in the light most favorable to the plaintiff."  *Greater Pa. Carpenters*, 2005 U.S. Dist. LEXIS 12971, at *7.

Defendants' executive compensation and bonuses, when considered in the totality of Plaintiffs' allegations, support a strong inference of scienter.  *See Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 661 (8th Cir. 2001) (noting that "the magnitude of [defendant's] compensation package," together with other factors, "provides an unusual, heightened showing of motive to commit fraud"); *In re Wellcare Mgmt. Group Sec. Litig.*, 964 F. Supp. 632, 639 (N.D.N.Y. 1997) ("[T]he Court will not disregard, as irrelevant, allegations that incentive compensation was affected by the alleged fraudulent conduct.").  Here, Defendants' fraudulent scheme permitted Rein to receive in fiscal 2007 $9.8 million total compensation, including $1.1 million salary, $6.6 million option awards, and other compensation; and permitted Wasson to continue to receive in fiscal 2007 $1.9 million total compensation, including $595,000 salary, $558,421 option awards, and other compensation.  ¶¶11, 13, 18, 32, 82-83.  Indeed, Defendants' compensation was significant and should be considered in deciding scienter.  *See Norfolk County Ret. Sys.*, 2009 U.S. Dist. LEXIS 65731, at *32 ("Although these may be modest sums in the eyes of some securities lawyers, this court does not regard such bonuses and awards to be common among corporate executives in general, or these particular sums to be insignificant.").

Moreover, the Complaint shows that Defendants were motivated to maintain the rosy outlook by any means necessary, including fraudulently misleading the Company's shareholders about Walgreens' financial health.  All of this, considered in conjunction with Rein's and Wasson's insider trading and the other allegations of scienter herein, sufficiently pleads a strong inference of scienter

- 27 -

that is much more compelling than Defendants' inference that they were simply too optimistic. *See id.* ("Personal profit, coupled with professional motives to hide internal weaknesses and paint a rosy picture of the restructuring lend weight to not only a cogent inference of scienter, but a compelling one in light of the alternative suggested by Defendants – that the misstatements and errors were due to bungling management.")  Nonetheless, as the U.S. Supreme Court has stated, "while it is true that motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference, we agree with the Seventh Circuit that the absence of a motive allegation is not fatal." *Tellabs*, 551 U.S. at 325.

### C.     The Complaint Properly Pleads Loss Causation

The Seventh Circuit has described loss causation "as a 'practical requirement' that 'ought not place unrealistic burdens on the plaintiff at the initial pleading stage.'" *Lieblang*, 2008 U.S. Dist. LEXIS 7918, at \*17 (quoting *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th Cir. 1997)).  Moreover, the Supreme Court has acknowledged that a "short and plain" statement under Fed. R. Civ. P. 8(a)(2) will suffice.  *See Ong v. Sears, Roebuck & Co.*, 459 F. Supp. 2d 729, 742 (N.D. Ill. 2006) (holding that *Dura* did not heighten the pleading standard for loss causation) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)).  A plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347.

The Court's Order indicates that Plaintiffs have adequately pled loss causation.  Order at 2. In particular, referring to the disclosure of lower generic reimbursements and higher SO&A expenses, the Court found that "there is reason to believe, at least at this stage, that these were the dominant factors giving rise to the stock drop at the end of September, 2007."  Order at 2. Defendants seem to have acknowledged the Court's finding that the generic reimbursements and SO&A disclosures at the end of the Class period caused Plaintiffs' loss, as they do not make a loss

- 28 -

causation argument. Given the proper allegations in the Complaint, the Court's prior ruling and Defendants' failure to address the issue, it seems clear that Plaintiffs have properly pled loss causation.

### D.     The Section 20(a) Claim Is Properly Pled

Plaintiffs' Exchange Act §20(a) claim, which must be pled only in accordance with Fed. R. Civ. P. 8, is properly pled. In this Circuit, §20(a) is viewed "as remedial, to be construed liberally, and '"requiring only some indirect means of discipline or influence short of actual direction to hold a 'control person' liable."'" *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 880 (7th Cir. 1992). The Complaint satisfies this standard; it alleges that the individual defendants exercised control over Walgreens, and had the power to control the conduct on which the primary violation is predicated. ¶¶155-157; *see also Harrison*, 974 F.2d at 881. Plaintiffs have adequately alleged a primary securities violation; therefore, the §20(a) claim should be sustained.

## IV.     CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss.

DATED: March 3, 2010                    Respectfully submitted,

                                        COUGHLIN STOIA GELLER
                                          RUDMAN & ROBBINS LLP
                                        X. JAY ALVAREZ
                                        RYAN A. LLORENS


                                        _____
                                               */s/ X. Jay Alvarez*
                                               X. JAY ALVAREZ

                                        655 West Broadway, Suite 1900
                                        San Diego, CA  92101
                                        Telephone:  619/231-1058
                                        619/231-7423 (fax)

                                        Lead Counsel for Plaintiffs

- 29 -

MILLER LAW LLC
MARVIN A. MILLER
LORI A. FANNING
115 S. LaSalle Street, Suite 2910
Chicago, IL  60603
Telephone:  312/332-3400
312/676-2676 (fax)

Liaison Counsel

507719_1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 3, 2010, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system which will send notification of such filing to the e-mail

addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on March 3, 2010.

*/s/ X. Jay Alvarez*
X. JAY ALVAREZ

COUGHLIN STOIA GELLER
        RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail:  jaya@csgrr.com

# Mailing Information for a Case 1:08-cv-02162

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **X. Jay Alvarez**
  jaya@csgrr.com,e_file_sd@csgrr.com

- **Lori Ann Fanning**
  LFanning@MillerLawLLC.com,MMiller@MillerLawLLC.com,JRamirez@millerlawllc.com

- **Ryan A Llorens**
  ryanl@csgrr.com

- **Marvin Alan Miller**
  Mmiller@millerlawllc.com,LFanning@millerlawllc.com,KPulido@millerlawllc.com,JRamirez@millerlawllc.com

- **Therese King Nohos**
  tnohos@dl.com,jefriedman@dl.com,mhanson@dl.com,courtalert@dl.com

- **Alan Norris Salpeter**
  asalpeter@dl.com,jefriedman@dl.com,courtalert@dl.com

- **Vincent P. Schmeltz , III**
  vschmeltz@dl.com,llucas@dl.com,jefriedman@dl.com,mhanson@dl.com,courtalert@dl.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)