# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

PLUMBERS AND STEAMFITTERS
LOCAL NO. 7 PENSION FUND,

     Plaintiff,

     v.

WALGREEN CO., JEFFREY A. REIN and
GREGORY D. WASSON,

     Defendants.

Case No. 08 CV 2162

Judge Joan B. Gottschall

Magistrate Judge Geraldine Soat Brown

## REPLY MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

Alan N. Salpeter, Esq.
Vincent P. Schmeltz III, Esq.
Therese King Nohos, Esq.
DEWEY & LEBOEUF LLP
180 North Stetson, Suite 3700
Two Prudential Plaza
Chicago, Illinois  60601-6710
Telephone:  312-794-8000
Facsimile:  312-794-8100

## TABLE OF CONTENTS

Page

INTRODUCTION ...............................................................................................................1

ARGUMENT.....................................................................................................................3

I.  PLAINTIFFS FAIL TO ALLEGE A FRAUDLENT STATEMENT WITH
    PARTICULARITY.....................................................................................................3

    A.  As With The CAC, The SAC Fails To Plead That Walgreens Had
        A Duty To Make The Disclosures At Issue. ...............................................3

        1.  Walgreens' Statements Regarding Historical Results Were
            Not Misleading....................................................................................4

        2.  The Market Knew The Generic Drug Lifecycle. ..........................4

        3.  The Market Expected Walgreens' 4Q07 Expenses To
            Increase By About 15% Over 4Q06, Which They Did. ..............5

    B.  Plaintiffs Cannot State A Claim Based On The Lehman Report............6

        1.  The Lehman Report Cannot Be Attributed To Walgreens. ........7

        2.  The Lehman Report Contains No False Or Misleading
            Statements. ...........................................................................................9

            a)  The Generic Drug Lifecycle Had Not Changed. ...........10

            b)  Walgreens Was "Happy" With Negotiations—Not Profits. ..........11

            c)  The Lehman Report Did Not Omit Material Information
                About Expenses. ....................................................................12

II.  PLAINTIFFS FAIL TO ALLEGE PLAUSIBLE FACTS THAT RAISE A
     "STRONG INFERENCE" OF SCIENTER.................................................................12

        1.  Plaintiffs Failed To Plead With Particularity That
            Walgreens Knew With Certainty That Gross Profits Would
            Decline When Lehman Published Its Report.............................13

        2.  The Individual Defendants' Stock Sales And/Or
            Compensation Packages Do Not Raise A "Cogent And
            Compelling" Inference Of Scienter. .............................................15

        3.  The Competing Inferences Against A Finding Of Scienter
            Are Infinitely More Compelling. ..................................................18

i

CONCLUSION.........................................................................................................................20

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal,*
   129 S. Ct. 1937 (2009)............................................................................3, 8

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007)....................................................................................3

*Brooks v. Ross,*
   578 F.3d 574 (7th Cir. 2009) .....................................................................3

*DiLeo v. Ernst & Young,*
   901 F.2d 624 (1990)..................................................................................15

*Dura Pharms., Inc. v. Broudo,*
   544 U.S. 336 (2005)....................................................................................8

*Fla. St. Bd. of Admin. v. Green Tree Fin. Corp.,*
   270 F.3d 645 (8th Cir. 2001) ...................................................................17

*Greer v. Advanced Equities, Inc.,*
   Case No. 08 C 4958, 2010 WL 152002 (N.D. Ill. Jan. 15, 2010)...................14

*In re Bally Total Fitness Sec. Litig.,*
   Case No. 04 C 3530, 2006 WL 3714708 (N.D. Ill. Jul. 12, 2006) ...............15

*In re Harmonic Inc. Sec. Litig.,* 163 F.Supp.2d 1079 (N.D.Cal. 2001) ..............9

*In re Neopharm, Inc. Secs. Litig.,*
   Case No. 02 C 2976, 2003 WL 262369 (N.D. Ill. Feb. 7, 2000)................8, 9

*In re Newell Rubbermaid Inc. Sec. Litig.,*
   Case No. 99 C 6853, 2000 WL 1705279 (N.D. Ill. Nov. 14, 2000) ...............8

*In re Pinnacle Systems, Inc.,*
   Case No. C00-2596 MMC, 2002 WL 31655187 (N.D. Cal. Nov. 18, 2002).................8

*In re Time Warner Inc. Sec. Litig.,*
   9 F.3d 259 (2d Cir. 1993) ...........................................................................7

*In re Westell Tech., Inc. Secs. Litig.,*
   Case No. 00 C 6735, 2001 WL 1313785 (N.D. Ill. Oct. 26, 2001) ......7, 8, 12

*Klein v. General Nutrition Cos.,*
   186 F.3d 338 (3rd Cir. 1999) ......................................................................7

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.,*
   513 F.3d 702 (7th Cir. 2008) .................................................................4, 14

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.,*
   437 F.3d 588 (7th Cir. 2007) ....................................................................10

*Novak v. Kasaks,*
   216 F.3d 300 (2d Cir. 2000) .....................................................................17

*Premier Capital Mgmt., LLC v. Cohen,*
    Case No. 02 C 5368, 2003 WL 21960357 (N.D. Ill. Aug. 15, 2003) ...........................17

*Pugh v. Tribune Co.,*
    521 F.3d 686 (7th Cir. 2008) ................................................................................15, 16

*Raab v. Gen. Physics Corp.*
    4 F.3d 286 (4th Cir. 1993) ............................................................................................9

*Roth v. OfficeMax, Inc.,*
    527 F. Supp. 2d 791 (N.D. Ill. 2007) ...........................................................................9

