# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| TEAMSTERS AFFILIATES PENSION PLAN & INTERNATIONAL BROTHERHOOD OF TEAMSTERS GENERAL FUND AND RETIREMENT AND PROTECTION PLAN, ) ) ) ) ) Plaintiffs, ) ) v. ) ) WALGREEN CO., JEFFREY A. REIN, & ) GREGORY D. WASSON, ) ) Defendants. ) | Case No. 08 C 2162<br><br>Judge Joan B. Gottschall |

## MEMORANDUM OPINION AND ORDER

Teamsters Affiliates Pension Plan and International Brotherhood of Teamsters General Fund and Retirement and Protection Plan ("plaintiffs") have brought suit against Walgreen Co. ("Walgreens"), Jeffrey A. Rein, and Gregory D. Wasson (collectively, "defendants") under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. After plaintiffs' Corrected Amended Complaint was dismissed by this court on September 24, 2009, plaintiffs filed a Second Amended Complaint ("SAC"). Defendants have moved to dismiss the current complaint with prejudice. To the extent plaintiffs rely on the same six statements the court already addressed in its September 24, 2009 order, plaintiffs' claims relating to those statements are dismissed for the reasons already provided by the court. The court now turns to the new allegations in the SAC involving the statements in the Lehman Brothers report.

## I. Background

Plaintiffs are investors in Walgreens stock. The genesis of Plaintiffs' complaint involves a stock drop occurring on or around October 1, 2007. Walgreens announced on that day its fourth

quarter earnings per share ("EPS") for 2007, and the number was lower than analysts had expected. The Walgreens stock dropped 15% after the news was announced, from $47.24 to $40.16 per share. Plaintiffs allege, and at this stage defendants do not dispute, that the lowered EPS was a result of two predictable facts. First, Walgreens was receiving substantial profits from one of its generic drugs, simvastatin, and because of the nature of the generic drug market it was predictable that the profits from simvastatin would decline in the fourth quarter of 2007.[1] Second, plaintiffs allege that Walgreens had increasing sales, occupancy and administration expenses ("SO&A") during the fourth quarter, which were predictable because of the manner in which Walgreens monitored its revenue and expenses on a weekly basis.

## II.     Legal Standards

Defendants bring their motion to dismiss for failure to state a claim under Rule 12(b)(6), arguing that plaintiffs fail to state a claim under section 10(b) of the Exchange Act and SEC Rule 10b-5, and that they fail to plead fraud with particularity under the Private Securities Litigation Reform Act ("PSLRA") and Rule 9(b). Rule 12(b)(6) permits a court to dismiss a claim where a plaintiff fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The court must accept as true the allegations of the complaint and draw all reasonable inferences in favor of plaintiff. *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007) (internal citation omitted). To survive a Rule 12(b)(6) motion, "the complaint need only contain a 'short and plain

---

[1] According to both parties, the sale of new generic drugs is typically the most profitable in the first six months after the generic drug enters the market, during which time the generic drug's price reaches a "sweet spot." SAC ¶ 24. After six months, multi-sourcing begins and competition drives down the cost of the generic and reduces third-party payer reimbursements. *Id*. at ¶ 23-24. At that stage, the generic drug moves to a maximum allowable cost ("MAC"), or the "weak spot," which represents a substantially lower reimbursement rate than that received in the first six months after a generic drug has been introduced. *Id*. at ¶ 23-25, 40.

statement of the claim showing that the pleader is entitled to relief.'" *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting Fed. R. Civ. P. 8(a)(2)). The facts in the complaint must provide the defendant with "'fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

In addition to the requirements of Rule 12(b)(6), Federal Rule of Civil Procedure 9(b) requires all allegations of fraud to be "state[d] with particularity," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." "The rule requires the plaintiff to state the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994) (internal quotations omitted); *see also DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) ("Although states of mind may be pleaded generally, the 'circumstances' must be pleaded in detail. This means the who, what, when, where, and how: the first paragraph of any newspaper story."). The PSLRA amendments to the Exchange Act raise the pleading standard in securities cases even higher. "[T]he PSLRA essentially returns the class of cases it covers to a very specific version of fact pleading – one that exceeds even the particularity requirement of Federal Rule of Civil Procedure 9(b)." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 594 (7th Cir. 2006), vacated on other grounds, 551 U.S. 308 (2007). Under the PSLRA, a securities fraud complaint must: (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is

3

formed"; and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1), (2).