*Roth v. OfficeMax, Inc.,*
    Case No. 05 C 236, 2006 WL 2661009 (N.D.Ill. Sept. 13, 2006) ...............................10

*Silverman v. Motorola,,*
    Case No. 07 C 4507, 2008 WL 4360648 (N.D. Ill. Sept. 23, 2008)........................6, 10

*Southland Secs. Corp. v. Inspire Ins. Solutions, Inc.,*
    365 F.3d 353 (5th Cir. 2004) ........................................................................................7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007).......................................................................................... passim

*Wielgos v. Commonwealth Edison Co.,*
    892 F.2d 509 (7th Cir. 1989) ........................................................................................5

**Statutes**

15 U.S.C. § 78u-4(b)(1)) .....................................................................................................10

## **INTRODUCTION**

As this Court correctly noted when dismissing Plaintiffs' Corrected Amended Complaint ("CAC") with prejudice, Walgreens[1] has a "no guidance" policy, meaning it "does not make public predictions of future earnings." (Sept. 24, 2009 Order ("Order") at 3.) Thus, the Court dismissed the CAC because Plaintiffs had not pled facts suggesting that Walgreens had a "duty" to speak. (*Id.*) Plaintiffs' *fourth complaint*, the so-called Second Amended Complaint ("SAC"), does not cure that fatal defect. Furthermore, it fails for the independent reason—which the Court did not reach in ruling on the CAC—that it fails to plead a "strong inference" of scienter.

To begin, the SAC fails because it does not identify a single Walgreens' statement that is false or misleading. Instead, the SAC continues to quote the same 6 Walgreens' statements regarding historical results as the CAC, which the Court already examined when it dismissed the CAC. (Order at 3.) The Court's prior holding—that Walgreens' accurate reporting of historical results did not mislead by implying future results—applies with equal force now. (*Id.*) The mere two sentences Plaintiffs devote to this issue in their Response provide no basis for the Court to reach any other result.

Stripped of those 6 statements, the SAC rests solely on a June 26, 2007 Lehman Brothers analyst report (the "Lehman Report").[2] There can be little wonder why Plaintiffs omitted the Lehman Report from prior pleadings. For starters, the Lehman Report is not a *Walgreens' statement*, and Plaintiffs fail to plead particular facts suggesting that it can be attributed *to Walgreens*. Moreover, the Lehman Report eviscerates Plaintiffs' original theory of liability by

---

[1] Unless otherwise noted, "Walgreens" shall refer collectively to Defendants Walgreen Co., Jeffrey A. Rein, and Gregory D. Wasson. The "Company" shall refer to Walgreen Co. singularly, and the "Individual Defendants" shall refer to Rein and Wasson together.

[2] *See* Exhibit 1 to Defs.' Mem. In Supp. of Mot. To Dismiss ("Walgreens' Br.").

1

expressly disclosing that:  (i) the generic drug simvastatin had reached the lowest-level of reimbursement from third-party payers (known as "MAC pricing") well before the fourth quarter of 2007 ("4Q07") started; and (ii) Walgreens' expenses rose "rapidly" in 3Q07 and would continue to grow at a similar rate in 4Q07.  In the face of these express disclosures, Plaintiffs now assert that the market did not know the *exact extent* by which reimbursements on simvastatin would decline or expenses would increase.  But Plaintiffs plead no facts suggesting that Walgreens had a duty to disclose such minutia about its business, particularly in light of its "no guidance" policy.  Certainly, the alleged statements that "generics are very positive" and Walgreens "remains happy" with negotiations with third-party payers, which are mere corporate puffery and immaterial as a matter of law, do not give rise to such a duty.

If the Court does not dismiss the SAC solely upon Plaintiffs' failure to identify a fraudulent statement again, the SAC should be dismissed with prejudice for the independent reason that Plaintiffs still have not pleaded a strong inference of scienter.  Contrary to Plaintiffs' assertion, the Court did not reach this issue before, as it did not need to.  For example, the Court did not engage in the mandatory weighing of nonculpable explanations for Walgreens' conduct against the allegedly culpable.  Here, Plaintiffs' scienter allegations fall far short of "cogent and compelling."  Plaintiffs make the familiar allegations that the Individual Defendants were motivated by greed to commit insider trading and to retain their high-paying jobs.  But courts have held such boilerplate allegations do not give rise to a strong inference of scienter.  That is particularly true here, where each Individual Defendant maintained significant stock holdings through the putative class period that declined significantly in value; that decline erased all of Rein's alleged profits on his trades and the majority of Wasson's profits.

# ARGUMENT

Plaintiffs ignore controlling United States Supreme Court precedent when arguing that Walgreens "must show that the pleadings themselves fail to provide a basis for any claim for relief under any set of facts." (Resp. at 6.) That has not been the law for some years. The Supreme Court deemed that standard "best forgotten as an incomplete, negative gloss on an accepted pleading standard . . . ." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 563 (2007). Rather, Plaintiffs must allege "a claim to relief that is plausible on its face." *Id.* at 570. Mere "labels and conclusions" will not suffice, *id.* at 555, nor will "sketchy or implausible" allegations. *Brooks v. Ross,* 578 F.3d 574, 581 (7th Cir. 2009). Thus, the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009). This standard comports with the PSLRA's purpose of serving as a "check against abusive litigation by private parties." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 313 (2007). The SAC's implausible allegations do not come close to meeting the PSLRA's high pleading standard and, therefore, it should be dismissed with prejudice.