"In general, to prevail on a Rule 10b-5 claim, a plaintiff must prove that the defendant: 1) made a misstatement or omission, 2) of material fact, 3) with scienter, 4) in connection with the purchase or sale of securities, 5) upon which the plaintiff relied, and 6) that reliance proximately caused the plaintiff's injury." *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1331 (7th Cir. 1995).

### III. Analysis

In the SAC, plaintiffs argue that Walgreens is liable for statements made in a June 26, 2007 Lehman Brothers analyst report. SAC ¶ 34. The report stated, "The company continues to reiterate that generics are very positive for its business and that there are no meaningful changes in reimbursement from third-party payers …. [Walgreens] says that it negotiates with payers for what it considers an acceptable gross profit dollar per script, looked at as an average of all the scripts it fills for a particular plan. The company says it remains happy with the outcome of those negotiations." *Id*. Plaintiffs argue that Walgreens used "conversations with securities analysts to artificially inflate its stock price in furtherance of the fraud," *id*. ¶ 35, and that they need not identify the name of the source of the information at Walgreens in order to meet the heightened pleading standard. Walgreens, in arguing for dismissal, maintains that any statements made in the Lehman Brothers report must be attributed to Lehman Brothers, not Walgreens. Further, Walgreens argues that Rule 9(b) requires, at a minimum, that plaintiffs identify the speaker of the allegedly fraudulent statements.

"Generally, securities issuers are not liable for statements or forecasts disseminated by securities analysts or third parties unless they have 'sufficiently entangled [themselves] with the analysts' forecasts [so as] to render those predictions 'attributable to [the issuers].'" *Southland Securities Corp. v. INSpire Ins. Solns. Inc.*, 365 F.3d 353, 373 (5th Cir. 2004) (quoting *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 163 (2d Cir. 1980)). Put another way, when investors seek to hold a corporate defendant liable for statements made by a third party in an analyst's report, the investors "must demonstrate that the statements were adopted by the defendant[] or attributable to the defendant[] in some way, such as when officials of a company 'have, by their activity, made an implied representation that the information they have reviewed is true or at least in accordance with the company's views.'" *Id*. (quoting *Elkind*, 635 F.2d at 163).

For their part, plaintiffs argue that Walgreens made false and misleading statements to a Lehman Brothers analyst, with the knowledge that the analyst would communicate those statements to the market. The Fifth Circuit, in *Southland Securities*, acknowledged this scenario when it explained, "[I]nvestors could … allege that the defendants used the analysts as a conduit, making false and misleading statements to securities analysts with the intent that the analysts communicate those statements to the market." 365 F.3d at 373. However, the Fifth Circuit made clear that,

> The plaintiff must plead with particularity how [this] exception[] appl[ies], including who supplied the information to the analyst, how the analyst received the information, and how the defendant was entangled with or manipulated the information and the analyst. Since the allegation of entanglement is central to the overall allegation of securities fraud, it must be pleaded with the required degree of specificity. The pleading should (1) identify the specific forecasts and name the insider who adopted them; (2) point to specific interactions between the insider and the analyst which allegedly gave rise to the entanglement; and (3) state the dates on which the acts which allegedly gave rise to the entanglement occurred.

5

*Id*. at 373-74 (internal citations omitted). Here, plaintiffs merely make the conclusory allegation that an unnamed individual at Walgreens provided the information to Lehman Brothers knowing the allegedly false statements would be reported. Fatally, plaintiffs failed to provide any facts which would explain necessary details, such as which Walgreens employee supplied the information to the analyst, descriptions of any meetings or conversations between the parties, and the pertinent dates. For this reason, plaintiffs' factual allegations fail to satisfy the heightened pleading standard applicable in this case.

In addition to the "conduit theory," plaintiffs seem to argue that the statements in the report attributed to Walgreens are sufficient under the "entanglement theory" as well. With respect to Walgreens' specific argument that plaintiffs' allegations fail because plaintiffs do not identify the analyst's source of information at Walgreens, plaintiffs argue that their allegations are sufficient because unattributed statements, such as the ones in the Lehman Brothers report, are sufficient to survive a motion to dismiss. The court disagrees. Plaintiffs have pointed to no case[2] in which a court held a defendant liable for statements in an analyst's report where the source of the information was not identified in some way. Here, the analyst's report states that: (1) "The company continues to reiterate;" (2) "[Walgreens] says"; and (3) "The company says." In order to meet the heightened pleading standard applicable here, and potentially find Walgreens liable for any fraudulent statements in the analyst's report, plaintiffs need to identify the speaker with more