## I.   PLAINTIFFS FAIL TO ALLEGE A FRAUDLENT STATEMENT WITH PARTICULARITY

### A.   As With The CAC, The SAC Fails To Plead That Walgreens Had A Duty To Make The Disclosures At Issue.

As established in Walgreens' opening brief, Walgreens had no duty to make any additional disclosures regarding either the generic drug lifecycle or increasing expenses because (i) Walgreens' statements regarding historical results did not mislead by implication as to future results and (ii) the market already knew of the generic drug lifecycle and Walgreens' increasing expenses. (Walgreens' Br. at 12-17.) Plaintiffs fail to explain how the SAC overcomes these pleading hurdles and, therefore, it should be dismissed with prejudice.

1. **Walgreens' Statements Regarding Historical Results Were Not Misleading.**

The Court already has rejected Plaintiffs' theory that Walgreens can be liable for making 6 statements that accurately disclosed its historical results. (Walgreens' Br. at 12-14.) In a two-sentence response, Plaintiffs offer no basis for the Court to reverse its prior ruling. (Resp. at 10.) Thus, the Court's holding that Walgreens did not mislead the market by those 6 statements is law of the case. *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) (holding that court's prior ruling on motion to dismiss is law of the case). Therefore, unless the Court attributes the Lehman Report to Walgreens (and it should not, *see infra* at 7-9), the Court need not consider any other issues before dismissing the SAC with prejudice. (Order at 3 ("The disclosure of accurate historical results does not become misleading even if less favorable results might be predictable by the company in the future.") (internal quotation omitted).)

2. **The Market Knew The Generic Drug Lifecycle.**

Plaintiffs do not seriously dispute that the generic drug lifecycle, which is a product of federal statute, is followed by the analyst community and, therefore, was already known by the market. (*Compare* Walgreens' Br. at 14-17 to Resp. at 16.) In fact, Plaintiffs' case now hinges upon the Lehman Report, which disclosed that simvastatin was in the lowest-tiered pricing phase, known as "MAC pricing," at least as early as 3Q07. Thus, Plaintiffs no longer contend that the lower reimbursement rate on simvastatin was a secret. Instead, recognizing the gaping hole in their pleading, Plaintiffs now contend that Walgreens had a duty to tell the market the exact *extent* by which the reimbursement rate on simvastatin had declined. (Resp. at 16, 21.) But Plaintiffs themselves describe MAC pricing as the "weak spot" of the generic lifecycle. (SAC ¶ 64.) And they allege nothing to suggest that the simvastatin "weak spot" was any weaker than the market expected. To the contrary, Plaintiffs quote the Lehman Report, which

4

stated that the "level of changes" in reimbursement rates had stayed the same. (Walgreens' Br., Ex. 1, Lehman Rpt. at 2.) Thus, Plaintiffs plead no plausible facts to suggest that, even if Walgreens were responsible for the statements in the Lehman Report, the Company needed to provide the exact reimbursement rate for a single drug out of the thousands it sells.

Indeed, given the nature of Walgreens' business, Plaintiffs' argument is utterly implausible. Walgreens—America's largest pharmacy—sells not only various prescription drugs but also general merchandise of all kinds. If Walgreens had to disclose the exact reimbursement rate (or, by analogy, its wholesale cost for general merchandise) for every product it sells, its disclosures would resemble a telephone book. *See Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 518 (7th Cir. 1989) ("Issuers and underwriters must decide what information will be useful without burying investors under a blizzard of paper."). Providing the exact reimbursement rate for a single generic drug would not be "useful" where Walgreens' focus is on the reimbursement "average of all the scripts it fills for a particular plan," (Walgreens' Br., Ex. 1, Lehman Rpt. at 2), rather than the rate for any one particular drug. This is particularly true here, where Walgreens never said what the reimbursement rate was or would be on simvastatin for 4Q07. Thus, omitting the exact reimbursement rate was *per se* not misleading.[3]

### 3.   The Market Expected Walgreens' 4Q07 Expenses To Increase By About 15% Over 4Q06, Which They Did.

As set out in Walgreens' opening brief (16-17), Walgreens had no duty to disclose its increasing expenses because the market already knew of them. Plaintiffs practically concede this

---

[3] In any event, it appears that analysts were able to forecast the impact of reduced reimbursements on profits. (*See* Walgreens' Br., Ex. 10, 10/1/2007 Bear Stearns Rpt. at 3, "Waterfall Analysis For Generic Margin Contribution For Industry.") While the Bear Stearns Report post-dates 4Q07, there is no reason to believe that Bear Stearns did not perform such an analysis in prior quarters, particularly given its statement that "[w]e have discussed the margin lifecycle of [generic] drugs many times in the past." (*Id.* at 1.)

point. (Resp. at 17.) Nevertheless, in order to save the SAC, Plaintiffs now contend that Walgreens had a duty to disclose the exact *extent* by which its expenses were increasing because the market thought "expenses were rising at a gradual rate" and "certainly did not expect the rise in expenses that were disclosed." (*Id.*) The Lehman Report itself renders this claim implausible.