---

[2] The primary case relied on by plaintiffs is a pre-PSLRA case, *Warshaw v. Xoma*, 74 F.3d 955 (9th Cir. 1996). The court does not dispute that *Warshaw* supports plaintiffs' argument that their "conduit theory" is viable. However, the opinion is quite limited in its discussion of the issue, other than to acknowledge that such a theory is possible. Ultimately, the Ninth Circuit directed the district court, on remand, to perform a "contextual, 'delicate assessment' of the fact presented." 74 F.3d at 959. Ultimately, *Warshaw* does not address the pertinent issue here, namely what a plaintiff actually needs to plead to survive a motion to dismiss.

specificity. *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 265 (2d Cir. 1993) (Rule 9(b) requires that the plaintiff identify the speaker of the allegedly fraudulent statements; merely stating that some unknown agents of Time Warner made misleading statements in discussions with an analyst was not sufficient to survive motion to dismiss); *In re Neopharm, Inc. Sec. Litig.*, No. 02 C 2976, 2003 WL 262369, at *14 (N.D. Ill. Feb. 7, 2003) (rejecting plaintiff's attempt to hold defendants liable for statements in analyst's report where plaintiff did not provide the identity of the source of the information or explain how the defendants otherwise "placed their imprimatur" on the statements at issue); *Fulton Cty. Employees' Retirement Sys. v. MGIC Investment Corp., et al.*, No. 8 C 458, 2010 WL 601364, at *6 (E.D. Wisc. Feb. 18, 2010) (rejecting claim against defendant based on statements in analyst report where statements were not direct quotes from defendant's CEO); *In re Westell Techs., Inc. Sec. Litig.*, No. 00 C 6735, 2001 WL 1313785, at * 6 (N.D. Ill. Oct. 26, 2001) (allowing claim where stock analyst's report expressly noted that he had discussions with "the Company's management" and with "Westell's management"). Because plaintiffs have not identified the source of the information at Walgreens, or at least narrowed it down to one of a group of people, their allegations fail to meet the heightened pleading standard applicable here.

Even if the statements in the Lehman Brothers report could be attributed to Walgreens, however, those statements are not actionable. Specifically, the report states,

> The company continues to reiterate that generics are very positive for its business and that there are no meaningful changes in reimbursement from third-party payers – either in the timing of reimbursement changes or the level of those changes. Other retailers have commented specifically on pressures related to generic reimbursement, particularly in the timing that generics move to the fixed price list called MAC (maximal allowable cost) from a reimbursement methodology tied to average wholesale price. [Walgreen's] continues to say that MAC begins when a generic starts to be supplied by multiple suppliers (known as multi-sourcing). In the past we believe that there was some lag between multi-sourcing and MAC, and this period provided incremental gross profit dollars to pharmacies. Some of the questions about

7

> generic reimbursement are coming because generic Zocor (simvastatin), the largest generic launched during the past few years, went to MAC pricing very quickly. [Walgreens] says that it negotiates with payers for what it considers an acceptable gross profit dollar per script, looked at as an average of all the scripts it fills for a particular plan. The company says it remains happy with the outcome of those negotiations.

June 26, 2007 Lehman Brothers Report, Defs.' Mot. at Ex. 1. Plaintiffs argue that based on the statements above, "the market could only conclude that Walgreens was going to have another solid quarter." Pls' Resp. at 5. Plaintiffs claim that the market was taken "by surprise" to learn that Walgreens' "4Q07 results showed a substantial drop in earnings, as the Company's [earnings per share] of $0.40 was dramatically below the street consensus." *Id*. Walgreens ultimately concluded that "lower generic drug reimbursements, combined with higher salary and store expenses, and higher advertising costs negatively impacted the quarter." SAC ¶ 48. Because this was foreseeable by Walgreens, plaintiffs argue, Walgreens knew that the statements in the report were false and/or misleading.

The court now turns to the specific statements at issue.[3] "Courts have held immaterial as a matter of law 'loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.'" *In re Midway*, 332 F. Supp. 2d 1152, 1164 (N.D. Ill. 2004) (quoting *Shaw v Digital Equip. Corp., et al.*, 82 F.3d 1194, 1217 (1st Cir. 1996)). With respect to the statements that "generics are very positive" and Walgreens "remains happy" with negotiations, those statements are mere puffery. *See, e.g.*, *Tellabs*, 437 F.3d at 597 (statements that "demand

---

[3] As a general matter, the court rejects the notion that the statements at issue indicate that Walgreens was saying that its next quarter would be "solid." The statements in the report cannot be read to give any assurances concerning Walgreens' performance later in 2007.