Indeed, the Lehman Report disclosed that, in 3Q07, "expenses continued to grow *rapidly*" at a rate of 14.7%, even exceeding forecasted growth of 14.5%. (Walgreens' Br., Ex. 1, Lehman Rpt. at 1, "Investment Conclusion," "Summary" (emphasis added).) Lehman further predicted that, in 4Q07, "*SG&A growth is likely to remain in the mid-teens.*" [4] (*Id.* at 2 (emphasis added).) Thus, Plaintiffs' argument that Walgreens' actual year-over-year increase of 15.3% was "certainly a material increase" is fallacious. (Resp. at 17.) The 15.3% year-over-year expense growth rate corresponded *exactly* with Lehman's forecast of a rate of the "mid-teens." As a matter of law then, Plaintiffs cannot claim to have been misled. *Silverman v. Motorola*, Case No. 07 C 4507, 2008 WL 4360648, *9 (N.D. Ill. Sept. 23, 2008) ("Where the facts and circumstances allegedly omitted or represented have actually been disclosed . . . there will be no liability under the securities laws." (internal quotation omitted, alteration in original)).[5]

**B.      Plaintiffs Cannot State A Claim Based On The Lehman Report.**

Plaintiffs' effort to resuscitate its case with the Lehman Report fails for two additional reasons:  (i) Plaintiffs fail to plead sufficient facts attributing the Lehman Report to Walgreens and, in any event, (ii) the Lehman Report contained no fraudulent statements.

---

[4] In addition, other analysts opined that Walgreens' actual 4Q07 performance "was not materially different from recent trends," (Walgreens' Br. at 24), a point which Plaintiffs do not address.

[5] The appropriate comparison—which Plaintiffs ignore—is how close Walgreens came to meeting the analysts' expense ratio predictions. (Walgreens' Br. at 16, 24.) Walgreens' actual expense ratio of 23.48% missed Bear Stearns' projection of 23.05% *by less than ½ of 1%.* (*Id.*)

### 1.    The Lehman Report Cannot Be Attributed To Walgreens.

Plaintiffs contend that Walgreens should be liable for the Lehman Report under either the so-called conduit theory or the entanglement theory. As Plaintiffs' own case holds, however, these theories are *exceptions* to the general rule that an issuer cannot be liable for statements made by an analyst. *See, e.g., Southland Secs. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353 (5th Cir. 2004). And Plaintiffs have not pleaded particularized facts to justify applying those exceptions to this case. *See id.* at 373 ("The plaintiff must plead *with particularity* how these exceptions apply, including *who* [at Walgreens] supplied the information to the analyst, *how* the [Lehman] analyst received the information, and *how* [Walgreens] was entangled with or manipulated the information and the analyst." (emphasis added)). Thus, the Lehman Report cannot be attributed to Walgreens.

To begin, Plaintiffs fail to plead the elementary fact of *who* spoke to the Lehman analyst. Thus, as even Plaintiffs' case holds, the SAC must be dismissed against the Individual Defendants. *See In re Westell Tech., Inc. Secs. Litig.* (*"Westell"*), 2001 WL 1313785, *9 (N.D. Ill. Oct. 26, 2001) (dismissing individual defendant where "[n]othing in the complaint . . . points to [him] as a declarant of any statement at issue."). Lacking this critical detail, they merely identify the "Company" or "WAG" as the speaker. (Resp. at 12.) But courts have rejected such vague allegations. *See In re Time Warner Inc. Sec. Litig.* (*"Time Warner"*), 9 F.3d 259, 264-65 (2d Cir. 1993) (pleading that "Time Warner" and "the company" spoke was insufficient); *Klein v. General Nutrition Cos.*, 186 F.3d 338, 345 (3rd Cir. 1999) (identifying "management" as analyst's source was not sufficiently particular). The Second Circuit reasoned that issuers should not be subject to expensive and vexatious discovery where the plaintiff could not identify the source of an analyst statement with particularity. *Time Warner*, 9 F.3d at 264-65. Recent Supreme Court precedent confirms the soundness of *Time Warner's* holding. *See Tellabs*, 551

7

U.S. at 320 (the PSLRA's substantive and procedural safeguards were designed to curb "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers") (internal quotation omitted); *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005) (the PSLRA curbs "the routine filing of lawsuits . . . with only [a] faint hope that the discovery process might lead eventually to some plausible cause of action") (internal quotation omitted, alterations in original).[6]

Thus, Plaintiffs' reliance on its string of cases is misplaced.  In *Neopharm, Westell,* and *Newell Rubbermaid*, the plaintiff arguably narrowed the speaker down to someone who had authority to speak on behalf of the issuer. *See In re Neopharm, Inc. Sec. Litig.,* Case No. 02 C 2976, 2003 WL 262369, *11 (N.D. Ill. Feb. 7, 2003) (plaintiff alleged analyst's source was "management"); *Westell,* Case No. 00 C 6735, 2001 WL 1313785 at *9 (plaintiff identified the analyst's source as the chief financial officer and/or the head of investment relations); *In re Newell Rubbermaid Inc. Sec. Litig.,* No. Case No. 99 C 6853, 2000 WL 1705279, *14 (N.D. Ill. Nov. 14, 2000) (quoting conversations with "management").  In any event, none of the cases Plaintiffs cite is consistent with recent Supreme Court precedent strictly applying the PSLRA. And, neither *Warshaw* nor *Cooper* was even decided under the PSLRA.  *See In re Pinnacle Systems, Inc.*, Case No. C00-2596 MMC, 2002 WL 31655187, *4, n.5 (N.D. Cal. Nov. 18, 2002) (noting that both cases were decided on "pre-PSLRA" standards).

Plaintiffs also plead no facts suggesting *what* Walgreens purportedly said to the Lehman analyst. Plaintiffs allege only that the Lehman Report "disclos[ed] *presumably* what it discussed with the Company on a call subsequent to Walgreens' [3Q07 earnings] announcement." (SAC

---

[6] Indeed, without identifying *who* spoke on behalf of Walgreens and that he or she had authority to do so, Plaintiffs' bare-bones allegations do not even meet the Rule 8 plausibility standard. *See Iqbal,* 129 S. Ct. at 1949 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility . . . ." (internal quotation omitted)).