8

remains strong" and "we feel very good about robust growth" were not actionable); *Silverman v. Motorola, Inc.*, No. 07 C 4507, 2008 WL 4360648, at *9 (N.D. Ill. Sept. 23, 2008) (statements that company was "upbeat" and "confident" were puffery).

Next, plaintiffs point to the statement that "there are no meaningful changes in reimbursement from third-party payers – either in the timing of reimbursement changes or the level of those changes." Plaintiffs have failed to meet their burden in providing facts which explain why this statement is false or misleading. The Lehman Brothers report itself recognized that simvastatin had already gone to MAC pricing. As the court reads it, the report was merely confirming that there were no changes to the timing or level of reimbursement rates since the progression to MAC pricing in the beginning of 2007.

Finally, plaintiffs point to the statement that "[Walgreens] says that it negotiates with payers for what it considers an acceptable gross profit dollar per script, looked at as an average of all the scripts it fills for a particular plan. The company says it remains happy with the outcome of the those negotiations." After reading plaintiffs' complaint and their response multiple times, it is still unclear exactly what plaintiffs' theory is here. On the one hand, plaintiffs argue that Walgreens, and only Walgreens, knew that simvastatin went to MAC pricing in January 2007 and no one else knew that fact until Walgreen's October 1, 2007 disclosure. But this is patently untrue, as evidenced by the fact that the Lehman Brothers report itself acknowledges that, prior to June 2007, simvastatin had already reached MAC pricing. Then, directly contradicting its earlier assertion that no one in the market had knowledge that simvastatin had reached MAC pricing in early 2007, plaintiffs rely on Walgreens' statement in the Lehman Brothers report (concerning negotiations with payers) to argue that Walgreens should have disclosed the *exact* amount of its negotiated reimbursement

9

amounts, as well as the fact that reimbursement rates would lead to lower gross profits in 4Q07. This type of illogical and internally inconsistent argument cannot possibly be seen as "particular."

Ultimately, the court must decide if the statement was misleading without an accompanying statement that the reduced reimbursement rates for simvastatin would lead to lower gross profits in 4Q07. The court concludes that it is not. Plaintiffs would like the court to view the statement in a vacuum, but the court must consider the statement in the context of the report. *See Silverman*, 2008 WL 4360648, at *8 (stating that the court would read the allegedly false statements in the context of surrounding statements). The sentence immediately preceding the one at issue acknowledges that simvastatin had already gone to MAC pricing. Reading the two statements together then, Walgreens is saying the following: given that simvastatin is in MAC pricing (which the market would understand means that the drug is in its "soft spot" where reimbursement rates are at their lowest), the company is satisfied with the "gross dollar profit per script" it is receiving as a result of its negotiations with third party payers. Given this context, the court does not conclude that the statement was misleading. Despite plaintiffs' suggestion otherwise, the court does not conclude that Walgreens was under a duty to state affirmatively the precise amount of reimbursements it was receiving. Plaintiffs failed to provide the court with any authority that a company has such a duty, and the court does not conclude such disclosure was necessary to make Walgreens' statement not misleading.

Plaintiffs also argue that Walgreens' statements in the Lehman Brothers report misled the market because Walgreens' "lofty statements concerning generic drug reimbursements also misled the public on the SO&A expenses related to generic drugs." Pls' Resp. at 10. They also argue more generally that Walgreens "failed to inform the public that Walgreens' SO&A expenses were

10

increasing and would impact their business, as Defendants ultimately revealed at the close of the Class Period." *Id*. at 8. As with their earlier Corrected Amended Complaint, plaintiffs fail to explain why Walgreens had an affirmative duty to disclose this information. To the extent plaintiffs are arguing that the statements in the Lehman Brothers report are misleading because they fail to disclose the fact that the SO&A expenses were increasing, the court rejects that argument for all the reasons explained above. When read in context, the statements are not misleading.

Plaintiffs also raise a claim under Section 20(a) of the Securities and Exchange Act, 15 U.S.C. § 78t(a), against Rein and Wasson (Count II). However, to find Rein and Wasson liable under Section 20(a), the court would have to first find a violation under Section 10(b). *Id.* Because Count I is dismissed, Count II is dismissed.

## IV. Conclusion

In light of the above, defendants' motion to dismiss [70] is granted. The SAC was the plaintiffs' fourth unsuccessful attempt at crafting a complaint that would survive a motion to dismiss. Because the court concludes that amendment at this point would be futile, the court grants defendants' request that the complaint be dismissed with prejudice. *See, e.g.*, *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 852 (N.D. Ill. 2003) (dismissing complaint with prejudice where amendment would be futile).

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: September 29, 2010