8

¶ 34 (emphasis added).)   It is not even clear that the analyst asked Walgreens about the reimbursement rate for simvastatin specifically, or if the analyst just mentioned simvastatin to educate the market about the industry generally.   It is clear, however, that the PSLRA does not permit Plaintiffs to put Walgreens through the expense of discovery without pleading with particularity *what* information the analyst received from *whom* and *when*.   *See Raab v. Gen. Physics Corp.* 4 F.3d 286, 288 (4th Cir. 1993) (issuers do not face securities fraud liability where an employee's statements "could be taken out of context, incorrectly quoted, or stripped of important qualifiers" by an analyst).

Finally, Plaintiffs plead no particularized facts suggesting that Walgreens "entangled" itself with Lehman.   Instead, Plaintiffs argue that Walgreens "exploited" its alleged conversation with the Lehman analyst "in order to circulate false, positive information to the market."   (Resp. at 14.)   This allegation fails, as even Plaintiffs' case holds.   *See In re Neopharm, Inc. Sec. Litig.*, 2003 WL 262369 at *12 ("conclusional allegations that defendants provided the information [to the analyst], with no further facts, are insufficient under the heightened pleading standard.").   The entanglement theory requires a two-way flow of information.   *See, e.g.*, *In re Harmonic Inc. Sec. Litig.*, 163 F.Supp.2d 1079, 1095 (N.D.Cal. 2001) ("The complaint must allege a two-way flow of information between the analyst and the insider. . . .").   Absent such allegations, Plaintiffs cannot attribute the Lehman Report to Walgreens.

### 2.   The Lehman Report Contains No False Or Misleading Statements.

Even if Plaintiffs had pleaded particularized facts attributing the Lehman Report to Walgreens, which they have not, the SAC still would fail.   The PSLRA requires Plaintiffs to allege with particularity *why* a statement is false or misleading when made, which Plaintiffs cannot do.   *See Roth v. OfficeMax, Inc.*, 527 F. Supp. 2d 791, 796 (N.D. Ill. 2007) (Gottschall, J.)

(citing 15 U.S.C. § 78u-4(b)(1).   Here, Plaintiffs lift three sentences out of an 11-sentence paragraph:

- "The company continues to reiterate that generics are very positive for its business and that there are no meaningful changes in reimbursement from third-party payers—either in the timing of reimbursement changes or the level of those changes."

- "WAG says that it negotiates with payers for what it considers an acceptable gross profit dollar per script, looked at as an average of all the scripts it fills for a particular plan.   The company says it remains happy with the outcome of those negotiations."

(Resp. at 8.)   The statements that "generics are very positive" and Walgreens "remains happy" with negotiations are mere puffery. *See, e.g., Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597 (7th Cir. 2007), vacated on other grounds, 551 U.S. 308 (2007) (statements that "demand remains strong" and "we feel very good about robust growth" were not actionable); *Silverman*, 2008 WL 4360648 at *9 (statements that company was "upbeat" and "confident" were puffery).[7]   As a matter of law, then, "no reasonable investor could find them important to the total mix of information available."   *Id.*; *Roth v. OfficeMax, Inc.*, Case No. 05 C 236, 2006 WL 2661009, *2 (N.D. Ill. Sept. 13, 2006) (Gottschall, J.) ("If the statement amounts to vague aspiration or unspecific puffery, it is not material." (internal quotation omitted)).   As discussed below, Plaintiffs plead no particularized facts suggesting why the remaining statements misled the market either.

### a)       The Generic Drug Lifecycle Had Not Changed.

Plaintiffs claim the statement that "there are no meaningful changes in reimbursement from third-party payers" was "false and misleading," although they do not explain how.   (Resp.

---

[7] In any event, Plaintiffs actually contend that generics *were* positive for Walgreens' business.   (SAC ¶¶ 22, 65 (generics were "main driver behind the Company's increase in prescription sales" and "generic drugs were the most profitable products.")   Further, they make no allegations about Walgreens' negotiations with third party payers at all.

at 8-9.) While the allegation fails without such an explanation, the Lehman Report also renders it implausible. Lehman published its report in June, the first month of 4Q07. It disclosed that simvastatin had reached MAC pricing well before 4Q07 started or, as Plaintiffs themselves plead, in January 2007—over 6 months *before* Lehman published its report. (SAC ¶ 56.) Plaintiffs identify no reimbursement changes other than this typical progression to MAC pricing. In other words, the Lehman Report *confirmed* that there had been no meaningful changes.

      **b)**      **Walgreens Was "Happy" With Negotiations—Not Profits.**

Walgreens allegedly misled the market by stating that "it remains happy with the outcome of . . . negotiations" with third party payers without simultaneously disclosing that "gross profits" on simvastatin were going to "decline significantly." (Resp. at 9, 23.) In so arguing, Plaintiffs improperly conflate "gross profit dollar per script" with "gross profits." Indeed, overall "gross profits" for pharmaceutical sales are a function of the volume of sales (*i.e.*, number of units sold times the gross profits per unit), whereas "gross profit dollar per script" is a negotiated figure independent of volume sold. Nothing in the Lehman Report directly or impliedly suggests how many units Walgreens expected to sell. Further, while "gross profit dollar per script" declined in 4Q07 for simvastatin due to MAC pricing (as Lehman disclosed it would), overall "gross profits" did not. Plaintiffs' own allegations establish that *gross profits* from simvastatin "were virtually the same" in 4Q07 as 4Q06 because Walgreens sold three times the number of simvastatin prescriptions. (SAC ¶ 48.) Thus, given that the statement pertained to gross profit dollars per script only, Walgreens had no duty to say anything about the separate subject of overall gross profits. Indeed, Plaintiffs concede (as they must), that Walgreens provides no earnings guidance. (Resp. at 8.). In any event, Walgreens did warn that reduced reimbursements could negatively impact gross profits, which Plaintiffs do not refute. (*See* Walgreens' Br. at 15-16.) The Lehman Report stated the same thing. (Walgreens' Br., Ex. 1 at 2

11

("A slowdown in generics could lead to operating margin contraction.").) Thus, even if these two terms had the same meaning (and they do not), the market was not misled in light of these express warnings.

**c)**   **The Lehman Report Did Not Omit Material Information About Expenses.**

Plaintiffs do not contend that the Lehman Report said anything patently false about rising expenses. Instead, they argue that the report misled the market because Walgreens' "lofty statements concerning generic drug reimbursements also misled the public on the SO&A expenses related to generic drugs." (Resp. at 10.) As explained above, (*supra* at 5-6), the express disclosures in the Lehman Report regarding rapidly rising expenses renders this claim utterly implausible. *See Westell*, 2001 WL 1313785 at *8 (plaintiffs "cannot credibly claim to be misled by a company's attempt to hide negative information when that same information is publicly available via alternate channels.") (internal quotation omitted).

## II.   PLAINTIFFS FAIL TO ALLEGE PLAUSIBLE FACTS THAT RAISE A "STRONG INFERENCE" OF SCIENTER.

Plaintiffs' scienter theory heaps one implausible inference upon the next. Plaintiffs ask the Court to infer that Walgreens decided to engage in fraud to elevate its share price for the last quarter of a record-breaking year. It allegedly did so by hiding its internal projections for profits and expenses. Plaintiffs do not say what Walgreens' internal projections were or when Walgreens knew it would miss them, both fatal defects. At best, they allege that Walgreens missed *analysts'* projections by a paltry ½ *of 1%* each. (SAC ¶¶ 74-75.) The Individual Defendants allegedly masterminded this scheme in order to sell a small portion of their overall shares pursuant to stock option exercises (by which they simultaneously *purchased* the same number of shares), even though they could have sold for similar prices earlier in the year without raising suspicions of insider trading. At the end of the quarter, the Individual Defendants then

12

made multiple statements blaming the earnings miss on generics and expenses—the very information they allegedly fraudulently withheld from the market. This theory is less than implausible; it is incredible. Thus, the SAC falls far short of raising a "strong inference" of scienter, "*i.e.,* a powerful or cogent inference." *Tellabs,* 551 U.S. at 323.

As a threshold matter, however, Walgreens rejects Plaintiffs' erroneous contention that the CAC adequately pleaded scienter. (Resp. at 22 ("thus, the Court should not alter its opinion that Plaintiffs have made a 'strong showing' of Defendants' scienter.").) The CAC did not plead scienter, nor did the Court so hold. Plaintiffs twist the Court's statement that "Plaintiffs have likely shown that Defendants were aware that the stock price would drop when the[] disclosures were later made." (Order at 2.) This is not a ruling on scienter. Indeed, the Court did not even engage in the mandatory exercise of weighing competing inferences against scienter. *Tellabs,* 551 U.S. at 314 ("a court . . . must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiffs . . . but also competing inferences rationally drawn from the facts alleged.").[8]

1.    **Plaintiffs Failed To Plead With Particularity That Walgreens Knew With Certainty That Gross Profits Would Decline When Lehman Published Its Report.**

Plaintiffs' Response confirms that the SAC rests upon the alleged omission of forward-looking information only. (Resp. at 5 (Walgreens did not disclose that increased expenses and reduced profits "*would* hurt the Company's bottom line." (emphasis added).) This concession "has implications for pleading, since the 'strong inference' that must be drawn to avoid dismissal

---

[8] In any event, Plaintiffs' allegations about the generic drug lifecycle have changed markedly and, therefore, require fresh analysis. In the CAC, Plaintiffs alleged that the profit lifecycle for generic drugs "is a well established occurrence in the pharmacy business." (CAC ¶ 22.) Now, in a complete about-face, Plaintiffs argue that "the cycle of generics and reimbursement rates is *not as predictable* as Defendants make it appear in their motion." (Resp. at 16 (emphasis added).)

cannot be an inference merely of recklessness if predictions are challenged as fraudulent." *Makor Issues & Rights, Ltd.*, 513 F.3d at 705. Thus, "**actual knowledge** of falsity, **not merely indifference** to the danger that a statement is false" is required. *Id.* (internal quotation omitted, emphasis added). Plaintiffs cannot meet this standard merely by alleging that Walgreens had access to information that may have disclosed a problem. *See Greer v. Advanced Equities, Inc.*, Case No. 08 C 4958, 2010 WL 152002, *13 (N.D. Ill. Jan. 15, 20 10) ("As in *Pugh* and *Higginbotham*, however, allegations of access in and of themselves fail to sufficiently allege scienter.") (collecting Seventh Circuit authority).

Plaintiffs cite to no internal projections whatsoever demonstrating that, as of June 26, 2007, Walgreens knew with certainty that its (allegedly) decreasing profits on simvastatin and increasing expenses would materially impact overall earnings for 4Q07. Lacking such details, Plaintiffs make implausible allegations such as that Walgreens' finances were a "house of cards." (SAC ¶ 30.) But the fact of the matter is that 4Q07 capped off Walgreens' "33[rd] consecutive year of record earnings and sales." (*Id.* ¶ 48.) In fact, Walgreens' 4Q07 sales *beat* at least one analyst's predictions by over $7 million. (*Id.* ¶ 74.) These facts render Plaintiffs' conclusory allegations to the contrary implausible.

Furthermore, because the alleged omissions were projections, Plaintiffs' argument that this is like a case where corporate insiders "must have known" of critical problems and covered them up is a red herring. (*See* Resp. at 19 (arguing that the Individual Defendants "are presumed to know of factors that effect a company's core operations").) As the Seventh Circuit held in *Tellabs*, mere recklessness is insufficient to establish scienter with regard to forward-looking statements. In any event, this is not a case where material problems arose with a company's only or key product. *Cf. Makor Issues & Rights, Ltd.*, 513 F.3d at 709 (holding it "exceedingly

14

unlikely" that misstatements about "Tellabs' most important products," the "flagship" 5500 and its "heralded successor" the 6500, were the result of careless mistakes). Plaintiffs do not, and cannot, allege that Walgreens was singularly reliant on simvastatin.[9]

Finally, Plaintiffs' reliance on Walgreens' post-quarter statements does not save the SAC. Walgreens never admitted that it knew it would miss analysts' forecasts because of increasing expenses and declining profit margins. (*See, e.g., SAC ¶ 59.*) To the contrary, Rein, for example, said "we took our eye off the ball," suggesting that management did ***not*** foresee any problem. (*Id.* ¶ 60.) That Plaintiffs do not like Walgreens' performance is not a basis for a securities fraud claim. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (1990) ("Securities laws do not guarantee sound business practices and do not protect investors against reverses.").

2.    **The Individual Defendants' Stock Sales And/Or Compensation Packages Do Not Raise A "Cogent And Compelling" Inference Of Scienter.**

According to the Seventh Circuit, "because executives sell stock all the time, stock sales must generally be unusual or suspicious to constitute circumstantial evidence of scienter." *Pugh v. Tribune Co.*, 521 F.3d 686, 695 (7th Cir. 2008). Moreover, "the motive to earn bonuses and awards" is "too common among corporations and their officers to be considered evidence of scienter." *In re Bally Total Fitness Sec. Litig.*, Case No. 04 C 3530, 2006 WL 3714708, *9 (N.D. Ill. Jul. 12, 2006) (collecting authority). Thus, Plaintiffs' boilerplate allegations of fraud

---

[9] Plaintiffs argue that simvastatin "was such a significant piece of its generic drug business," but plead no facts suggesting ***what*** portion of Walgreens' business came from simvastatin. Rather, in an apparent effort to inflate the importance of generic drug sales generally, Plaintiffs misquote their own allegations. (*See* Resp. at 3 "prescriptions accounted for 65% of sales, with ***generic drug reimbursement sales making up 94.8%*** of total prescription sales." (emphasis added).) That is not what Plaintiffs alleged, however. Plaintiffs alleged that 94.8% of prescription sales came ***from third-party payer sales***, which of course encompass both branded and generic sales. (SAC ¶ 21.) In fact, the Lehman Report indicates that only 65.8% of prescription drug sales related to generics in 3Q07. Thus, one can surmise that generics represent only about 40% of Walgreens sales overall and that a single drug, simvastatin, makes up a much smaller portion of that (although, again, Plaintiffs do not say ***what*** portion).

driven by greed are not "cogent and compelling" and, therefore, do not raise a "strong inference" of scienter.

As for the Individual Defendants' stock sales, Plaintiffs must allege "facts that would allow an assessment of whether the trading during the class period was unusual or suspicious." *Pugh*, 521 F.3d at 695. Plaintiffs' mere recitation of the number of shares Rein and Wasson sold during the putative class period, (Resp. at 26), is exactly the type of argument that the Seventh Circuit has rejected:

> the complaint merely sets forth the aggregate amount of shares sold during the class period and the value of those shares. In *Higginbotham*, we stated that the failure to provide any context showing that the applicable time period was unusual undercuts a 'strong' demonstration of scienter.

*Pugh*, 521 F.3d at 695. Unable to meet this standard, Plaintiffs unpersuasively argue that the Seventh Circuit has not set a threshold for what percent of stock is deemed too little to rebut an insider trading allegation per se. (Resp. at 25-26.) This does not cure the defect.

Plaintiffs' next argument, that the *timing* of the Individual Defendants' sales was suspicious, is utterly implausible. (*See* Resp. at 26.) Plaintiffs argue that Rein and Wasson "coordinated" their trades to take advantage of the stock prices hovering "between $45.14 and $47.50." (*Id.*) But Walgreens stock traded at similar prices all year and intra-day trading reached a high of $49.10 in March.[10] Plainly, if Rein and Wasson knew *as of January* that gross profits would decline *starting in June*, they certainly would have been better off to sell in

---

[10] *See, e.g.,* http://bigcharts.marketwatch.com/historical/ for historical stock prices (last visited 3/18/2010). The Court may take judicial notice of publicly available stock prices. *Pugh,* 521 F.3d at 691 n.2 ("We may take judicial notice of documents in the public record, including publicly reported stock prices, without converting a motion to dismiss into a motion for summary judgment.").

March.  Selling in March would have yielded higher profits and avoided any suspicion of insider trading.  Thus, Plaintiffs' timing theory is neither cogent nor compelling.

Plaintiffs' argument is rendered further implausible by the fact that the Individual Defendants each retained significant holdings, which declined in value when 4Q07 results were announced.  For example, Rein, who traded pursuant to a pre-approved 10b5-1 plan, sustained a loss of over $450,000 on his remaining stock holdings.  (Walgreens' Br., Exs. 7, 9.)  When combined with the transaction cost of his trades of $629,969, he actually lost about $147,000 for the quarter.  (*Id.*)  Similarly, Wasson's gain on his trades were all but eliminated.  (*Id.*)  Rather than address this argument, Plaintiffs merely ask the Court to ignore it.  (Resp. at 27.)  But *Tellabs* requires the Court to consider "other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular . . . matters of which a court may take judicial notice," including SEC filings demonstrating the Individual Defendants' holdings.

Finally, Plaintiffs' allegations regarding Rein's and Wasson's respective compensation do not change the analysis.  *See, e.g., Premier Capital Mgmt., LLC v. Cohen,* Case No. 02 C 5368, 2003 WL 21960357, *7 (N.D. Ill. Aug. 15, 2003) (Gottschall, J.) ("a plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold") (internal quotation omitted).  Even Plaintiffs' case holds that "pleading that a defendant's compensation depends on corporate value or earnings does not, by itself, establish motive to fraudulently misrepresent corporate value or earnings." *Fla. St. Bd. of Admin. v. Green Tree Fin. Corp.,* 270 F.3d 645, 661 (8th Cir. 2001) (citing *Novak v. Kasaks,* 216 F.3d 300, 307 (2d Cir. 2000)).  The facts that established scienter in the *Florida State Board of Administration,* where (i) the executive was the highest paid executive in America and (ii) his compensation was tied

directly to the company's pre-tax earnings of which he earned a percentage, are entirely absent here.

      **3.      The Competing Inferences Against A Finding Of Scienter Are Infinitely More Compelling.**

*Tellabs* holds that "the court ***must*** take into account plausible opposing inferences. . . ." 551 U.S. at 323 (emphasis added).  Because the "strength of an inference cannot be decided in a vacuum, . . . a court must consider plausible nonculpable explanations for the defendant's conduct . . . ." *Id.* at 323-24.  Here, particularly when examined together, Plaintiffs' allegations become *less* plausible, not more, and are nowhere near as plausible as the nonculpable inferences that can be readily drawn from the SAC.

      To begin, it is utterly implausible that the Individual Defendants would purposefully wait to sell shares in the last quarter of a banner year when they allegedly ***knew*** they would have to defraud the market in that quarter.  Plainly, they would have sold earlier, such as in March, when stock prices were higher and before they had said anything allegedly false or misleading.

      Plaintiffs' inference does not become any more plausible given the Individual Defendants' alleged motive to keep their high-paying jobs.  Indeed, those two motivations are internally inconsistent:  an executive hoping to keep his job for the long term would not risk it for short term profit.  Furthermore, such an executive would not sit idly by and wait for a disastrous quarter to unfold, which would surely ***jeopardize*** his job and high compensation.  Common sense dictates that Rein and Wasson would have taken whatever corrective steps necessary to keep expenses in line with projected profit margins for 4Q07.  Particularly given the small percentage by which Walgreens missed analysts' expense and profit projections respectively, it would have taken very little to right the ship.  Instead, Plaintiffs ask the Court to infer that Walgreens purposefully steered straight into an iceberg.  Moreover, an executive who

18

had committed fraud by purposefully hiding information about increasing expenses and declining profit margins would not have pointed to those two very factors immediately after 4Q07 ended as the reasons for the so-called "earnings miss." Yet, Rein and Wasson did just that here.

The competing inferences to Plaintiffs' farfetched scenario are much more plausible. For example, Walgreens may have been counting on the introduction of new generics—such as norvasc (for high blood pressure)—to drive increased profit margins in place of simvastatin. Alternatively, Walgreens could have been counting on (i) the increased volume of sales of simvastatin to make up for the lower profit margins or (ii) increased advertising dollars driving more sales volume generally. Or Walgreens may simply have been too optimistic going into the fourth quarter of a record-breaking year. Any of these inferences is infinitely more plausible considering that (i) the Individual Defendants' retained significant share holdings through the end of 4Q07, which declined in value, (ii) Walgreens missed analysts' expense and gross profit projections by about *½ of 1%* each, and (iii) Walgreens took no steps to cover up its "fraud."

## CONCLUSION

Plaintiffs' real gripe is not that Walgreens made a material misstatement or omission. It is that Walgreens had a "no guidance" policy, which precluded it from offering predictions as to anticipated gross profits and expenses. This is not an actionable complaint. The securities laws do not require issuers to make forecasts, nor do they punish issuers for missing analysts' erroneous forecasts. Without a viable Rule 10b-5 theory, Plaintiffs cannot proceed on either of the SAC's claims. Therefore, for the reasons stated here and in Walgreens' opening brief, each of the Walgreens defendants respectfully requests that the Court dismiss the SAC with prejudice.

Dated: March 23, 2010

Respectfully Submitted,

WALGREEN CO., JEFFREY A. REIN, AND GREGORY D. WASSON

By____/s/ Alan N. Salpeter_____
        One of their attorneys

Alan N. Salpeter, Esq.
Vincent P. Schmeltz III, Esq.
Therese King Nohos, Esq.
DEWEY & LEBOEUF LLP
180 North Stetson, Suite 3700
Two Prudential Plaza
Chicago, Illinois 60601-6710
Telephone: 312-794-8000
Facsimile: 312-794-8100

20

## CERTIFICATE OF SERVICE

Alan N. Salpeter, an attorney, hereby certifies that on this **REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**, was filed electronically on March 23, 2010. Notice of this filing will be sent by electronic mail to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

By   /s/ Alan N. Salpeter
Alan N. Salpeter